UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

MHJ,

                          Plaintiff,

                                                    9:23-CV-0362

v.                                            (BKS/ML)

WELLPATH, Onondaga County Jail Medical
Provider; and JOHN S. DRAPIKOWSKI,

                        Defendants.

_____

APPEARANCES:                                   OF COUNSEL:

MHJ
  *Pro Se* Plaintiff
1258 West Belden Avenue, Apt. #1
Syracuse, New York 13204

BARCLAY DAMON, LLP                        PAUL A. SANDERS, ESQ.
  Counsel for Defendants                   AMANDA MILLER, ESQ.
2000 Five Star Bank Plaza
100 Chestnut Street
Rochester, New York 14606-2072

MIROSLAV LOVRIC, United States Magistrate Judge

## **REPORT and RECOMMENDATION**

Currently before the Court, in this civil rights action filed by MHJ ("Plaintiff") against

defendants Wellpath and John S. Drapikowski[1] (collectively "Defendants"), is Defendants'

---

[1]     Pursuant to Chief Judge Sannes's Decision and Order dated July 5, 2023, John S. Drapikowski was added as defendant "in place of Onondaga County Jail Chief Deputy John Doe." (Dkt. No. 13 at 7.) Hence, there are no remaining claims against Defendant John Doe Onondaga County Jail Chief Deputy.

motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. No. 54.) For the reasons set forth below, I recommend that Defendants' motion be granted.

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Claims

In her Decision and Order dated May 24, 2023, Chief United States District Judge Brenda K. Sannes thoroughly outlined the factual allegations contained in Plaintiff's Complaint. (Dkt. No. 9, Attach. 6 at 4-6.) Plaintiff alleges that while incarcerated at the Onondaga County Justice Center ("OCJC") he informed nursing staff of a serious medical condition that necessitates a daily prescription medication but for over thirty days Defendants failed to provide him with his necessary medication. (*Id.*) At this procedural posture, Plaintiff asserts medical indifference claims pursuant to the Eighth Amendment against Defendants. (Dkt. No. 9, Attach. 6 at 15; *see generally* Dkt. No. 1.) On July 5, 2023, Chief Judge Sannes *sua sponte* added Defendant Drapikowski as a defendant in place of Onondaga County Jail Chief Deputy John Doe for purposes of service and discovery only. (Dkt. No. 13 at 7.) Chief Judge Sannes noted that upon Plaintiff's discovery of the identity of the officials responsible for the decision not to provide him with access to his medication, he should file an amended complaint that properly names all necessary parties. (*Id.* at 8.)

### B.      Briefing on Defendants' Motion for Judgment on the Pleadings

Generally, in support of their motion for judgment on the pleadings, Defendants assert the following two arguments: (1) Plaintiff's Complaint must be dismissed against Defendant Wellpath because it fails to allege facts plausibly suggesting a *Monell* claim; and (2) Plaintiff's state law claims, if any, must be dismissed because (a) the Complaint fails to allege compliance with the General Municipal law, (b) in the alternative, the Complaint fails to plead the requisite

elements of any State law claim, and (c) in the alternative, the Court should decline to exercise supplemental jurisdiction. (*See generally* Dkt. No. 54, Attach. 4.)

More specifically, with respect to their first argument, Defendants assert that the Complaint fails to sufficiently allege deliberate indifference to support Plaintiff's claim because at most Plaintiff alleges an unintentional delay in administration of medication due to the rejection of his blood sample by the lab. (Dkt. No. 54, Attach. 4 at 9.) Defendants argue that even if Plaintiff did sufficiently allege an underlying deliberate indifference claim, the Complaint is devoid of factual allegations plausibly suggesting a formal policy, widespread practice or custom, or deliberate indifference by supervisory individuals who are alleged to have crafted any pertinent policies. (*Id*.) Defendants assert that Plaintiff's conclusory allegation that Defendant Wellpath has a widespread custom or practice of not providing incarcerated individuals with prescribed medications is insufficient and Plaintiff fails to identify any similarly situated incarcerated individuals who also did not receive their prescribed medication, amounting to a widespread deprivation. (*Id*.)

With respect to their second argument, Defendants argue that the Complaint does not assert any State law claims but that if it is liberally construed as asserting any, they should be dismissed. (*Id*. at 10-11.)

The deadline for Plaintiff to respond to Defendants' motion for judgment on the pleadings was November 20, 2025. (Dkt. No. 55.)

On December 2, 2025, Defendants filed a letter response noting that Plaintiff had not served an opposition to their motion and the deadline to do so had passed. (Dkt. No. 56.) Defendants noted that Plaintiff appears to be unreachable at the address listed on ECF and requested that the Court grant their motion on the merits. (*Id*.)

3

On December 3, 2025, the Court *sua sponte* granted Plaintiff an extension of time to December 22, 2025, to file an opposition to the pending motion. (Dkt. No. 57.) The Court cautioned Plaintiff that the "failure to file any response to the motion may result in the motion being granted since the Court will not have the benefit of Plaintiff's response to consider in making its decision." (*Id.*)

To date, Plaintiff has not filed any opposition to Defendants' motion for judgment on the pleadings. (*See generally* docket sheet.)

## II.    LEGAL STANDARD GOVERNING MOTIONS FOR JUDGMENT ON THE PLEADINGS

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard for granting a Rule 12(c) motion is identical to that of a 12(b)(6) motion to dismiss. *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the level of speculation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). So while legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or

4

incorporated into it by reference, and matters of which judicial notice may be taken.  *Goel v.*

*Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

### III.    ANALYSIS

After carefully considering the matter, I recommend that Defendants' motion for

judgment on the pleadings be granted.[2]

### A.        *Monell* Claim Against Defendant Wellpath[3]

Municipal liability is limited under Section 1983 by *Monell v. Dep't of Soc. Servs. of City*

*of New York*, 436 U.S. 658 (1978).  In *Monell*, the Supreme Court found that municipal liability

existed "where that organization's failure to train, or the policies or customs that it has

sanctioned, led to an independent constitutional violation."  *Segal v. City of New York*, 459 F.3d

207, 219 (2d Cir. 2006).  Thus, to successfully state a claim for *Monell* liability, a plaintiff must

"make factual allegations that support a plausible inference that the [alleged] constitutional

violation took place pursuant either to a formal course of action officially promulgated by the

municipality's governing authority or the act of a person with policy making authority for the

municipality."  *Missel v. Cnty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (citing *Vives v.*

*City of N.Y.*, 524 F.3d 346, 350 (2d Cir. 2008)).  "Absent such a custom, policy, or usage, a

---

[2]    Defendants' motion contained two sentences—with no legal or record citations—arguing that Plaintiff alleged at most, an unintentional delay in administration of medication and thus, failed to allege an underlying deliberate medical indifference claim. (Dkt. No. 54, Attach. 4 at 9.)  In reaching this recommendation, the undersigned does not address Defendants' secondary argument that Plaintiff failed to allege an underlying deliberate medical indifference claim. (Dkt. No. 9, Attach. 6 at 7-10).

[3]    Defendants do not raise the issue of whether Defendant Wellpath is a "state actor" under Section 1983.  As a result, the undersigned assumed, for purposes of this Report and Recommendation only, that Defendant Wellpath may be sued as a "state actor" under Section 1983, and does not discuss the issue further herein. (*See* Dkt. No. 9 at 6 n.5 ["The Court assumes, for purposes of this Decision and Order only, that Wellpath may be sued as a 'state actor' under Section 1983, and will not discuss this issue further herein."].)

municipality cannot be held liable on a respondeat superior basis for the tort of its employee." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see also Los Angeles County, Cal. v. Humphries*, 562 U.S. 29, 36 (2010) ("[I]n *Monell* the Court held that 'a municipality cannot be held liable' solely for the acts of others, e.g., 'solely because it employs a tortfeasor.'" (quoting *Monell*, 436 U.S. at 691)).

"[I]n keeping with the pleading requirements imposed by *Twombly* and *Iqbal,* a plaintiff must give a factual description of such a policy, not just bald allegations that such a thing existed." *Bess v. City of New York*, 11-CV-7604, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) (citing *Davis v. City of New York,* 07-CV-1395, 2008 WL 2511734, at *6 (S.D.N.Y. June 19, 2008)); *see also Rowles v. Doe*, 558 F. Supp. 3d 66, 71 (W.D.N.Y. Sept. 3, 2021) ("To survive a motion to dismiss, the plaintiff 'cannot merely allege the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists.'") (quoting *Triano v. Town of Harrison, N.Y.*, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012) (further quotation omitted)).

Courts in the Second Circuit have held that "[t]o state there is a policy does not make it so," and "while a plaintiff need not assert the allegations in the initial complaint with a level of specificity only made possible through discovery . . . additional facts for Plaintiff's 'official policy' *Monell* allegations are required." *Rowles*, 558 F. Supp. 3d at 72 (citing, *inter alia, Vassallo v. City of New York*, 15-CV-7125, 2016 WL 6902478, at *14 (S.D.N.Y. Nov. 22, 2016) ((internal citation omitted)); *Fleming v. City of New York*, 18-CV-4866, 2019 WL 4392522, at *8 (S.D.N.Y. Aug. 27, 2019) ("Plaintiff's conclusory allegations are . . . insufficient to allege that the *Monell* Defendants have a longstanding custom, pattern, or practice of . . . being deliberately indifferent to inmates' medical needs or physical safety.")). Simply put, "'mere allegations of a

municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details.'" *Rowles*, 558 F. Supp. 3d at 72 (quoting *Tieman v. City of Newburgh*, 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015); *Simms v. City of New York*, 10-CV-3420, 2011 WL 4543051, at *3 (E.D.N.Y. Sept. 28, 2011) (dismissing plaintiff's claim against city, which made "a scant three factual assertions, which, when read together, d[id] not amount to a plausible claim that any City policy, practice, or custom contributed to [plaintiff's] injury"), *aff'd*, 480 F. App'x 627 (2d Cir. 2012)).

As Defendants set forth, the Complaint alleges that during intake Plaintiff informed nursing staff that he had a serious medical condition that required daily prescription medication and the nurse asked Plaintiff for the name of the pharmacy where his prescription was filled, which he provided. (Dkt. No. 1, Attach. 2 at 2-3.)  The Complaint alleges that Plaintiff wrote requests and grievance forms where he complained that he feared his levels had begun to drop because he had not received his daily prescription medication. (*Id*. at 3.)  Plaintiff alleges that at some time, he was taken to OCJC medical where a blood sample was drawn. (*Id*.)  The Complaint alleges that one week laker, Plaintiff was brought to OCJC medical where another blood sample was taken and he was informed that the last sample was rejected by the lab because the blood was not frozen upon receipt. (*Id*.)  Plaintiff alleges that he communicated with jail ministry about not receiving his medication. (Dkt. No. 1, Attach. 2 at 3-4.)  The Complaint alleges that during the week of March 14, 2023, Plaintiff noticed skin lesions and swelling, which he brought to the attention of a medical provider, who ordered more testing and noted that the swelling could be caused by salt in Plaintiff's diet. (*Id*. at 4.)  The Complaint alleges that on

March 20, 2023, Plaintiff noticed a red pimple that he feared may be "Kaposi Sarcoma."  (*Id*. at 4-5.)

The Complaint alleges no facts regarding any official policy, custom, or practice, and pleads no facts concerning Defendant Wellpath's training, supervision, or deliberate indifference to a known need for training.  (*See generally* Dkt. No. 1); *see also Alston v. New York City Dep't of Corr*., 24-CV-6444, 2026 WL 751205, at *6 (S.D.N.Y. Mar. 17, 2026) (dismissing the deliberate indifference to medical needs claim against the Department of Corrections because, among other things, the amended complaint did not allege any facts "regarding any official policy, custom, or practice, and pleads no facts concerning DOC's training, supervision, or deliberate indifference to a known need for training.").  Plaintiff does not allege any specific facts beyond his own experience and does not allege that the incidents that happened to him also happened to others or that Defendant Wellpath has been responsible for similar violations in the past.  (*See generally* Dkt. No. 1.)  Hence, the allegations in the Complaint are insufficient to impose municipal liability on Defendant Wellpath.  *Compare Leckie v. City of New York*, 19-CV-6719, 21-CV-7212, 2023 WL 3168699, at *16 (S.D.N.Y. May 1, 2023) (affirming a report and recommendation that found the plaintiff's allegations insufficient where he provided "only conclusory allegations of the existence of an unconstitutional policy denying incarcerated people adequate dental care, with no specific facts beyond his own experience."), *with Alvarado v. Westchester Cnty.*, 22 F. Supp. 3d 208, 217 (S.D.N.Y. Apr. 24, 2014) (holding that the plaintiffs plausibly alleged a widespread pattern of misconduct by the jail medical provider where seven incarcerated plaintiffs were uniformly denied methadone or suboxone over the course of nine months and one plaintiff was falsely informed that the jail did not have a methadone program at all).

As a result, I recommend that Plaintiff's deliberate medical indifference claim against Defendant Wellpath be dismissed for failure to state a claim upon which relief may be granted.

### B.    State Law Claims

Defendants' motion argues that "Plaintiff's Complaint does not assert State law claims. If it is determined that such claims were intended, they should be dismissed." (Dkt. No. 54, Attach. 4 at 10.)  The Decision and Order of Chief Judge Sannes dated May 24, 2023, does not liberally construe the Complaint as alleging any state law claims. (Dkt. No. 9, Attach. 6 at 6; *see generally* Dkt. No. 9, Attach. 6.)  Indeed, the only claims that Chief Judge Sannes concluded survived *sua sponte* review were Eighth Amendment claims against Defendant Wellpath and Onondaga County Jail Chief Deputy John Doe. (Dkt. No. 9, Attach. 6 at 15.)  Hence, there are no pending state law claims to consider with respect to Defendants' arguments.

### C.    Claims Against Defendant Drapikowski

As set forth above, Chief Judge Sannes *sua sponte* added Defendant Drapikowski as a defendant in place of Onondaga County Jail Chief Deputy John Doe "so that service may proceed and issue may be joined." (Dkt. No. 13 at 7.)  Chief Judge Sannes directed Plaintiff that, upon discovery of the identity of "the official(s) ultimately responsible for the decision not to provide him with access to his medication . . . . he should file an amended complaint that properly names all necessary parties." (Dkt. No. 13 at 8.)

Defendants have made no argument with respect to dismissal of the claims Plaintiff asserts against Defendant Drapikowski. (*See generally* Dkt. Nos. 54, 56.)  Notwithstanding, Defendants seek dismissal of the Complaint. (Dkt. No. 54 at 1; Dkt. No. 54, Attach. 1 at 2; Dkt. No. 54, Attach. 4 at 12.)

Discovery closed on September 30, 2025.  (Dkt. No. 52; *see generally* docket sheet.) Despite having an opportunity for discovery, Plaintiff has not sought to amend the complaint to identify the official(s) responsible for the decision not to provide him with access to his medication.  (*See generally* docket sheet.)  It is undisputed that Defendant Drapikowski lacked personal involvement with the allegations set forth in Plaintiff's Complaint.[4]  (Dkt. No. 13 at 7-8; *see generally* Dkt. No. 1.)

As a result, I recommend that Plaintiff's claims against Defendant Drapikowski be dismissed.  *Davis v. Kelly*, 160 F.3d 917, 921-22 (2d Cir. 1998) ("After an opportunity for discovery, undisputed allegations that the supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case.").

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Defendants' motion for judgment on the pleadings (Dkt. No. 54) be **GRANTED**; and it is further respectfully

**RECOMMENDED** that the Complaint (Dkt. No. 1) be **DISMISSED**; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report and Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[5]

---

[4]      Defendant Drapikowski was added by Chief Judge Sannes solely to replace defendant Onondaga County Jail Chief Deputy John Doe Defendant for purposes of service and joinder of issue.  (Dkt. No. 13 at 7-8.)  Defendants make no motion as to Defendant Drapikowski.  If the assigned District Judge disagrees with the recommendation regarding Defendant Drapikowski, then the undersigned recommends that the Complaint proceed against Defendant Drapikowski.

[5]      The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE**: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: May  6 , 2026
        Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[6]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  FED. R. CIV. P. 6(a)(1)(C).

2026 WL 751205
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jesse ALSTON, Plaintiff,
v.
NEW YORK CITY DEPARTMENT OF CORRECTION, New York State Department of Corrections and Community Supervision, American Airlines Group Inc., American Eagle Airlines, New York City Health and Hospitals Corporation, Jane Doe #1 in her official capacity, Jane Doe #1 in her individual capacity, John Doe #1 in his official capacity, John Doe #1 in his official capacity, and John Does #2-5, Defendants.

24 Civ. 6444 (NRB)
|
Signed March 17, 2026

**Attorneys and Law Firms**

Ezra B. Glaser, Ezra B. Glaser & Associates, Brooklyn, NY, for Plaintiff.

Doreen Dufficy, Barbiero Bisch O'Connor & Commander LLP, Melville, NY, Cynthia Robinson, Joseph Shmulewitz, Megan E. Verbos, Heidell Pittoni Murphy & Bach LLP, New York, NY, Rosalie Tanis, Heidell, Pittoni, Murphy & Bach, White Plains, NY, for Defendant New York City Department of Correction.

Daniel Shay Kirschbaum, Office of the Attorney General, New York, NY, for Defendant New York State Department of Corrections and Community Supervision.

Gregory John Radomisli, Martin Clearwater & Bell LLP, New York, NY, for Defendant New York City Health and Hospitals Corporation.

### MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff Jesse Alston ("plaintiff") brings this action against defendants New York City Department of Correction ("DOC"), New York State Department of Corrections and Community Supervision ("DOCCS"), New York City Health and Hospitals Corporation ("HHC"), Jane Doe #1 in her official and individual capacities, John Doe #1 in his official and individual capacities, John Does #2-5, American Airlines Group Inc., and American Eagle Airlines, [1] seeking monetary damages and alleging that, while being transported to and subsequently held in custody at Rikers Island, he was deprived of medical treatment and accommodations in violation of federal and state law.

Presently before the Court is DOC's motion to dismiss plaintiff's Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] DOC contends, inter alia, that: (i) plaintiff's claim under the Americans with Disabilities Act ("ADA") fails because he was not unreasonably excluded by reason of his disability; (ii) plaintiff's constitutional claims fail because he has not demonstrated deliberate indifference or the DOC's personal involvement; (iii) plaintiff does not adequately plead a claim for municipal liability pursuant to 42 U.S.C. § 1983 and Monell; (iv) plaintiff's state law claims are time-barred; and (v) DOC is a non-suable entity. For the reasons stated herein, the Court grants DOC's motion to dismiss.

### I. Factual Background[3]

#### a. Plaintiff's Travel to Virginia

**\*2** Plaintiff is a formerly incarcerated individual who, after being convicted of offenses including robbery, criminal possession of a weapon, and grand larceny, was incarcerated in New York state prisons for approximately 18 years beginning in 1998. AC ¶ 13. On May 26, 2016, plaintiff was released from custody and placed on parole by the New York State Division of Parole. Id. ¶ 14. While walking on a Brooklyn sidewalk in December 2019, plaintiff, a diabetic, stepped on a nail, resulting in a chronic infection that eventually required the amputation of his right foot in March 2020. Id. ¶¶ 15, 32. The infection persisted despite the amputation, and in July 2021, plaintiff traveled to Charlottesville, Virginia to obtain medical treatment. Id. ¶¶ 16-17. Plaintiff was admitted to the University Medical Center in Charlottesville on July 31, 2021, where he underwent a second amputation, resulting in the removal of his right leg below the knee. Id. ¶ 18.

Rather than returning to New York by the same means he had used to travel to Virginia, plaintiff instead contacted DOCCS

"and/or a Magistrate Judge" in August 2021 to surrender in connection with a parole violation arising from his failure to notify his parole officer that he had left New York. Id. ¶ 19. Plaintiff waived his right to contest extradition from Virginia to New York. Id. ¶ 20. He was discharged from University Medical Center on August 11, 2021, and detained in a Virginia jail until August 24, 2021, when New York parole officers, defendants Jane Doe #1 and John Doe #1, arrived to facilitate his return to New York. Id. ¶ 21.

### a. Plaintiff's Transport to New York

Jane Doe #1 and John Doe #1 accompanied plaintiff to Richmond International Airport, where he was to be transported to New York on a flight operated by defendants American Airlines Group, Inc. and American Eagle Airlines. Id. ¶ 22. Upon arrival, plaintiff was provided with, and handcuffed to, a wheelchair. Id. ¶ 23. Because he could not use a wheelchair inside the aircraft and was not provided with crutches, plaintiff was required to hop down the aisle to his seat in the last row. Id. ¶ 24. After landing at LaGuardia Airport, plaintiff again traversed the aisle by hopping. Id. ¶ 25. Plaintiff lost his balance, fell, and landed on his recently amputated right leg. Id. He experienced sharp, internal pain and heard a popping sound. Id. Plaintiff informed Jane Doe #1 that he believed he was injured and requested medical assistance. Id. ¶ 26. Jane Doe #1 stated that she did not see any visible blood on his right leg. Id. Upon exiting the aircraft, plaintiff was placed in a wheelchair and transported out of the airport. Id. ¶ 27. Plaintiff, still in pain, was transferred to a halfway house in Queens, New York for approximately four hours before being transported to Rikers Island ("Rikers"). Id.

### b. Plaintiff's Detention at Rikers Island

Upon arrival at Rikers, plaintiff complained of severe pain stemming from his fall. Id. ¶ 28. At some point over the next four days, plaintiff's recently amputated right leg became increasingly red, swollen, and painful, and he requested to be taken to the hospital. Id. ¶ 29. Defendants John Does #2-5, HHC medical personnel serving inmates and pre-trial detainees at Rikers, rewrapped his bandages and assured him that no serious issue was present. Id. ¶¶ 11, 29. On August 28, 2021, plaintiff was transferred to Bellevue Hospital, one of the hospitals within HHC's network. Id. ¶ 30. Three days later, on August 31, 2021, he underwent a third amputation, this time of his left leg, due to "extensive infection and gangrene." Id.

¶¶ 30-31. The surgeon, Dr. William Johnson, allegedly stated that plaintiff's condition worsened due to delayed medical intervention. Id. ¶ 31.

Plaintiff remained hospitalized until September 10, 2021. Id. ¶ 32. Diagnostic imaging revealed significant vascular issues, including arterial occlusions that contributed to poor healing. Id. ¶ 33. Plaintiff was treated for several conditions, including wound infections, anemia, and "complications from uncontrolled diabetes." Id. ¶ 32. Laboratory testing showed elevated white blood cell counts and high C-reactive protein levels indicative of infection and inflammation. Id. ¶ 34.

**\*3** As alleged, the amputation of plaintiff's left leg was necessitated by advanced infection and the risk of systemic spread. Id. ¶ 35. Upon discharge, plaintiff was prescribed medications including gabapentin, morphine, oxycodone, and tetracycline. Id. ¶ 36. His discharge plan included follow-up care at a vascular surgery clinic and physical therapy. Id. ¶ 37. Plaintiff alleges ongoing medical needs, as well as continuing pain, psychological distress, and physical limitations arising from the loss of his left leg. Id. ¶¶ 37-38. Plaintiff advances no allegations of any mistreatment following the surgery at Bellevue.

### II. Procedural Background

Plaintiff filed his original complaint on August 26, 2024. ECF No. 1. HHC answered on September 24, 2024. ECF No. 20. That same day, DOC requested an extension until November 7, 2024, to answer or otherwise respond to plaintiff's complaint, which the Court granted. ECF Nos. 22, 25. On September 25, 2024, DOCCS requested a pre-motion conference for a proposed motion to dismiss plaintiff's complaint, and DOC made a similar request on November 7, 2024. ECF Nos. 24, 29. Plaintiff responded to the requests from DOCCS and DOC on November 13, 2024. ECF No. 30. On December 17, 2024, HHC also requested a pre-motion conference for a proposed motion to dismiss plaintiff's complaint. ECF No. 31.

On January 9, 2025, the Court held a teleconference with the parties, permitting DOCCS, DOC, and HHC to make their motions and granting plaintiff leave to file an amended complaint by February 6, 2025. The Court also directed the parties to propose a briefing schedule in which no more than 60 days would elapse between motions and replies.

Plaintiff filed his Amended Complaint on February 5, 2025, asserting the following causes of action: (i) violations of

the Americans with Disabilities Act ("ADA"); (ii) deliberate indifference to his medical needs, in violation of the Fourteenth Amendment's Due Process and Equal Protection Clauses; (iii) negligent hiring and retention; (iv) violations of his constitutional rights as guaranteed under 42 U.S.C. § 1983, including the Fourth and Fourteenth Amendments; and (v) failure to intervene. ECF No. 32. After the parties failed to agree on a briefing schedule, ECF Nos. 36, 37, the Court set one on February 24, 2025. ECF No. 39. In accordance with that schedule, HHC filed its motion to dismiss, ECF No. 42, along with an accompanying memorandum of law, ECF No. 47 ("HHC Mot."), and declaration in support thereof, ECF No. 43, on March 17, 2025. DOCCS filed its motion to dismiss, ECF No. 48, and accompanying memorandum of law, ECF No. 49 ("DOCCS Mot."), on March 24, 2025. The next day, DOC filed its motion to dismiss, ECF No. 51, and accompanying memorandum of law, ECF No. 53 ("DOC Mot."). Plaintiff opposed the motions filed by DOCCS and DOC on May 6, 2025. ECF Nos. 56 ("Pl. DOCCS Opp."), 57 ("Pl. DOC Opp."). DOCCS and DOC filed reply memoranda in support of their respective motions on May 22, 2025. ECF Nos. 58 ("DOCCS Reply"), 59 ("DOC Reply").

On December 19, 2025, after realizing that plaintiff had never filed an opposition to HHC's motion, originally due in May 2025, the Court directed plaintiff to do so by January 6, 2026. ECF No. 62. Plaintiff complied with that direction. ECF No. 64 ("Pl. HHC Opp."). HHC filed its reply on January 16, 2026. ECF No. 70 ("HHC Reply").

This opinion addresses only DOC's motion.

### III. Legal Standard

#### a. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court accepts the truth of the pleaded facts, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678).

### DISCUSSION

**\*4** DOC moves to dismiss plaintiff's Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Before proceeding to the merits of that motion, the Court makes two preliminary observations. First, the Amended Complaint largely fails to plead claims on a defendant-specific basis. In particular, the first, second, and fourth causes of action – asserting violations of the ADA, the Fourteenth Amendment, and 42 U.S.C. § 1983 – are directed broadly at "Defendants" and do not reference problematic conduct attributable to any specific defendant. The Amended Complaint likewise does not identify any individuals (including Doe defendants) employed by or affiliated with DOC.

Second, as DOC correctly argues, it is well-established that DOC is a non-suable entity. See, e.g., N.Y.C. Charter Ch. 17 § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law."); see also Williams v. New York City, 2005 WL 1084585, at \*9 (S.D.N.Y. July 15, 2005) ("[P]laintiff's claims against the DOC must fail because the DOC is a non-suable entity under the New York City Charter."). Accordingly, the claims against DOC must be dismissed. In any event, even if the Court construes plaintiff's claims as brought against the City of New York, those claims still fail.

DOC argues that plaintiff has failed to state: (i) a claim under the ADA; (ii) a constitutional claim for deliberate indifference; and (iii) a Monell claim pursuant to 42 U.S.C. § 1983. DOC further contends that plaintiff's state law claims are time-barred. The Court addresses each argument, beginning with plaintiff's constitutional claims.

### I. Plaintiff's Constitutional Claims

Plaintiff's second cause of action asserts claims pursuant to Section 1983 and alleges that defendants deprived plaintiff of his federal constitutional rights by denying him medical treatment. AC ¶¶ 44-49, 54-55. While plaintiff invokes the Fourth [4] and Fourteenth Amendments in his Amended

Complaint, id. ¶ 55, both parties address the substantive constitutional claims as asserting deliberate indifference to plaintiff's serious medical needs under the Fourteenth Amendment's Due Process Clause.[5] Plaintiff's fifth cause of action is identified as a "failure to intervene" and alleges that defendants violated plaintiff's constitutional rights by "failing to intercede and prevent the violation[.]" Id. ¶¶ 56-57.

### a. Prerequisite of Personal Involvement Under Section 1983

**\*5** A claim arising under 42 U.S.C. § 1983 must allege the personal involvement of any individual defendant in the purported constitutional deprivation. Raspardo v. Carlone, 770 F.3d 97, 115-16 (2d Cir. 2014) ("If a defendant has not personally violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against th[at] defendant ... § 1983 requires individual, personalized liability on the part of each government defendant."); see also Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013) ("It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation.").

Plaintiff has failed to plausibly allege DOC's personal involvement in any constitutional deprivation. The Amended Complaint contains no factual allegations directed at DOC at all. It identifies no DOC employees, by name, description, or otherwise, and asserts no claims against any DOC-affiliated individual. To the contrary, the Amended Complaint specifically identifies Jane Doe #1 and John Doe #1 as state parole officers employed by DOCCS, and John Does #2-5 as HHC medical personnel who served prisoners and pre-trial detainees at Rikers. AC ¶¶ 7-8, 11. Plaintiff does not identify a single DOC correction officer or employee.

Liberally construed, plaintiff's allegations concern only (i) medical care provided by HHC personnel at Rikers (John Does #2-5), and (ii) accommodations allegedly not provided by DOCCS personnel during plaintiff's transport from Virginia to New York (Jane Doe #1 and John Doe #1). Such allegations, entirely untethered to any conduct by DOC personnel, are insufficient to establish personal involvement as required under Section 1983. Dawson v. City of New York, 2023 WL 6294256, at \*2 (S.D.N.Y. Sep. 27, 2023) (dismissing claims against DOC where plaintiff failed to identify any correction officers by name, description,

or otherwise); Roundtree v. City of New York, 2018 WL 1586473, at \*6 (S.D.N.Y. Mar. 28, 2018) (dismissing claims against correction officers where personal involvement was unclear and plaintiff's allegations were general and conclusory). Absent any allegations describing actions taken, or not taken, by DOC or DOC personnel, the Court cannot even begin to conduct a deliberate indifference analysis under the Fourteenth Amendment.

Likewise, the Court is unable to conduct any analysis concerning a potential failure to intervene claim. As a threshold matter, failure to intervene is not a standalone cause of action. Rather, it imposes liability where a government official could have, but did not, intervene in a constitutional violation committed by another government official in his or her presence. Hickey v. City of New York, 2004 WL 2724079, at \*16 (S.D.N.Y. Nov. 29, 2004), aff'd, 173 F. App'x 893 (2d Cir. 2006). Stated differently, failure to intervene is a form of individual, rather than municipal, liability, and requires a showing of personal involvement. Rindgen v. Cnty. of Broome, 2025 WL 2772080, at \*31 (N.D.N.Y. Sep. 29, 2025) ("Because failure to intervene is a form of individual, rather than municipal, liability, plaintiff's failure to intervene claim against the City must be dismissed."); see also Hardy v. Baird, 2016 WL 2745852, at \*12 (S.D.N.Y. May 10, 2016) ("Without personal involvement in the alleged violation, [a defendant] cannot be found liable for failing to intervene.").

Here, the Amended Complaint identifies no DOC-affiliated individuals at all, either specifically or generally, and therefore fails at the outset to the plead personal involvement required for a failure to intervene claim. Nor does it contain any non-conclusory allegation that any DOC personnel were present during, aware of, or had a realistic opportunity to prevent a constitutional violation but failed to do so. Absent an underlying constitutional violation, there can be no failure to intervene. See, e.g., Turner v. City of New York, 2019 WL 6173701, at \*9 (S.D.N.Y. Nov. 19, 2019).

**\*6** Plaintiff's constitutional claims in the Amended Complaint's second, fourth, and fifth causes of action, as asserted against DOC pursuant to Section 1983, must be dismissed.

### II. Plaintiff's Monell Claim Against DOC

To the extent plaintiff attempts to assert a claim for municipal liability against DOC under 42 U.S.C. § 1983 pursuant to Monell v. Dep't of Social Services of the City of New York, 436 U.S. 658 (1978), that claim also fails. To hold a

municipality liable under Monell, a plaintiff must plead and prove three elements: (i) an official policy or custom which (ii) causes the plaintiff to be subjected to (iii) a denial of a constitutional right. Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995). In his opposition, plaintiff attempts to amend his Monell claim as solely premised on DOC's purported failure to adequately train its staff under City of Canton, Ohio v. Harris, 489 U.S. 378 (1989), even though he did not include a failure to train claim in the Amended Complaint. See generally Pl. DOC Opp. at 9-11.

At the threshold, plaintiff's Monell claim necessarily fails because "[i]t is well-settled that a Monell claim cannot succeed without an underlying violation, and here there is no constitutional violation." Mastromonaco v. Cnty. of Westchester, 779 F. App'x 49, 51 (2d Cir. 2019); see also DeRaffele v. City of New Rochelle, 2017 WL 2560008, at *6 (S.D.N.Y. 2017) ("It is well established that a Monell claim cannot lie in the absence of an underlying constitutional violation."). It is similarly well-established that "Monell does not provide a separate cause of action ... it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006). As discussed above, plaintiff has not alleged a constitutional violation because he alleges no facts establishing the personal involvement of DOC or any DOC-affiliated individual. Without an "independent constitutional violation," Segal, 459 F.3d at 219, plaintiff's municipal liability claim against DOC based on a purported failure to train must be dismissed.

Even if an underlying claim survived, plaintiff has not plausibly alleged a Monell claim against DOC under a failure-to-train theory, necessitating dismissal on this independent ground. Plaintiff argues for the first time in opposition that the alleged failure to obtain emergency medical treatment reflects a "glaring deficiency in the training of medical personnel at Rikers." Pl. DOC Opp. at 10. That belated assertion is insufficient. The Amended Complaint alleges no facts regarding any official policy, custom, or practice, and pleads no facts concerning DOC's training, supervision, or deliberate indifference to a known need for training. The Court need not credit conclusory assertions, nor may plaintiff further amend the Amended Complaint through arguments raised for the first time through his opposition. Plaintiff's attempt to advance a failure-to-train theory therefore cannot sustain a Monell claim against DOC.

### III. Plaintiff Fails to State a Claim Under the ADA

**\*7** Plaintiff's first cause of action arises under Title II of the ADA. AC ¶¶ 39-43. Plaintiff alleges that despite being aware of his disability, DOC failed to provide adequate medical care at Rikers. Id. DOC maintains that claims of inadequate medical care, without more, do not constitute viable ADA claims. DOC Mot. at 6-7.

To state a prima facie ADA discrimination claim, a plaintiff must allege that: (i) the plaintiff is a qualified individual with a disability; (ii) defendant is a public entity subject to the ADA; and (iii) the plaintiff is being excluded from participation in, or being denied the benefits of, a service, program, or activity offered by defendant, or was otherwise discriminated against by reason of his or her disability. Wright v. New York State Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016). A plaintiff may proceed under theories of intentional discrimination (disparate treatment), disparate impact, or failure to make reasonable accommodation. Brooklyn Ctr. for Psychotherapy Inc. v. Phila. Indem. Ins. Co., 955 F.3d 305, 311 (2d Cir. 2020). Under Title II, a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual "to have access to and take a meaningful part in public services." Powell v. Nat'l Bd. Of Med. Exam'rs, 364, F.3d 79, 85 (2d Cir. 2004). A plaintiff must also allege that his or her mistreatment was "motivated by either discriminatory animus or ill will due to disability." Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 112 (2d Cir. 2001). The animus requirement reflects the purpose of the ADA, which is to "ensure evenhanded treatment between the disabled and the able-bodied." Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir. 1998).

DOC does not dispute that, by reason of his amputation, plaintiff is a qualified individual with a disability within the meaning of the ADA. DOC Mot. at 6. While the DOC is a non-suable entity, the City of New York, as a local government, is a public entity subject to suit under Title II of the ADA. See 42 U.S.C. § 12131(1)(A). The Court accordingly focuses on the third element of plaintiff's prima facie case: whether he was denied the opportunity to participate in or benefit from defendant's services, programs, or activities, or was otherwise discriminated against by defendant because of his disability. Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

The Amended Complaint's ADA theory rests on the allegation that DOC did not provide plaintiff with adequate medical care. AC ¶ 43. The Amended Complaint contains no allegations that plaintiff was excluded from, denied access

to, or otherwise deprived of any "service[ ], program[ ], or activit[y]" provided by DOC, as required by the ADA. Wright, 831 F.3d at 72. Nor does plaintiff allege that he sought to participate in any such service, program, or activity, or that he was otherwise denied access to one by reason of his disability. Id.; see also Henrietta D., 331 F.3d at 273-75 (requiring an ADA plaintiff to allege a denial of meaningful access to public service). That failure alone is a fundamental defect warranting dismissal of plaintiff's ADA claim. Burgess v. Goord, 1999 WL 33458, at *7 (S.D.N.Y. Jan. 26, 1999) (dismissing ADA claim where inmate did not allege that he was prevented from using certain prison services because of his disability).

**\*8** Further, a "challenge to the adequacy of services provided, as opposed to a challenge alleging denial of services," as here, is not a valid claim under the ADA. Maccharulo v. New York State Dep't of Corr. Servs., 2010 WL 2899751, at *5 (S.D.N.Y. July 21, 2010). Allegations of inadequate medical treatment, "even when made by a person with a serious disability," do not state a claim under the ADA. Elbert v. New York State Dep't of Corr. Servs., 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) (collecting cases); see also Freudenberg v. Cnty. of Orange, 2024 WL 4307176, at *8 (S.D.N.Y. Sep. 25, 2024) (holding that "no matter how they are packaged," a plaintiff's allegations that "go to the substance of the services provided rather than illegal discrimination" cannot state a valid ADA claim). Here, plaintiff does not allege that he was denied medical services because of his disability; rather, his claim concerns only the adequacy of the medical treatment he received. That species of claim is not cognizable under the ADA, and to hold otherwise would allow detainees "to litigate in federal court virtually every medical malpractice claim arising in a custodial setting under the auspices of the ADA." Tardif v. City of New York, 991 F.3d 394, 405 (2d Cir. 2021). Accordingly, plaintiff's ADA claim against DOC is dismissed.

### IV. Plaintiff's Negligent Hiring and Retention Claim Is Time-Barred

Plaintiff's third cause of action asserts that DOC was negligent in retaining and hiring employees who were unfit for their positions, leading to plaintiff's injuries. AC ¶¶ 50-53. DOC maintains that this claim is subject to, and barred under,

the one-year-and-90-day statute of limitations applicable to common law claims asserted against municipalities. DOC Mot. at 17-18. Specifically, the conduct underlying plaintiff's allegations against DOC occurred in August 2021, but plaintiff did not commence the instant action until 2024. See AC ¶¶ 28-31; ECF No. 1. DOC contends that plaintiff failed to (i) file a notice of claim within 90 days of the claim's accrual, and (ii) commence this action within one year and 90 days. Id. Plaintiff responds that his negligent hiring and retention claim is "an aspect of" his Section 1983 claims and is therefore subject to a three-year statute of limitations. Pl. DOC Opp. at 12.

To the extent that plaintiff's negligent hiring and retention claim is duplicative of his Monell claim, it is dismissed for the same reasons as set forth above, supra Section II. Outside the context of a Monell claim premised on a policy of negligent hiring or retention, "a general claim of negligence is not actionable under Section 1983." D.J. by Comfort v. Corning-Painted Post Area Sch. Dist., 722 F. Supp. 3d 148, 166 (W.D.N.Y. 2024); see also Gibson v. Pasta City, 2023 WL 8188431, at *3 (S.D.N.Y. Nov. 27, 2023) ("[N]egligence ... is not a viable basis for a claim of federal constitutional violation under Section 1983."). Accordingly, to the extent that plaintiff's negligent hiring and retention claim arises under state law, it is barred by New York's one-year-and-90-day statute of limitations for claims against municipalities. N.Y. Gen. Mun. Law § 50-i (McKinney). Plaintiff's negligent hiring and retention claim is therefore dismissed.

### CONCLUSION

For the foregoing reasons, DOC's motion to dismiss plaintiff's claims is granted. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 51. Further, given that the motions pending at ECF Nos. 42 and 48 will also be terminated, and given that defendants American Airlines Group Inc. and American Eagle Airlines are dismissed, the Clerk of Court is also directed to close this case.

### All Citations

Slip Copy, 2026 WL 751205

## Footnotes

1     During an initial teleconference with the parties, the Court sought an explanation as to why American Airlines Group Inc. and American Eagle Airlines had not appeared in this action. At the Court's request, plaintiff's counsel represented that he would follow up. The Court acknowledges that plaintiff's counsel filed an affidavit of service from a process server in September 2024 which neither contained the title of the individual served nor a description of the individual's job responsibilities. ECF No. 15. However, the absence of any appearance by either American Airlines Group Inc. or American Eagle Airlines raises questions as to whether the process server served an individual authorized to accept service on behalf of those entities. In any event, there is no indication that plaintiff's counsel pursued his claims against those defendants. For example, plaintiff never sought a default in the years following the filing of this action in August 2024. Accordingly, American Airlines Group Inc. and American Eagle Airlines are dismissed, as any further attempt to serve them would be untimely given that more than three years have passed since the events underlying this action occurred.

2     DOCCS and HHC each moved to dismiss plaintiff's Amended Complaint. ECF Nos. 42, 48. Separate opinions, also filed today by this Court, address the individual motions filed by DOCCS and HHC.

3     The following facts are drawn from the Amended Complaint, ECF No. 32 ("AC"), and are assumed true for purposes of resolving the instant motion. Stadnick v. Vivint Solar, Inc., 861 F.3d 31, 35 (2d Cir. 2017).

4     The Amended Complaint includes a lone reference to the Fourth Amendment. AC ¶ 55 ("[Defendants'] actions violated Plaintiff's due process rights and constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including the Fourth and Fourteenth Amendments."). The Fourth Amendment is irrelevant to this action. Plaintiff has cited no facts that pertain in any way to "unreasonable searches and seizures," and the Fourth Amendment is not cited to or referenced in any of plaintiff's moving papers. The Court accordingly assumes that this reference was in error and that plaintiff intended to only cite the Fourteenth Amendment.

5     Deliberate indifference claims brought by pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment, while the Cruel and Unusual Punishments Clause of the Eighth Amendment governs similar claims brought by convicted prisoners. Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017); Haynes v. City of New York, 2020 WL 4926178, at *6 (S.D.N.Y. Aug. 20, 2020). While the parties assume that plaintiff's claims arise under the Fourteenth Amendment because his detention at Rikers was in connection with an alleged parole violation, AC ¶¶ 14, 19, the Court notes that whether an individual detained for a suspected parole violation is considered a prisoner or pretrial detainee is an "unresolved and difficult question." Harry v. Suarez, 2012 WL 2053533, at *2 n.3 (S.D.N.Y. June 4, 2012); see also Reinoso-Delacruz v. Ruggerio, 2019 WL 2062434, at *2 (D. Conn. May 9, 2019) ("This Circuit has not fully addressed whether a probationer awaiting disposition of his revocation proceeding is considered a prisoner or a pretrial detainee for purposes of the Eighth Amendment."). That distinction is irrelevant here, however, as plaintiff does not assert a cognizable claim under either standard.

**End of Document**           © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1164919
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Curtis BESS, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendant.

No. 11 Civ. 7604(TPG).
|
March 19, 2013.

### OPINION

THOMAS P. GRIESA, District Judge.

**\*1** Curtis Bess, *pro se,* brings this action under 42 U.S.C. § 1983 alleging that defendants, the City of New York and Corizon Health Services, failed to provide him adequate medical care during his detention at Otis Bantum Correctional Center on Rikers Island. Bess originally sued the New York City Department of Corrections and Prison Health Services but the court subsequently substituted the City of New York as a party for NYCDOC, and Prison Health Services has subsequently changed its name to Corizon Health Services.

Defendants move to dismiss the complaint. The motion is granted.

### The Complaint

Bess alleges that, on an undisclosed date, he was taken into custody by the police, presumably the New York Police Department, and placed in the backseat of a police vehicle. The police vehicle he was riding in, however, was involved in an accident with a taxi cab and, therefore, he was transferred to another vehicle which took him to the police station. Bess alleges that, throughout this process, he made several requests for medical attention, all of which were ignored.

Eventually, for reasons Bess does not explain, he became an inmate at Otis Bantum Correctional Center under the care of NYCDOC. Bess alleges that, while in prison, he continued to seek medical care. But he alleges that he was repeatedly denied care and at one point was told "that's not our problem.

You should've fixed the problem when you [were] in police custody." It appears that Bess was seen by a doctor at least once as evidenced by the "request for a second opinion" form attached to his complaint and his statement on that form that the treatment he received up to that point had not been medically appropriate.

Bess alleges that, due to the automobile accident and lack of subsequent medical care, he suffers from severe back and neck pain as well as nausea, headaches, and sleeplessness. He seeks damages of $3,000,000.

### Discussion

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a complaint must plead sufficient facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal, 556* U.S. 662, (2009). In deciding such a motion, a court must accept as true the facts alleged in the complaint, but it should not assume the truth of its legal conclusions. *Iqbal, 556* U.S. at 678–79. A court must also draw all reasonable inferences in the plaintiffs favor, and it may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit. *ATSI Commc'ns, Inc. v. Shaar Fund. Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). A complaint filed by a *pro se* plaintiff is to be construed liberally and, therefore, interpreted to raise the strongest arguments that it suggests. *See Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006).

**\*2** It is well established that a municipality may not be sued under 42 U.S.C. § 1983 for acts of its employees unless a plaintiff can show that these actions were caused by an official policy or custom of the municipality. *Monell v. Dep't of Soc. Services of City of New York,* 436 U.S. 658 (1978). And, in keeping with the pleading requirements imposed by *Twombly* and *Iqbal,* a plaintiff must give a factual description of such a policy, not just bald allegations that such a thing existed. *See Davis v. City of New York,* 07 Civ. 1395, 2008 WL 2511734 (S.D.N.Y. June 19, 2008).

Here, plaintiff brings claims against a municipality, the City of New York, and a private entity performing a municipal function, Corizon. Despite the fact that it is a private entity, Corizon enjoys the benefit of the *Monell* requirements for the same reason it may be named as a defendant in a § 1983

suit. In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality. *See Buckner v. Toro,* 116 F.3d 450, 452 (11th Cir.1997); *Conner v. Donnelly,* 42 F.3d 220, 224 (4th Cir.1994); *Iskander v. Vill. of Forest Park,* 690 F.2d 126, 128 (7th Cir.1982); *Mercado v. City of New York,* 8 Civ. 2855, 2011 WL 6057839 at *7 n. 10 (S.D.N.Y. Dec. 5, 2011).

Thus, to bring a § 1983 action against either the City of New York or Corizon, Bess must plausibly allege that the constitutional violations he alleges were caused by official policies or customs of those entities. But he has not done so. Bess's only allegation that speaks to defendants' liability for the actions of their employees is that "NYCDOC is directly responsible for my well-being and healthcare while in their custody. They employ the services of [Corizon] and all of its staff." But this contains no allegation at all that these employees were acting pursuant to anything like an official policy. Therefore, the allegations in Bess's complaint are not adequate to support an action against the City of New York or Corizon under § 1983.

### Conclusion

Defendants' motion to dismiss is granted and the complaint is therefore dismissed.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1164919

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2511734
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Gregory DAVIS, Plaintiff,
v.
CITY OF NEW YORK, New York City
Police Department, Police Officer George
Lopez Police Officer "John Doe", Defendants.

No. 07 Civ. 1395(RPP).
|
June 19, 2008.

**Attorneys and Law Firms**

Mark Lubelsky & Associates, Attn: Mark L. Lubelsky, New York, NY, for Plaintiff.

Office of the Corporation Counsel, New York City Law Dep't, Attn: Sabrina Melissa Tann, New York, NY, for Defendants.

**OPINION AND ORDER**

ROBERT P. PATTERSON, JR., District Judge.

**\*1** Plaintiff Gregory Davis filed a complaint against Defendants City of New York, New York City Police Department ("NYPD"), Police Officer George Lopez and Police Officer "John Doe" alleging a cause of action under 42 U.S.C. § 1983. Defendants City of New York and NYPD move to dismiss the complaint in its entirety pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the following reasons, Defendants' motion for summary judgment (Doc. No. 12) is granted.

BACKGROUND
On February 26, 2007, Plaintiff initiated this action by filing the complaint with the Court. (Defs.' Rule 56.1 Stmt. ¶ 4; Pl.'s Rule 56.1 Stmt. ¶ 4.) The complaint alleges that on or about March 16, 2004, Police Officers George Lopez and "John Doe" used excessive force while arresting Plaintiff near the intersection of Broadway and 136th Street for minor drug possession, caused him physical injury, and subsequently denied him medical treatment in violation of Plaintiff's constitutional rights. (Compl. ¶¶ 15-34; Defs.' Rule

56.1 Stmt. ¶ 2; Pl.'s Rule 56.1 Stmt. ¶ 2.) The complaint also alleges that the City of New York failed to properly train and supervise its officers, resulting in the deprivation of Plaintiff s constitutional rights. (Compl. ¶¶ 65-66; Defs.' Rule 56.1 Stmt. ¶ 3; Pl.'s Rule 56.1 Stmt. ¶ 3.

By letter dated April 25, 2007 and copied to Plaintiff's counsel, Sabrina Tann, Esq., counsel for Defendant City of New York, requested an adjournment of the initial pretrial conference scheduled for the following day on the grounds that "none of the named defendants in this action have been served with a copy of the summons and complaint." (Tann Decl., Ex. C; Defs.' Rule 56.1 Stmt. ¶ 6.) On May 10, 2007, Plaintiff served Corporation Counsel of the City of New York, located at 100 Church Street, New York, New York 10007, with two copies of the summons and complaint. (Tann Decl. ¶ 7; Defs.' Rule 56.1 Stmt. ¶ 7; Pl.'s Rule 56.1 Stmt. ¶ 7.) Each of the two summons, dated February 26, 2007, were addressed to "Police Officer George Lopez," "Police Officer John Doe," "City of New York," and "The New York City Police Department" at "100 Church Street, Fourth Floor, New York, New York 10026." [1] (Tann Decl., Ex. D; *id.* ¶ 8; Defs.' Rule 56.1 Stmt ¶ 8; Pl.'s Rule 56.1 Stmt. f 8.) Plaintiff never filed any affidavits of service of the summons and complaint with the Court. (Tann Decl. ¶ 11; Defs.' Rule 56.1 Stmt. ¶ 10; Pl.'s Rule 56.1 Stmt. ¶ 10.)

On June 12, 2007, Defendants City of New York and NYPD filed their answer to the complaint. (Tann Decl. ¶ 12; Defs.' Rule 56.1 Stmt. ¶ 11; Pl.'s Rule 56.1 Stmt. ¶ 11.) In their answer, Defendants City of New York and NYPD stated "[u]pon information and belief, the individual identified in the caption of the complaint as George Lopez, has not been served with a copy of the Summons and Complaint or requested representation from the office of Corporation Counsel." (Tann Decl., Ex. E; Defs.' Rule 56.1 Stmt. ¶ 12; Pl.'s Rule 56.1 Stmt. ¶ 12.)

**\*2** On September 11, 2007, at an initial conference with both counsel present before the Court, Defendants' counsel stated that service of process had not been effected on the named defendant George Lopez. (Tann Decl. ¶ 13; Defs.' Rule 56.1 Stmt. ¶ 13.) At that conference, the Court set a briefing schedule for Defendants' proposed motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(c). (Tann Decl. ¶ 15; Defs.' Rule 56.1 Stmt. ¶ 15; Pl.s' Rule 56.1 Stmt. ¶ 15.) By letter dated September 26, 2007, Defendants withdrew their request to submit the motion to dismiss, and by order dated September 26, 2007, the Court

directed the parties to complete discovery by January 1, 2008 and submit a proposed Pre-Trial order by January 18, 2008. (Tann Decl., Ex. F; Defs.' Rule 56.1 Stmt. ¶¶ 16-17; Pl's Rule 56.1 Stmt. ¶¶ 16-17.)

Following the Court's September 27, 2007 Order, Plaintiff failed to seek leave from the Court for a further period in which to serve Defendant George Lopez with process. (Tann Decl. ¶ 18; Defs.' Rule 56.1 Stmt. ¶ 18.) Ms. Tann, counsel for Defendants City of New York and NYPD, has not contacted Mr. Lopez with respect to the claims asserted against him in the complaint, nor has Mr. Lopez contacted the office of Corporation Counsel to request legal representation in this matter. (Tann Decl. ¶ 19; Defs.' Rule 56.1 Stmt. ¶ 19.) Upon information and belief of Defendants, to date, George Lopez has had no notice of this action. (Tann Decl. ¶ 20; Defs.' Rule 56.1 Stmt. ¶ 20.)

On November 19, 2007, Plaintiff served the City of New York with a first demand for production of documents and first set of interrogatories. (Pl.s' Affirmation, Ex. C.) On December 12, 2007, Plaintiff's counsel sought a two-month stay of discovery on the grounds that counsel, despite ardent efforts, was unable to contact Plaintiff to assist him with the prosecution of this matter. (Tann Decl., Ex. G; Defs.' Rule 56.1 Stmt. ¶ 23; Pl's Rule 56.1 Stmt. ¶ 23.) By letter dated December 18, 2007, Defendants opposed Plaintiff's application for a stay and sought leave to file a motion pursuant to Federal Rule of Civil Procedure 56. (Tann Decl., Ex. H; Defs.' Rule 56.1 Stmt. ¶ 24; Pl.'s Rule 56.1 Stmt. ¶ 24.) By order dated December 20, 2007, the Court granted Plaintiff's application in part and stayed discovery until February 12, 2008. (Pl.s' Affirmation, Ex. B; Pl.s' Rule 56.1 Stmt. ¶ 25.)

Defendants City of New York and NYPD filed the instant motion for summary judgment on January 18, 2008. At the time the motion was filed, Plaintiff had not sought to depose any witnesses in this matter or identified "Police Officer John Doe." (Tann Decl. ¶¶ 21, 22; Defs.' Rule 56.1 Stmt. ¶ 21, 22; Pl.s' Rule 56.1 Stmt. ¶ 21, 22.) Nor had Defendants responded to Plaintiffs' document demands and interrogatories. (Pl.s' Rule 56.1 Stmt. ¶ 21 .)

Defendants City of New York and NYPD move for summary judgment on the grounds that the NYPD is not a suable entity and that the complaint fails to state a claim against the City of New York for failure to properly train and supervise the defendant officers. Defendants also argue that the claims

against Officers Lopez and "John Doe" should be dismissed pursuant to Federal Rule of Civil Procedure 4(m) because Plaintiff failed properly to serve Officer Lopez within 120 days of filing this action despite having notice that his service was defective and also failed to apply for an order extending the 120-day period.

## DISCUSSION

### I. Summary Judgment Standard

**\*3** A court may grant summary judgment only where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Braham v. Clancy,* 425 F.3d 177, 181 (2d Cir.2005). Summary judgment is inappropriate if, after resolving all ambiguities and drawing all inferences against the moving party, there remains a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

### II. Plaintiff's Claim against Police Officers George Lopez and "John Doe"

Defendants move for summary judgment in favor of the individual police officers against whom Plaintiff alleges § 1983 violations on the grounds that they were never served with the summons and complaint. Defendants argue that the claim against the defendant officers should be dismissed with prejudice because Plaintiff cannot show good cause for his failure to timely serve, the statute of limitations ran on Plaintiff's claim on March 16, 2007, and Officer Lopez would be prejudiced by an extension for service at this time.

### A. Whether service was effected on the defendant officers

Federal Rule of Civil Procedure 4(e)(1) provides that service of process is effected on an individual in one of three ways: (1) pursuant to the law of the state in which the district court is located, or in which the service is effected; (2) by delivering a copy of the summons and complaint to the individual personally, or by leaving copies at the individual's "dwelling

house or usual place of abode with some person of suitable age and discretion then residing therein"; or (3) by delivering a copy of the summons and complaint to an agent authorized by law to receive service of process. Under New York law, service can be made by delivering the summons "to a person of suitable age and discretion at the actual place of business ... and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business." N.Y. C.P.L.R. 308 (McKinney 2007). Under this section, " 'actual place of business' shall include any location that the defendant, through regular solicitation or advertisement, has held out as its place of business." *Id.*

Plaintiff argues that he complied with New York law by serving Police Officers George Lopez and "John Doe" at the office of Corporation Counsel. Under C.P.L.R. § 311, Corporation Counsel is an authorized agent permitted to accept service on behalf of the City of New York. N.Y. C.P.L.R. § 311. Plaintiff contends because the police officers are employees of the City of New York, service on the City is proper. Section 311 of the C.P.L.R., however, pertains to "personal service upon a corporation or governmental subdivision" and does not authorize the City of New York to accept service on behalf of individuals. See *id.* Nor is the office of Corporation Counsel the "actual place of business" for Officer Lopez or the unnamed officer "John Doe," under C.P.L.R. § 308. The police precinct to which they report and where they conduct their business is their actual place of business. Moreover, Plaintiff made no effort to serve the officers personally or at their actual residences. Under these circumstances, service on the City of New York constitutes improper service on the defendant police officers. See *Moultry v. City of Poughkeepsie,* 154 F.Supp.2d 809, 811 (S.D.N.Y.2001) (holding that service on the police officers who allegedly violated plaintiff's civil rights was not proper where the summons and complaint were served on an official in a city office never frequented by the officers, and no effort was made to serve them personally or leave papers at their residences).

**B. Whether an extension for service should be granted**
**\*4** Under Rule 4(m) of the Federal Rules of Civil Procedure, a plaintiff must properly serve the defendants within 120 days of filing of the complaint. Fed.R.Civ.P. 4(m). If a plaintiff fails to timely serve, the district court must either "dismiss the action without prejudice as to that defendant or direct that service is effected within a specified time." *Id.* The district court is required to grant an appropriate extension of time to

effect service if the plaintiff shows good cause for failure to serve and has discretion to grant such an extension even in the absence of good cause. *Id.;* Zapata v. City of New York, 502 F.3d 192, 197 (2d Cir.2007) (holding that under Rule 4(m) "district courts have discretion to grant extensions even in the absence of good cause" but are not required to do so). The policy behind Rule 4(m) and the statute of limitations is to promote the "diligent prosecution of civil cases." *Nat'l Union Fire Ins. Co. v. Sun,* No. 93 Civ. 7170, 1994 U.S. Dist. LEXIS 11934, at \*7 (S.D.N.Y. Aug. 18, 1994); *accord* **Gordon v. Hunt,** 116 F.R.D. 313, 320 (S.D.N.Y.1987) (noting that the policy behind Rule 4(m) and the statute of limitations is "to encourage prompt movement of civil actions in the federal courts").

In this case, Plaintiff cannot show good cause for failure to serve the defendant police officers within the 120-day period. Plaintiff and Plaintiff's counsel were put on notice on June 8, 2007, when Defendants filed their answer, and again on September 11, 2007, at the initial pretrial conference before the Court, that the defendant police officers had not been served. (Tann Decl. ¶¶ 12, 13.) Despite this notice, Plaintiff took no steps to serve Officer Lopez, request an extension of the 120-day period (Tann Decl. ¶ 18), or request assistance in locating the officers. An attorney's inadvertence, neglect, or ignorance of the rules does not constitute good cause for untimely service. *McKibben v. Credit Lyonnais,* No. 98 Civ. 3358, 1999 U.S. Dist. 12310, at \*9 (S.D.N.Y. Aug. 9, 1999) (citing Klein v. Williams, 144 F.R.D. 16, 19-20 (E.D.N.Y.1992)). Under the circumstances in this case, Plaintiff fails to establish good cause for untimely service. See Bogle-Assegai v. Connecticut, 470 F.3d 498, 508 (2d Cir.2006) (holding that the plaintiff failed to establish good cause where she knew that defendants thought service was improper and made no effort to remedy this defect or ask the court to extend her time to effect service).

Nor is this a case where an extension should be granted in the Court's discretion despite the absence of good cause. In considering whether or not to grant an extension absent a showing of good cause, the Court must weigh the impact a dismissal or extension would have on the parties. Zapata, 502 F.3d at 197. Dismissing the complaint without prejudice in this case would have serious consequences for Plaintiff because the statute of limitations would bar him from re-filing. On the other hand, these consequences are attributable in large part to Plaintiff and his counsel's neglect and failure to prosecute. Plaintiff's counsel filed the complaint on February 16, 2007, only three weeks shy of the expiration of the three-

year statute of limitations on his § 1983 claims. Even after being notified that the defendant officers had not been served, Plaintiff's counsel failed to make any further attempts to effect service or seek an extension of the 120-day period. Importantly, Plaintiff's counsel did not inform the Court that he had lost contact with Plaintiff until his December 12, 2007 letter requesting a stay of discovery, which the Court had ordered completed by January 1, 2008. In his letter, Plaintiff's counsel stated that he had "recently attempted to contact Mr. Davis on numerous occasions in order to respond to defendant's [discovery] demands" but had been unable to reach him by either phone or mail. (PL's Affirmation, Ex. B.) Although the Court granted counsel's request for a 60-day stay of discovery to "provide plaintiff the needed time to effectuate contact" (*id.*), counsel has not informed the Court that any contact has been restored. Furthermore, more than four years have passed since the alleged incident took place. Officer Lopez never received notice of this litigation, as he was never served and no depositions were ever taken to make him aware of the case against him. Were Plaintiff granted leave to effect service at this point, Officer Lopez would suffer considerable prejudice in defending against the case, as the facts would have certainly faded from memory. Under these circumstances, the Court declines to exercise its discretion to grant an extension for service under *Zapata.*

### III. Plaintiff's Claim against the City of New York

**\*5** Plaintiff alleges that the City of New York failed to properly train and supervise the police officers who deprived Plaintiff of his constitutional rights. (Compl.¶¶ 65-66.) Defendants seek to dismiss Plaintiff's claim against the City of New York on the grounds that the complaint fails adequately to state a claim for municipal liability and that, even if the claim is adequately plead, Plaintiff fails to proffer any evidentiary support for the claim.

A municipality may not be held liable under 42 U.S.C. § 1983 for the conduct of its employees based on a theory of respondeat superior. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal liability attaches only if the plaintiff can show that a municipal policy or custom caused the deprivation of his constitutional rights. *Id.* at 690-91. Where a plaintiff alleges municipal liability based on a failure to train and supervise, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," and therefore amounts to an

actionable city "policy or custom." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

In *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the Supreme Court held that district courts may not apply a "heightened pleading standard" beyond what is generally required by Federal Rule of Civil Procedure 8(a) to Section 1983 complaints alleging municipal liability. *Id.* at 164. *Leatherman* appears to reject the pleading standard applied by the Second Circuit in *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993), which held that the allegation of a single incident involving only actors below the policymaking level does not suffice to state a claim of municipal liability under Section 1983. *See Simpkins v. Bellevue Hosp.,* 832 F.Supp. 69, 73 n. 3 (S.D.N.Y.1993); *see also Cooper v. Metro. Transp. Auth.,* 2006 U.S. Dist. LEXIS 47970, at \*9-10 (S.D.N.Y. July 13, 2006). Since *Leatherman.* courts in this district have denied motions to dismiss complaints alleging that an individual officer's conduct conformed to official policy or custom or that an individual officer was empowered to make policy decisions on behalf of the municipality. *See, e.g., Cooper,* 2006 U.S. Dist. LEXIS 47970, at \*9-10 (holding that "[u]nder the *Leatherman* rule ... Plaintiff's bare allegations that Harrington was a "policy maker" and that both Harrington and Paul were empowered to make policy decisions on behalf of Metro-North/MTA are sufficient" to withstand a motion to dismiss); *Lucas v. New York City,* 1995 U.S. Dist. LEXIS 17017, at \*7, 1995 WL 675477 (S.D.N.Y. Nov. 14, 1995) (denying the motion to dismiss plaintiff's § 1983 claim under *Leatherman* to the extent plaintiff alleges he was arrested pursuant to the long established policy of racially selective law enforcement attributable to the City). Plaintiff, represented by counsel in this case, fails adequately to plead a claim of municipal liability against the City of New York. Even the usual pleading standard of Rule 8(a) still requires more than conclusory allegations. *Bell Atlantic v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (stating that Rule 8(a) "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *see also Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (stating that on a motion to dismiss, a district court is "not bound to accept as true a legal conclusion couched as a factual allegation"). Plaintiff makes only the conclusory allegation that the City of New York "failed to properly train the person(s) who deprived [Plaintiff] of his civil rights" and "failed to properly supervise the person(s) who deprived [Plaintiff] of his civil rights ."

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 25 of 102

**\*6** Such conclusory allegations that a municipality failed to train and supervise its employees is insufficient to state a *Monell* claim. *See McAllister v. New York City Police Dep't,* 49 F.Supp.2d 688, 705 (S.D.N.Y.1999) ("Conclusory allegations of a municipality's pattern or policy of unconstitutional behavior are insufficient to establish a *Monell* claim, absent evidence to support such an allegation."); *Oparaji v. City of New York,* 1997 U.S. Dist. LEXIS 23686, \*10, 1997 WL 139160 (E.D.N.Y. Mar. 21, 1997) (dismissing a *Monell* claim for failure to state a claim where plaintiff alleged only that the City had a policy, practice or custom of failing to adequately screen, hire and train police officers which resulted in the violation of his constitutional rights).

Plaintiff argues that summary judgment is inappropriate at this stage because no discovery has taken place. The Court granted Plaintiff's request for a stay of discovery from December 20, 2007 to February 12, 2008, and prior to the stay, Defendants had not responded to Plaintiff's document demands and interrogatories served on November 19, 2007.

Generally, before summary judgment may be granted, the nonmoving party "must have had the opportunity to discover information that is essential to his opposition to the motion ... [and] only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veteran Affairs,* 201 F.3d 94, 97 (2d Cir.2000) (internal quotations omitted). If, however, the allegations of a plaintiff's Section 1983 claim are insufficient as a matter of law or could not be aided by discovery, a district court may grant summary judgment even without discovery. *M.B. v. Reish,* 119 F.3d 230, 232 (2d Cir.1997) (concluding that the district court's denial of discovery was within its discretion because plaintiff's claims were insufficient as a matter of law and plaintiff failed to present a credible basis to suggest discovery would produce favorable evidence). In rejecting the heightened pleading standard for Section 1983 claims in *Leatherman,* the Supreme Court noted that "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Leatherman,* 507 U.S. at 168-169.

In this case, Plaintiff has not made any showing that further discovery is likely to lead to evidence supporting Plaintiff's claim against the City of New York. Moreover, because Plaintiff's complaint fails to state a claim of municipal liability upon which relief may be granted, Plaintiff's claim against the City of New York is insufficient as matter of law. On these grounds, Defendant City of New York's motion for summary judgment is granted.

#### IV. Plaintiff's Claim against NYPD

It is well settled that NYPD, as an agency of the City of New York, lacks independent legal existence and is therefore not a suable entity. *Jenkins v. City of New York,* 478 F.3d 76, 93 n. 19 (2d Cir.2007); *see also* N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."). In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff concedes that NYPD is a non-suable entity and discontinues his claim against NYPD. Accordingly, the claim against NYPD is dismissed.

#### CONCLUSION

**\*7** For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 12) is granted. The claims against Defendant Police Officers George Lopez and "John Doe" are dismissed for non-service, the claims against Defendant City of New York for failure to state a claim and insufficiency as a matter of law, and the claims against NYPD because it is not a suable entity.**

**IT IS SO ORDERED.**

#### All Citations

Not Reported in F.Supp.2d, 2008 WL 2511734

---

### Footnotes

---

1    Plaintiff acknowledges that the zip code was written as "10026" in error and that the correct zip code is 10007. (Tann Decl. at 2 n. 1.)

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4392522
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Patricia Scott FLEMING, as Administratrix of the Estate of Patrick Fleming and Individually, Plaintiff,

v.

The CITY OF NEW YORK, New York City Department of Corrections, Corizon Health, Inc., Physician Affiliate Group of New York, Elmhurst Hospital Center, Bellevue Hospital Center, Richard Holman, Nicole Lanatra, Mary Lynn Nierodzik, Roopalekha Shenoy, Aaron Stern, Jennifer Wu, Captain Desmond Blake, Captain Johanne Saint-fleur, Correctional Officer Timothy Owens, Correctional Officer Fred Rolle, Correctional Officer Jorel Ward, Correctional Officer David Whitaker, Correctional Officer John Wisti, Correctional Officer Curlee Williams, John Does 1-38, Endo International PLC, Endo Health Solutions, Inc., Maung Maungoo, M.D., M.D. Joon Park, P.A. Christopher Larosa, Nurse Mahmood, Commissioner Joseph Ponte, Correctional Officer Reyes, M.D. Myat Win, M.D. Antonio Martinez, and New York City Health and Hospitals Corporation, Defendants.

18 Civ. 4866 (GBD)
|
Signed 08/27/2019

**Attorneys and Law Firms**

Eden P. Quainton, Quainton Law, PLLC, New York, NY, for Plaintiff.

Susan P. Scharfstein, New York City Law Department, New York, NY, for Defendants City of New York, Captain Desmond Blake, Correctional Officer Fred Rolle, Correctional Officer Jorel Ward, Correctional Officer John Wisti, Correctional Officer Curlee Williams, Commissioner Joseph Ponte.

Susan P. Scharfstein, New York City Law Department, New York, NY, for Defendant New York City Department of Corrections.

Ana Maria Vizzo, Doreen Dufficy, Heidell, Pittoni, Murphy & Bach, LLP, Daryl Paxson, Lord Day Lord, White Plains, NY, for Defendants Corizon Health, Inc., Physician Affiliate

Group of New York, Richard Holman, Nicole Lanatra, Mary Lynn Nierodzik, Roopalekha Shenoy, Aaron Stern, Jennifer Wu, Maung Maungoo, M.D., Joon Park, M.D., P.A. Christopher Larosa, Nurse Mahmood, Myat Win, M.D., Antonio Martinez, M.D., New York City Health And Hospitals Corporation.

Daryl Paxson, Lord Day Lord, White Plains, NY, for Defendants Elmhurst Hospital Center, Bellevue Hospital Center.

Angela Rosalee Vicari, Arnold & Porter Kaye Scholer LLP, New York, NY, for Defendant Endo Health Solutions, Inc.

## MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, United States District Judge:

**\*1** Plaintiff Patricia Scott Fleming brings this action alleging that her son Patrick Fleming was subject to assault and medical malpractice during his pretrial detention at Rikers Island Correctional Center ("Rikers") from October 2012 until his release on June 4, 2017. (First Am. Compl. ("FAC"), ECF No. 6.) Specifically, she brings claims under the Constitution, enforceable under 42 U.S.C. § 1983; the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12131–12165; and the Rehabilitation Act (the "RA"), 29 U.S.C. § 794a. Plaintiff raises nineteen claims including twelve state law causes of action. [1]

Defendants moved to dismiss Plaintiff's first amended complaint for failure to state a claim pursuant to Rule 12(b) (6). [2] (Notice of Mot. ("Med. Defs.' Mot."), ECF No. 72; Notice of Mot. ("City Defs.' Mot."), ECF No. 85.)

The Medical Defendants' motion to dismiss is GRANTED as to all of Plaintiff's claims under Count Two (ADA claims), Count Three (RA claims), Count Nine (negligent hiring and retention), Counts Eleven and Eighteen (§ 1983 *Monell* claims), Count Seventeen (§ 1983 claim for loss of familial relationship), and Count Nineteen (declaratory judgment). The Medical Defendants' motion to dismiss is also GRANTED as to Counts Fourteen (medical malpractice) and Fifteen (wrongful death) against Dr. Richard Holman, Nurse Mahmood, and PA Larosa. The Medical Defendants' motion to dismiss Count One (§ 1983 claims for deliberate indifference to medical needs) is GRANTED as to Dr. Joon Park, and DENIED as to Drs. Maung Maungoo, Myat Win, and Antonio Martinez.

Case 9:23-cv-00362-BKS-ML Document 58 Filed 05/06/26 Page 28 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

**\*2** The City Defendants' motion to dismiss is GRANTED as to Count One (§ 1983 claims for deliberate indifference to safety, unconstitutional conditions of confinement, and retaliation), Count Ten (negligent hiring and retention), Counts Eleven and Eighteen (§ 1983 *Monell* claims), Count Sixteen (§ 1983 claims for malicious prosecution pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963)), Count Seventeen (§ 1983 claim for loss of familial relationship), and Count Nineteen (declaratory judgment).[3] The City Defendants' motion to dismiss is DENIED as to Count One (§ 1983 claims for deliberate indifference to medical needs), Count Two (ADA claims), Count Three (RA claims), and Count Seven (negligence).

## I. FACTUAL AND PROCEDURAL BACKGROUND [4]

Fleming was arrested in October 2012 on charges of "reckless driving and reckless endangerment" in connection with a vehicle accident that occurred while he was released on bail under separate armed robbery charges. (FAC ¶¶ 58–65.) In May 2015, Fleming plead guilty to one of the armed robberies that took place in 2011, accepting a nine-year prison term. (*Id.* ¶ 76.) In July 2015, the court granted Fleming's motion to withdraw this plea. (*Id.* ¶ 84.) On May 25, 2017, Fleming plead guilty a second time to an armed robbery, receiving a five-year sentence, which he had already served. (*Id.* ¶ 182.) Fleming was released from detention on June 3, 2017. (*Id.* ¶ 186.) He passed away on June 20, 2017, seventeen days after he was released. (*Id.* ¶ 193.)

### A. Assault Allegations.
Plaintiff alleges that, on April 21, 2015, correctional officers Defendants John Does 1–3 "instigated, condoned, and turned a blind eye" to a violent assault on Fleming by three gang members. (*Id.* ¶ 72.)

On June 8, 2015, Fleming was brought to court for sentencing pursuant to his first guilty plea. (*Id.* ¶ 78.) Plaintiff alleges that the DOC knew that Fleming had "a protective custody classification" because of his mental illness, which entitled him to accommodations that would protect him from physical injury. (*Id.* ¶ 79.) Plaintiff Fleming was nonetheless placed in the general population holding pen. (*Id.* ¶ 79–80.) According to Plaintiff, Fleming informed one of the correctional officers of his protective custody status. (*Id.* ¶ 80.) Instead of investigating Fleming's housing status, the correctional officer responded, "[G]et the f\* \* \* back in the pen." (*Id.*) Plaintiff alleges that the correctional officers then violently assaulted Fleming. (*Id.*)

**\*3** On August 16, 2015, Fleming was transferred to the Anna M. Kross Center ("AMKC") at Rikers. (*Id.* ¶ 88.) During a preventative search of the facility, Fleming allegedly told several correctional officers that "he was being threatened by gangs in the AMKC facility and asked that he not be housed with gang members in that facility." (*Id.* ¶ 89.) In response, one of the correctional officers allegedly told Fleming that if he complained again, he would be "smacked around," causing Fleming to "unconsciously remove[ ] all his clothing in protest." (*Id.* ¶ 90–92.) The correctional officers then allegedly brutally assaulted Fleming. (*Id.* ¶ 92.) Fleming shared the details of this assault with Plaintiff while awaiting surgery at Bellevue Hospital to remove his right testicle, which had been injured during the assault. (*Id.* ¶ 95.) According to Plaintiff, "[a] subsequent investigation of the August 16 assault exonerated all the correctional officers involved." (*Id.* ¶ 96.)

On October 20, 2016, correctional officers allegedly punched and kicked Fleming in the stomach and slammed him on the concrete floor. (*Id.* ¶ 156.) The attack was so severe that Fleming had to be rushed to Elmhurst Hospital, "where he was found to have suffered from traumatic retroperitoneal bleeding of the abdomen." (*Id.*) Plaintiff alleges that these correctional officers tried to cover up the assault by creating a false record of the incident and isolating Fleming from visitation. (*Id.* ¶ 158.)

### B. Solitary Confinement Allegations.
On April 19, 2016, Fleming was placed in solitary confinement for thirty days after an altercation with another prisoner. (*Id.* ¶ 116.) During this thirty-day period, Plaintiff alleges that Fleming was denied access to medical care, water, food, and hygiene products. (*Id.*) She also alleges that correctional officers failed to refer Fleming to mental health services despite exhibiting "behaviors and traits that clearly called for [it]." (*Id.* ¶¶ 115–16.) According to Plaintiff, the DOC policy required Rikers medical and correctional staff to evaluate Fleming within 24 hours of his placement in solitary confinement, which, on information and belief, never happened. (*Id.* ¶ 117.) On May 22, 2019, Fleming was placed in a cell by himself in Rikers's West Facility. (*Id.* ¶ 119.)

### C. Medical Malpractice Allegations.

After the April 21, 2015 assault, Plaintiff alleges that Fleming was prescribed opioid medication for his pain, which "was medically unnecessary, was prescribed to sedate [Fleming] as a pretext for treating his mental condition and was recklessly prescribed without proper warning as to the addictive effect of opioids." (*Id.* ¶ 73.)

After the June 8, 2015 assault, Fleming was taken to Bellevue Hospital, "where he was diagnosed as suffering from a herniated disk, abrasions to his face, and hematoma to his forehead." (*Id.* ¶ 82.) At some point thereafter, he was referred to the clinic at Rikers, where Plaintiff alleges that Dr. Martinez prescribed him opioid medications "as a pretext for treating his mental condition. (*Id.* ¶ 83.)

After the August 16, 2015 assault, Fleming was taken back to the AMKC clinic, where Plaintiff alleges that Dr. Park failed to examine him properly, document his injuries, or report the assault to the DOC's internal affairs division. (*Id.* ¶ 93.) Shortly thereafter, he was taken to Elmhurst Hospital and then to Bellevue Hospital for further examination. (*Id.* ¶ 94.) The records of those visits allegedly show that he suffered from a hematoma to the right side of his forehead, bruises to his face and arms, and dry blood in his right ear, indicative of head trauma. (*Id.*) He also had bruises to the right shoulder and arm and was placed on a C-collar due to neck pain and tenderness. (*Id.*) Finally, Fleming had emergency surgery at Bellevue Hospital to remove his right testicle, which ruptured due to trauma to the groin area. (*Id.* ¶¶ 94–95.) The day after the surgery, on August 17, 2015, Fleming was diagnosed with testicular cancer from samples of tissue taken during the testicular removal surgery. (*Id.* ¶ 97.) On August 24, 2015, he was also diagnosed with hepatitis B. (*Id.*)

**\*4** Following the surgery, Fleming was admitted to Bellevue Hospital for several days due to complaints of extreme mental and emotional distress. (*Id.* ¶ 98.) On discharge, he was prescribed hydromorphone (an opioid) along with several anti-depressant, anti-psychotic, and anti-epileptic medications. (*Id.*)

After about a month, Fleming was transferred back to the North Infirmary Command ("NIC"), where Dr. Martinez and PA Larosa allegedly "refused to provide [Fleming] treatment for his hepatitis B." (*Id.* ¶ 100.) A couple of months later, in or about December 2015, Fleming told his mother and Dr. Martinez about blood he found in his stool. (*Id.* ¶ 101.) Dr. Martinez then allegedly "failed to conduct any testing or diagnostic evaluation to determine the cause of the bleeding, and, on information and belief, prescribed [Fleming] excessive and unnecessary quantities of opioid medication." (*Id.* ¶ 101.)

Between August and October of 2015, Plaintiff alleges that correctional officers "purposely and recklessly refused to notify [Fleming] of and/or allow him to report to" scheduled medical oncology appointments at Bellevue Hospital and Elmhurst Hospital "in retaliation for [Fleming] having implicated their fellow officers in the August 16 assault." (*Id.* ¶¶ 102–05.) From January 4 to January 30, 2016, Fleming again missed chemotherapy appointments for the same alleged reasons. (*Id.* ¶¶ 105, 109.) As a result, Fleming only went through three cycles of chemotherapy, in October and November 2015 and January 2016. (*Id.* ¶¶ 104, 112.)

On January 30, 2016, Fleming allegedly reported blood in his stool during a visit to Bellevue Hospital. (*Id.* ¶ 111.) Again, Plaintiff alleges that the medical staff[5] there "recklessly and with deliberate indifference to [Fleming's] medical needs failed to perform diagnostic tests to determine the source or cause of the internal bleeding reported by [Fleming]." (*Id.*)

After that visit, Plaintiff alleges that Fleming refused his fifth cycle of chemotherapy on multiple occasions out of "an irrational fear produced by his declining mental condition." (*Id.* ¶ 114.) Plaintiff further alleges that the Bellevue medical staff "failed to provide [Fleming] with appropriate psychiatric treatment and/or medication and repeatedly failed to perform adequate psychiatric evaluations to ensure that [he] gave informed consent when he was discharged without completing the full treatment protocol." (*Id.*)

In June 2016, after his release from solitary confinement, Fleming allegedly complained of excruciating abdominal pain and blood in his stool to Plaintiff and to medical staff[6] at the jail. (*Id.* ¶ 120.) Again, Plaintiff alleges that the medical staff "failed to conduct appropriate testing to determine the cause of the bleeding, and further failed to make a referral so that [Fleming's] condition could be appropriately diagnosed and treated by a qualified outpatient medical provider." (*Id.*) Plaintiff alleges that they prescribed large doses of opioids "to sedate [Fleming] as a pretext for treating his mental condition." (*Id.* ¶ 121.) Plaintiff also alleges that Nurse Mahmood "refused to administer to [Fleming] his prescribed medications" for depression, anxiety, schizophrenia, and epilepsy. (*Id.* ¶ 122.)

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 30 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

**\*5** That month, Fleming began his first five-day cycle of intensive "TIP" chemotherapy at Bellevue Hospital, after it was discovered that his cancer had spread and that his medical condition deteriorated. (*Id.* ¶¶ 123–24.) Plaintiff alleges that Fleming told her that Dr. Nowitzki denied Fleming's request for a one-day break from the treatment because it made him "violently ill." (*Id.* ¶ 124.)

On July 6, 2016, Fleming allegedly complained again to medical staff[7] at the jail of excruciating abdominal pain and blood in his stool. (*Id.* ¶ 127.) The next day, the staff conducted a CAT scan, which was allegedly "inconclusive" because they failed to administer an appropriate contrast solution and to instruct Fleming not to eat ahead of time. (*Id.* ¶ 128.) The medical staff allegedly failed to properly perform a second CAT scan with contrast, "which would have evaluated the progress of Fleming's cancer, which ... had metastasized and spread to his liver." (*Id.*) On July 14, 2016, HHC refused the Legal Aid Society's ("Legal Aid's") request to conduct a second CAT scan on Fleming. (*Id.* ¶ 129.)

On July 21, 2016, Plaintiff alleges that Fleming was "discharged on the false pretext that [he] had 'refused' " his second cycle of TIP chemotherapy, when in fact Fleming had complained to the attending nurse that he or she was inserting the drip into the wrong location on Fleming's arm. (*Id.* ¶ 130.) Plaintiff thus alleges, on information and belief, that the medical staff "made no attempt to examine Fleming or make an appropriate psychiatric referral to enable [him] to continue the scheduled TIP chemotherapy." (*Id.*) Plaintiff also alleges that, upon Fleming's return from Bellevue, Dr. Maungoo and/or Dr. Win failed to refer Fleming to a mental health provider, to reschedule his chemotherapy, or to fully inform him about the possible implications of refusing treatment. (*Id.* ¶ 131.)

At the end of July 2016, Plaintiff alleges that Dr. Maungoo and/or Dr. Win again ignored Fleming's abdominal pain and "failed to refer [Fleming] to a qualified practitioner for diagnosis and treatment." (*Id.* ¶ 138.) Similarly, she claims that they failed to address Fleming's report that he lost his hearing. (*Id.* ¶ 140.) According to Plaintiff, the pain was so unbearable that DOC medical staff deemed Fleming unfit for his court appearance scheduled on July 28, 2016. (*Id.* ¶ 141.) Two months later, on September 20, 2016, Fleming contacted HHC directly to report that Dr. Maungoo and/or Dr. Win were ignoring his pain, and that "he feared his cancer had spread and that without proper medical treatment he would die." (*Id.* ¶ 142.) The next day, Fleming was taken to Bellevue Hospital but was not seen by any doctors. (*Id.* ¶ 147.)

On September 27, 2016, Fleming was taken to Bellevue Hospital for his second five-day cycle of TIP chemotherapy. (*Id.* ¶ 148.) This time, he was allegedly classified as "code red," which meant that he had to be handcuffed, in a wheelchair, and kept separate from other civilians or prisoners. (*Id.*) Plaintiff alleges, however, that upon arriving, a correctional officer attempted to force Fleming into a room with an unrestrained prisoner. (*Id.*) When Fleming verbally protested and informed the correctional officer "that he feared for his life and that he was terrified of being in a room with an unrestrained prisoner," the officer called additional security personnel who forcefully restrained and removed Fleming from the hospital premises. (*Id.* ¶¶ 149–50.) As a result, the medical staff[8] at Bellevue Hospital failed to refer Fleming to a psychiatrist, refused to further treat him, and instead referred his medical care to Elmhurst Hospital. (*Id.* ¶ 152–53.) On October 3, 2016, Fleming filed a grievance with HHC and DOC. (*Id.* ¶ 154.)

**\*6** After the October 20, 2016 assault, Defendant Dr. Aaron Stern allegedly discovered that Fleming had internal bleeding in the retroperitoneal region. (*Id.* ¶ 160.) Plaintiff alleges, however, that Dr. Stern "failed to perform an exploratory laparotomy to treat Fleming's internal bleeding and instead discharged [him] back to [Rikers] still bleeding internally." (*Id.* ¶ 161.)

On November 4, 2016, Fleming was finally able to begin his second five-day cycle of TIP chemotherapy. (*Id.* ¶ 162.) Plaintiff alleges that Defendant Dr. Roopalekha Shenoy once again denied Fleming's request for a one-day break to recuperate from the treatment, which along with the hospital food, was causing him severe nausea. (*Id.* ¶ 163.) Plaintiff also alleges that Elmhurst Hospital's tumor board incorrectly concluded that Fleming's tumor had grown due to refusal to accept cancer treatment, when in fact his noncompliance was the result of "psychiatric, mental, nutritional, and institutional reasons." (*Id.* ¶ 165.) According to Plaintiff, Fleming was discharged without completing the fifth day of the TIP cycle and without providing informed consent. (*Id.* ¶ 166.)

In February and March 2017, Fleming began his third and fourth TIP chemotherapy cycles at Elmhurst Hospital, respectively, but was again allegedly unable to complete them for the same reasons as the other two cycles. (*Id.* ¶¶ 170–72.)

On March 18, 2017, Plaintiff alleges that Fleming told her that Dr. Maungoo and/or Dr. Win again ignored Fleming's

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 31 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

complaints of bloody stools and severe back pain, failing to conduct appropriate tests to discover the source of the bloody stool, or to refer Fleming to another physician to do so. (*Id.* ¶¶ 173–74.) The next day, Plaintiff sent an ambulance to help her son at Riker's, but upon arrival the EMTs were allegedly told that there was no inmate by the name of "Patrick Fleming" there. (*Id.* ¶ 175.)

Plaintiff also alleges that, on May 17, 2017, a correctional officer who was responsible for the DOC's court transportation unit at Rikers refused to provide a wheelchair to transport Fleming to a court hearing. (*Id.* ¶¶ 179–80.) The hearing therefore had to be postponed a week, until May 25, 2017. (*Id.* ¶ 182.) The day after his hearing, on May 26, 2017, Fleming was allegedly barely conscious, crying out in agony, and pointing to his visibly bloated stomach. (*Id.* ¶ 183.) Plaintiff alleges that Dr. Maungoo and/or Dr. Win were prescribing him Percocet to mask the pain and underlying symptoms, instead of treating his condition. (*Id.*) Fleming was finally sent to Elmhurst Hospital "on the verge of death." (*Id.* ¶ 184.) He remained there for eight days, during which time Drs. Shenoy and Stern failed to adequately test Fleming "to determine the cause of [his] abdominal pain." (*Id.*)

On June 3, 2017, nine days after his last admittance at Elmhurst Hospital, Fleming received his court discharge papers, and Plaintiff transferred him to Mt. Sinai hospital for a second opinion. (*Id.* ¶ 187.) After several tests at Mt. Sinai, it was allegedly discovered that Fleming had been suffering from internal bleeding that could have been treated with a blood transfusion had it been discovered earlier. (*Id.* ¶ 188.) The transfusion was finally performed, but shortly afterwards, Fleming's liver and kidney failed, and it was determined that any further treatment would be futile. (*Id.*) Fleming passed away in Mt. Sinai's hospice unit on June 20, 2017. (*Id.* ¶ 193.)

### D. Allegations Of Unconstitutional Conditions Of Confinement.

**\*7** On March 22, 2017, Fleming returned to his cell to find that a pipe had been smashed spilling sewage all over his cell. (*Id.* ¶ 177.) Defendant John Doe 28 then allegedly ordered him to "get on his hands and knees and clean the feces from his cell." (*Id.*) Plaintiff alleges that Fleming called her afterwards to tell her what happened. (*Id.*)

### E. Third-Party Efforts To Secure Proper Medical Treatment Or Compassionate Release.

Plaintiff alleges that several third parties reached out to the DOC, HHC, and Commissioner Joseph Ponte to request that Fleming receive proper medical treatment or compassionate release. For example, on July 22, 2016, Legal Aid emailed an HHC physician requesting Fleming's compassionate release. (*Id.* ¶ 134.) That same day, New York City Assemblywoman Linda Rosenthal "wrote to Commissioner Ponte and informed [him] that [Fleming's] cancer had spread to his liver and that the 'urgency of his treatment is immense.' " (*Id.* ¶ 135.) On July 25, 2016, at the request of Fleming's father, Legal Aid requested that HHC take Fleming for proper treatment. (*Id.* ¶ 137.) Legal Aid renewed this request on September 20, 2016. (*Id.* ¶ 146.)

### II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court makes this determination by "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Schwamborn v. Cty. of Nassau*, 348 F. App'x 634, 635 (2d Cir. 2009). Still, the plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

A district court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Taveras v. UBS AG*, 513 F. App'x 19, 22 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679).

"In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Hogan v. Fischer,* 738 F.3d 509, 514 (2d Cir. 2013) (quoting *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 113 (2d Cir. 2010)).

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 32 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

## III. PLAINTIFF'S *MONELL* CLAIMS ARE DISMISSED

Count Eleven alleges that the City and HHC (the "*Monell* Defendants") deprived Fleming of his constitutional rights under 42 U.S.C. § 1983, pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (FAC ¶¶ 239–245.) However, Plaintiff's vague and conclusory allegations that the *Monell* Defendants had a "custom, practice, or pattern" of deliberate indifference to the constitutional rights of prisoners, and that they failed to train their staff to prevent such deprivations, are insufficient to plausibly allege a *Monell* claim.[9]

**\*8** A municipality may be liable under § 1983 only "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692.) Accordingly, the *Monell* Defendants are liable under § 1983 only if Plaintiff sufficiently alleges that (1) they officially promulgated or adopted an official policy to that effect, *see Monell*, 436 U.S. at 690; (2) an official responsible for establishing a final policy with respect to the subject matter in question made a deliberate choice to that effect, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986) (plurality opinion); (3) subordinate officials engaged in "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law,' " *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (citations omitted); or (4) they failed to train or supervise their employees to a degree that evinces a "deliberate indifference to the rights of persons with whom [they] come into contact," *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). Plaintiff must also plausibly allege that there is a "*direct causal link* between municipal policy or custom and the alleged deprivations." *Canton*, 489 U.S. at 385 (emphasis added).

Plaintiff does not allege that the *Monell* Defendants are liable under the first or second theories of municipal liability. Rather, her allegations fall under the third and fourth theories: (1) the *Monell* Defendants' subordinates engaged in "longstanding customs, policies, and practices" including "the use of excessive force and the deliberate indifference to and reckless disregard of [inmates'] medical needs, physical safety and bodily integrity"; and (2) the *Monell* Defendants failed "to properly train and supervise prison and medical staff." (FAC ¶ 241–42.)

The amended complaint's allegations of widespread "customs, patterns, and practices" are all stated in formulaic, boilerplate language, and "upon information and belief." (FAC ¶¶ 68, 70, 74, 92, 93, 125, 132, 144, 157.) These conclusory allegations "upon information and belief" are insufficient to establish a *Monell* claim because Plaintiff does not explain which facts, other than her son's alleged experiences in prison, support her belief that his alleged deprivation of rights is part of the *Monell* Defendants' existing "customs, patterns, or practices." *See D'Alessandro v. City of N.Y.*, 713 F. App'x 1, 10 (2d Cir. 2017) (finding that Plaintiff "[did] not sufficiently allege a pattern of similar constitutional violations by the District Attorney's Office" because he "never mentions specific instances of prosecutorial misconduct beyond [his] own case"); *Missel v. Cty. of Monroe*, 351 F. App'x 543, 545–46 (2d Cir. 2009) ("The allegations that [defendant] acted pursuant to a 'policy,' without any facts suggesting the policy's existence, are plainly insufficient."); *Twombly*, 550 U.S. at 551–53 (noting that allegations "upon information and belief" are insufficient to overcome a motion to dismiss where plaintiff does not support them with a statement of facts that creates a plausible inference of their truth). Nowhere in the amended complaint does Plaintiff allege specific, plausible allegations that the *Monell* Defendants were the "moving force" behind Fleming's deprivation of rights. *Canton*, 489 U.S. at 389; *see also Montero v. City of Yonkers, N.Y.*, 890 F.3d 386, 403–04 (2d Cir. 2018) ("[T]he mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.") (quoting *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)). Plaintiff's conclusory allegations are therefore insufficient to allege that the *Monell* Defendants have a longstanding custom, pattern, or practice of using excessive force, or of being deliberately indifferent to inmates' medical needs or physical safety.

**\*9** Plaintiff's "failure to train and supervise" allegation is also insufficient because Plaintiff does not offer facts to plausibly allege that they knew "to a moral certainty" that (1) their employees would confront a given situation, (2) the situation presents their employees with a difficult choice of

the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation, and (3) the wrong choice by the employees would frequently cause the deprivation of a citizen's constitutional rights. (City Defs.' Mem. at 12 (citing *Canton*, 489 U.S. at 388; *Jenkins v. City of N.Y.*, 478 F.3d at 94); Med. Defs.' Mem. at 11 (citing *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992))).) Here, Plaintiff does not attempt to allege any of the three prongs required for a "failure to train" *Monell* claim. In fact, Plaintiff alleges no facts to support her sole threadbare statement that the *Monell* Defendants had a practice and custom involving "failing to properly train and supervise prison and medical staff notwithstanding widespread reports of abuse and clear notice of the need for corrective action." (FAC ¶ 242.) This "simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury." *Dwares*, 985 F.2d at 100–01; *see also Triano v. Town of Harrison, NY*, 895 F. Supp. 2d 526, 540 (S.D.N.Y. 2012) ("After *Twombly* and *Iqbal*, the Second Circuit has made clear that Plaintiff must do more than merely state that the municipality's failure to train caused his constitutional injury."). Plaintiff's conclusory and boilerplate allegation that the *Monell* Defendants "failed to train" their prison and medical staff is thus insufficient to plausibly plead a *Monell* claim.

Accordingly, Plaintiff fails to state a *Monell* claim against the *Monell* Defendants.

### IV. PLAINTIFF'S § 1983 CLAIMS ARE PARTIALLY DISMISSED AGAINST THE C.O. DEFENDANTS AND RIKERS MEDICAL DEFENDANTS

Count One alleges that several Rikers correctional officers (the "C.O. Defendants") [10] and Rikers medical staff members (the "Rikers Medical Defendants") [11] deprived Fleming of his constitutional rights under 42 U.S.C. § 1983. [12] (FAC ¶¶ 195–200.)

Plaintiff's first cause of action alleges that these Defendants are liable for (1) using excessive force on Fleming, (2) being deliberately indifferent to Fleming's medical needs, (3) being deliberately indifferent to Fleming's safety, (4) subjecting Fleming to unconstitutional conditions of confinement, and (5) retaliating against Fleming. Those claims arise under 42 U.S.C. § 1983, which permits a civil action against

any "defendant 'who under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States].' " *Davis v. Shah*, 821 F.3d 231, 244 (2d Cir. 2016) (quoting 42 U.S.C. § 1983). [13]

To state a claim under the Fourteenth Amendment for deliberate indifference to medical needs, health or safety, or unconstitutional conditions of confinement during pretrial detention, Plaintiff must plausibly allege that (1) "the challenged conditions were *sufficiently serious* to constitute objective deprivations of the right to due process" (the "objective prong") and (2) defendants "acted with at least *deliberate indifference* to the challenged conditions" (the "*mens rea* prong"). *Darnell v. Pineiro*, 849 F.3d 17, 29–30 (emphasis added) (applying the two-part test to conditions of confinement claim); *see also Isaac v. City of N.Y.*, No. 17 Civ. 1021 (PGG), 2018 WL 1322196, at *3 (S.D.N.Y. Mar. 13, 2018) (applying the two-part test to deprivation of medical care claim). The "deliberate indifference" standard may be met by showing that defendants "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [defendants] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35 (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015)); *see also id.* at 33 n.9 (noting that "deliberate indifference means the same thing for" both "claim[s] for deliberate indifference to medical needs" and claims for "unconstitutional conditions of confinement").

### A. Plaintiff Has Stated A Claim For Deliberate Indifference To Medical Needs Against The C.O. Defendants.

**\*10** Plaintiff alleges that the C.O. Defendants were indifferent to Fleming's medical needs because they (1) failed to refer him to mental health services (FAC ¶¶ 115–17, 151), (2) denied him food appropriate for a cancer patient (*id.* ¶ 126); and (3) placed him in solitary confinement unsuitable for a cancer patient (*id.* ¶ 118).

Plaintiff "does not plead any facts that give rise to even an inference that the [C.O. Defendants] knew of, and disregarded, [Fleming's] alleged need for psychiatric services—for example, facts that the officers were familiar with psychosis symptoms and that [Fleming] was actually

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 34 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

exhibiting those symptoms." (City Defs.' Mem. at 4.) Although Plaintiff vaguely alleges that "[Fleming] exhibited behaviors and traits that clearly called for a mental health referral," she does not specify what those "behaviors and traits" were, or the mental illness of which they allegedly were symptoms. (FAC ¶ 115.) Plaintiff also alleges that Fleming's April 19, 2016 altercation with another inmate "resulted from Fleming's deteriorating mental state," but she does not specify what that "mental state" was. (*Id.* ¶ 116.) In fact, Plaintiff does not offer any "specific information about any particular mental illness or any diagnoses from a medical professional." *Selah v. N.Y.S. DOCS Comm'r.*, No. 04 Civ. 3273 (DC), 2006 WL 2051402, at *4 (S.D.N.Y. My 25, 2006). These conclusory allegations that Fleming suffered from "some kind of mental illness[ ] ... [are] insufficient to rise to the level of a constitutional violation for failure to provide medical care." [14] *Id.* at *5.

Courts in this Circuit have held that prison officials must provide an inmate with a specific diet *only* when his or her *treating physician prescribes it* as part of treatment for a diagnosed condition. *Mandala v. Coughlin*, 920 F. Supp. 342, 355 (E.D.N.Y. 1996) (finding that Plaintiff had a medical need for a high-fiber diet because "[he] had major surgery after which the *treating physicians* advised him that he would need a special diet to heal properly" (emphasis added)); *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996) (holding that prison officials were not responsible for depriving plaintiff of soft-food diet because "[his *treating physician*], not [defendants], ultimately removed the plaintiff from his diet ..." (emphasis added)); *Johnson v. Harris*, 479 F. Supp. 333, 335 (S.D.N.Y. 1979) (holding that prison officials violated a brittle diabetic plaintiff's Eight Amendment rights by denying him a low-sugar and low-carb diet "despite the fact that [his *treating physician*] ordered such a diet for plaintiff" (emphasis added)). In contrast, Plaintiff here does not allege that Fleming was prescribed a special diet as part of his cancer or hepatitis B treatment. She only asserts that Fleming was "unable to tolerate the regular diet" offered in the prison because of his chemotherapy. (FAC ¶ 126.) Even assuming this allegation to be true, it is insufficient to find that Fleming required a special diet as part of his medical needs, much less that the C.O. Defendants were deliberately indifferent to this need. *Word v. Croce*, 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001) ("Plaintiff's self-diagnosis of irritable bowel syndrome is insufficient to support a medical condition requiring a special diet.")

**\*11** Regarding solitary confinement, Defendants argue that "Plaintiff has not alleged any facts showing that it is objectively dangerous for a cancer patient to be placed in solitary confinement, or that [they] had knowledge of such danger." [15] (City Defs.' Mem. at 4.) Plaintiff summarily alleges that solitary confinement is "medically dangerous and inhumane," and therefore unsuitable for a patient in the early stages of cancer, whose "immune system is critical to his ability to fight the progression of the disease." (FAC ¶ 118.) This allegation that solitary confinement is inherently hurtful to cancer patients is insufficient to state a claim for deliberate indifference to Fleming's medical needs.

But Plaintiff also alleges that Fleming "languished then in solitary confinement for 30 days where he was *denied appropriate ... medical treatment*, as well as access to water, nutrition, and hygiene." (*Id.* ¶ 117 (emphasis added).) The amended complaint also alleges that Fleming was diagnosed with testicular cancer on August 17, 2015 and with hepatitis B on August 24, 2015, several months *before* he was placed in solitary confinement on April 19, 2016. (FAC ¶¶ 97, 116.) In between that time, Plaintiff went through at least five cycles of chemotherapy. (FAC ¶¶ 104–07, 112, 114.) The C.O. Defendants do not challenge these allegations. Surely, denying treatment to a cancer and hepatitis B patient objectively constitutes a serious risk to his health. Furthermore, given his diagnosis and treatment timeline, the C.O. Defendants knew, or should have known, that Fleming was diagnosed with cancer and hepatitis B, and therefore that placing him in solitary confinement *without access to medical treatment* for thirty days could pose a serious risk to his health. *Darnell*, 849 F.3d at 35. Accordingly, assuming these allegations to be true, Plaintiff plausibly alleges that the C.O. Defendants were deliberately indifferent to Fleming's medical needs when they placed him in solitary confinement without access to appropriate medical treatment.

### B. Plaintiff Has Not Stated A Claim For Deliberate Indifference To Medical Needs Against Dr. Park.

Plaintiff alleges that Dr. Park saw Fleming *once* "[i]mmediately after the August 16 Assault," but failed to "[1] examine [him] thoroughly, ... [2] document [his] injuries in [his] medical record, and [3] report the assault to the DOC's internal affairs division so that [his] injuries could be photographed as part of the internal affairs investigation into the use of force." (FAC ¶ 93.) Plaintiff admits that "[s]hortly after being seen [by Dr. Park], [Fleming] was taken first to Elmhurst Hospital, then to Bellevue Hospital," where he was

Case 9:23-cv-00362-BKS-ML   Document 58   Filed 05/06/26   Page 35 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

treated for the assault injuries. (*Id.* ¶ 94.) Therefore, Dr. Park's allegedly insufficient examination caused, at most, a short delay in Fleming's treatment for the assault injuries. "Without more, such allegations of a limited delay or interruption in treatment are insufficient to plead an objectively serious risk to Plaintiff's health rising to the level of a constitutional claim." *Narvaez v. City of N.Y.*, No. 16 Civ. 1980 (GBD), 2017 WL 1535386, at *10 (S.D.N.Y. Apr. 17, 2017). Furthermore, Dr. Park's alleged failure to document the injuries in Fleming's medical record and to report the assault to the DOC internal affairs divisions do not constitute an "objectively serious" risk to Fleming's health because Plaintiff "fails to plead facts that could plausibly show how Defendant's record-keeping caused [further] injuries." *Davis v. McCready*, 283 F. Supp. 3d 108, 119 (S.D.N.Y. 2017).

### C. Plaintiff Has Stated A Claim For Deliberate Indifference To Medical Needs Against Drs. Martinez, Maungoo, and Win.

**\*12**  Plaintiff first alleges that Dr. Martinez was deliberately indifferent to Fleming's medical needs because, between August and December 2015, on January 6, 2016, and between January 7 and January 20, 2016, he "recklessly failed to investigate the reason for [Fleming's] non-appearance" for his scheduled appointments with the outpatient oncologist, despite knowing that Fleming had been diagnosed with cancer. (FAC ¶¶ 103, 106, 110, 112.) Similarly, she alleges that Drs. Maungoo and Win failed to reschedule Fleming's outpatient chemotherapy appointment in July 2016. (*Id.* ¶ 131.) Defendants argue that "[Plaintiff] does not claim that these brief delays caused or contributed to her [*sic*] injuries or Fleming's death." (Med. Defs.' Mem. at 20.) This is underscored by the fact that Fleming attended his appointments on October 2015, January 7, 2016, and January 30, 2016, although Plaintiff alleges that these appointments were "unnecessarily and unconscionably delayed." (FAC ¶¶ 104, 107, 112.) Again, allegations of brief delays or interruptions in treatment, without more, are not "sufficiently serious" to constitute a constitutional violation. *See Narvaez*, 2017 WL 1535386, at *10. Therefore, Plaintiff does not plausibly allege that Dr. Martinez was deliberately indifferent to Fleming's medical needs when he failed to follow up on Fleming's missed outpatient cancer treatment appointments.

Plaintiff also alleges in conclusory fashion that Dr. Martinez, Dr. Maungoo, and Dr. Win "prescribed opioid medication ... to sedate [Fleming] as a pretext for treating his mental condition ... in reckless disregard of the risk of furthering his addiction to narcotics." (FAC ¶¶ 83, 121.) Plaintiff's

allegation that her son was addicted to painkillers does not necessarily mean that these physicians had no reason, other than to "further his addiction," to prescribe him opioids. To the contrary, Plaintiff admits that Dr. Martinez prescribed Fleming pain killers after the brutal June 8, 2015 assault, which caused him "significant pain" from "a herniated disk, abrasions to his face, and hematoma to his forehead." (*Id.* ¶¶ 80–82.) Similarly, Drs. Maungoo and Win prescribed painkillers to Fleming after he complained of "excruciating abdominal pain." (*Id.* ¶ 120.) Surely, Fleming's considerable pain provided these physicians with a non-pretextual reason to prescribe him painkillers. Therefore, Plaintiff fails to plausibly allege that Drs. Martinez, Maungoo, and Win were deliberately indifferent to Fleming's opioid addiction, even if they did negligently fail to respond to it. *Darnell*, 849 F.3d at 36 ("[A]ny § 1983 claim for a violation of due process requires proof of a *mens rea greater than mere negligence.*") (citing *Kingsley*, 135 S. Ct. at 2472 (emphasis added)).

Additionally, Plaintiff alleges that, on August 24, 2015, Dr. Martinez "recklessly refused to provide Fleming treatment for his hepatitis B." (FAC ¶ 100.) Additionally, she claims that in December 2015, June 2016, July 2016, and September 2016, Drs. Martinez, Maungoo, and Win "failed to conduct any testing or diagnostic evaluation to determine the cause of" Fleming's bloody stools and "excruciating abdominal pain." [16] (*Id.* ¶¶ 100–01, 120–21, 127–28, 142.) The Rikers Medical Defendants' response is that they were aware that Fleming was being treated for cancer at Bellevue Hospital and that "mere disagreement over the proper treatment does not create a constitutional claim." (Med. Defs.' Mem. at 21, 22.) But Plaintiff is not alleging that she disagrees with Drs. Martinez, Maungoo, and Win's treatment, but rather that they completely *failed to treat Fleming*, despite clear signs that he increasingly suffered from excruciating abdominal pain, had ongoing bloody stools, and had been diagnosed with hepatitis B.

**\*13**  The Second Circuit has held that "if the unreasonable medical care is a *failure to provide any treatment* for an inmate's medical condition," courts are only required to "examine whether the inmate's medical condition is *sufficiently serious.*" [17] *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d. Cir. 2006) (emphasis added). "Factors relevant to the seriousness of a medical condition include [1] whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' [2] whether the condition 'significantly affects an individual's daily activities,' and [3] whether it causes 'chronic and substantial pain.' " *Id.* (alterations in

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 36 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

original) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). Plaintiff's amended complaint plausibly alleges that Fleming had excruciating abdominal pain, serious bloating, and ongoing bloody stools during the relevant time period. These conditions were undoubtedly worthy of Drs. Martinez, Win, and Maungoo's comment, significantly impeded Fleming's daily activities, caused Fleming chronic and substantial pain, and likely contributed to his death. Similarly, hepatitis B is a "serious medical condition" that, if gone untreated, could also cause chronic and substantial pain, and inability to conduct daily activities. (FAC ¶ 100.) Plaintiff's allegations regarding Fleming's untreated hepatitis B diagnosis, abdominal pain, bloating, and bloody stools, are sufficient to plausibly allege that he suffered from a serious medical condition, and thus satisfies the objective prong of the *Darnell* deliberate indifference analysis.

To satisfy the *mens rea* prong, this Court must "determine, without the benefit of medical expertise, whether an objectively reasonable person in [Drs. Martinez, Maungoo, and Win's] position would have known, or should have known, that [his or her] actions or omissions posed an excessive risk of harm to [Fleming]." *Davis*, 283 F. Supp. 3d at 120 (citing *Darnell*, 849 F.3d at 35). In other words, after *Darnell*, this Court must distinguish between negligent medical treatment and something more than negligence, which would give rise to a constitutional claim. *Darnell*, 849 F.3d at 36 ("[A]ny § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence." (citing *Kingsley*, 135 S. Ct. at 2472)). This endeavor is especially difficult at the motion to dismiss stage, where this Court lacks the benefit of expert testimony and other relevant facts unearthed through discovery. *Davis*, 283 F. Supp. at 122 ("Determining whether a reasonable medical provider would expect the conduct to result in excessive risk, as opposed to some lower baseline level of risk associated with any negligent medical conduct, may be difficult in the context of a motion to dismiss—a stage at which the court does not have the benefit of expert opinion.")

Here, Plaintiff plausibly alleges that Fleming told Drs. Martinez, Maungoo, and Win about his abdominal pain, bloating, and bloody stools to no avail. She also alleges that these physicians knew that Fleming was diagnosed with hepatitis B—a life-threatening disease—but failed to treat it. (FAC ¶ 97, 100.) Based on these allegations, it cannot be determined whether, as a matter of law, no reasonable physician in Drs. Martinez, Maungoo, and Win's position would have known, or should have known, that his or her

actions or omissions posed an excessive risk of harm to Fleming.

Accordingly, Plaintiff plausibly alleges that Drs. Martinez, Maungoo, and Win were deliberately indifferent to Fleming's medical needs when they refused to treat his hepatitis B and his abdominal pain, bloating, and bloody stools.

### D. Plaintiff Has Not Stated A Claim For Deliberate Indifference To Safety Against The C.O. Defendants.

Plaintiff alleges that, after Fleming was assaulted by gang members, the C.O. Defendants failed to protect him "from a clear danger to his physical safety at the hands of other prisoners." (FAC ¶¶ 85, 86, 196.) Defendants first argue that the gang member assault happened on August 21, 2016, "over three years before the complaint was filed on June 1, 2018, ... and as such is time-barred." (City Defs.' Mem. at 6 (citing *Watkins v. Ramos*, 14 Civ. 2748 (LGS), 2016 WL 3197565, at *8 (S.D.N.Y. June 7, 2016))). Indeed, "[b]ecause the events at issue here occurred [at Rikers], New York's 3-year residual statute of limitations for personal injury claims applies" to Plaintiff's § 1983 claim. *Watkins*, 2016 WL 3197565, at *8 (citing *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002); N.Y. C.P.L.R. § 214(5) (McKinney 2015)). Plaintiff does not challenge that her claims based on the August 21, 2015 assault are time-barred.

**\*14** Plaintiff's amended complaint otherwise contains no other "timely allegations that [Fleming] was assaulted by other inmates, but rather only alleges that he was, at times, in fear of assault by other inmates." (City Defs.' Mem. at 6.) "Fear of assault, by itself, does not constitute a 'sufficiently serious' injury sufficient to state a claim for failure to protect." *Best v. City of N.Y.*, 11 Civ. 4475 (JMF), 2012 WL 5458054, at *7 (S.D.N.Y. Nov. 8, 2012). Plaintiff's sole response is that here, unlike in *Best*, Fleming had been previously assaulted, and therefore the C.O. Defendants knew that he was at risk of being assaulted again. (Mem. of Law in Opp'n to Mots. To Dismiss of City of N.Y. and Affiliates ("City Opp'n"), ECF No. 105, at 13–15.) Even if that were true, however, it does not change the fact that Fleming was not assaulted by other inmates again, and that the sole basis for Plaintiff's indifference to safety claim is that Fleming was afraid of a *future* assault. Accordingly, Plaintiff has failed to properly allege that the C.O. Defendants were deliberately indifferent to Fleming's safety.

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 37 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

### E. Plaintiff Has Not Stated A Claim For Unconstitutional Conditions of Confinement Against The C.O. Defendants.

Plaintiff alleges that Fleming was required to clean up sewage that seeped from a broken sewage pipe in his cell. (FAC ¶¶ 177, 196.) The Second Circuit has held that inmates may recover damages for *prolonged* exposure to waste and unsanitary conditions that last for "several consecutive days." *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (holding that inmate subjected to several days of feces, urine, and sewage water in his cell, as well as five months of below-freezing temperatures, sufficiently alleged unconstitutional conditions of confinement under the Eighth Amendment). Plaintiff's claim does not withstand the Defendants' motion to dismiss because, unlike in *Gaston*, Plaintiff's exposure to sewage was "intermittent or limited to a matter of hours," albeit very unpleasant. *Ortiz v. Dep't. of Corr. of City of N.Y.*, No. 08 Civ. 2195 (RJS) (HBP), 2011 WL 2638137, at *7 (S.D.N.Y. Apr. 29, 2011) (R.&.R), *adopted by, Ortiz v. Hernandez*, 2011 WL 2638140 (S.D.N.Y. July 5, 2011); *see also Odom v. Keane*, No. 95 Civ. 9941 (SS), 1997 WL 576088, at *5 (S.D.N.Y. Sept. 17, 1997) (finding that a toilet failing to flush between 9 p.m. and 7 a.m. for several months "does not amount to cruel and unusual punishment"); *Evans v. Fogg*, 466 F.Supp. 949, 950 (S.D.N.Y. 1979) ("To be kept in a refuse-strewn cell for 24 hours and in a flooded cell ... for two days is a rough experience, but, since neither condition persisted for more than a limited period of time, it cannot be said that the condition amounted to cruel and unusual punishment.") Accordingly, Plaintiff has failed to properly allege that the C.O. Defendants subjected him to unconstitutional conditions of confinement.

### F. Plaintiff Has Not Stated A Claim For Retaliation Under The First Amendment.

To state a claim under § 1983 for retaliation under the First Amendment, Plaintiff must plausibly allege that (1) "[Fleming] engaged in constitutionally protected conduct" and (2) "the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The Second Circuit has defined "adverse action" as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation marks omitted)). Even if Plaintiff can demonstrate adverse action on the part of the C.O. Defendants, the C.O. Defendants

may avoid liability if they can establish that they would have taken the adverse action even in the absence of the protected conduct. *Bennett*, 343 F.3d at 137.

Regarding the first prong of the *Bennett* test, Plaintiff alleges that Fleming engaged in protected speech in the form of filing a grievance with HHC and Commissioner Ponte, and prompting New York Assemblywoman Rosenthal and Legal Aid to send letters of complaint to Commissioner Ponte and the HHC. (City Opp'n at 15–16; FAC ¶¶ 135, 146, 154, 176.) The Second Circuit has held that filing a grievance is conduct protected by the First Amendment. *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ("filing a grievance ... is constitutionally protected"); *Washington v. Afify*, 681 F. App'x 43 (2d. Cir. 2017) (same); *Faulk v. Fisher*, 545 F.App'x 56, 58 (2d Cir. 2013) (same). Similarly, prompting letters of complaint to be sent to prison officials also constitutes constitutionally protected conduct. *Smith v. Greene*, No. 9:06 Civ. 505 (LEK), 2008 WL 794978, at *4 (N.D.N.Y. Mar. 24, 2008) (finding that letter of complaint sent to Inspector General's office was conduct protected under the First Amendment). Plaintiff therefore has plausibly alleged the first prong of the retaliation test.

**\*15** However, as the C.O. Defendants point out, Plaintiff's allegations that Fleming's protected activity motivated the C.O. Defendants to retaliate against him are wholly conclusory. (City Def. at 8.) Indeed, Plaintiff only alleges that "[on] information and belief" the C.O. Defendants "decided to retaliate against" Fleming by assaulting him on October 20, 2016 and forcing him to clean up sewage in his cell on March 22, 2017. (FAC ¶ 155, 176–77.) These allegations are insufficient to withstand a motion to dismiss, even if the alleged assaults were in close temporal proximity to the filing of the grievance and the letters of complaint. *Afify*, 681 F. App'x at 45 ("Although we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required *some further evidence of retaliatory animus* before permitting a prisoner to proceed to trial on a retaliation claim." (citing *Bennett*, 343 F.3d at 138–39) (emphasis added)). Because Plaintiff does not allege any facts to support a finding of retaliatory animus on the part of the C.O. Defendants "other than merely describing their acts as retaliatory," she fails to plausibly plead a § 1983 claim for retaliation under the First Amendment. (City Defs.' Mem. at 8.)

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 38 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

## V. PLAINTIFF'S § 1983 CLAIMS ARE DISMISSED AGAINST COMMISSIONER PONTE

Counts One and Seventeen allege that Commissioner Ponte, in his individual capacity, deprived Fleming's and Plaintiff's constitutional rights under 42 U.S.C. § 1983. (FAC ¶¶ 195–200.) "A defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Victory v. Pataki*, 814 F.3d 47, 67 (S.D.N.Y. 2016) (quoting *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)). Rather, the Second Circuit requires Plaintiff to allege that Commissioner Ponte was *personally involved* in the deprivation of Fleming's constitutional rights. *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to ... § 1983 suits," Plaintiff must plausibly allege that "each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

Here, Plaintiff's allegations against Commissioner Ponte are insufficient to establish that he was personally involved in Fleming's deprivation of rights. First, as Defendants point out, all but one of Plaintiff's allegations against Commissioner Ponte involve group pleading. (FAC ¶¶ 196, 204, 220, 230, 234.) These allegations are not sufficient to allege personal involvement because they "fail to differentiate as to which defendant was involved in the alleged unlawful conduct." *Amadou v. Cty. of Spotsylvania, Virginia*, 12 Civ. 07789 (ALC), 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016) (citing *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)). Furthermore, Plaintiff's allegation that Commissioner Ponte "ignored" a letter from Assemblywoman Rosenthal, dated July 22, 2016, is also insufficient to state a claim for deliberate indifference to Fleming's constitutional rights under § 1983. (FAC ¶¶ 135–36.) Indeed, "Courts in this circuit have repeatedly held that the receipt of letters or grievances, by itself, does not amount to personal involvement." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (collecting cases). Therefore, without more, Plaintiff's allegation that Commissioner Ponte ignored Assemblywoman Rosenthal's letter is insufficient to conclude that he had personal involvement in Fleming's constitutional rights deprivation.

Accordingly, all claims against Commissioner Ponte in his individual capacity for deprivation of constitutional rights pursuant to § 1983 are dismissed.

## VI. PLAINTIFF'S § 1983 CLAIMS IN HER INDIVIDUAL CAPACITY ARE DISMISSED

Count Seventeen alleges that the C.O. Defendants and the Rikers Medical Defendants deliberately interfered with Plaintiff's "constitutionally protected liberty interest in her relationship with [Fleming], a fundamental right to the care, custody and nurture of her son, and a constitutional right to be able to make informed choices with and for a progressively incapacitated son." (FAC ¶¶ 269–72.)

**\*16** "The Fourteenth Amendment guarantees a substantive right under the Due Process Clause to intimate familial association...." *Gorman v. Rensselaer Cty*, 910 F.3d 40, 47 (2d Cir. 2018) (citing *Patel v. Searles*, 305 F.3d 130, 135–36 (2d Cir. 2002)). To properly state an intimate association claim, Plaintiff must allege that her separation from Fleming was " 'so shocking, arbitrary, and egregious' that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Id.*; *see also Anthony v. City of N.Y.*, 339 F.3d 129, 143 (2d Cir. 2003) (citing *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999)).

"Plaintiff's complaint does not allege that any of the individual defendants 'specifically intended' to target her relationship with her son." (City Defs.' Mem. at 17 (citing FAC, *passim*).) Last year, the Second Circuit joined "the consensus view of the circuit courts," holding that "a claim under the Due Process Clause for infringement of the right to familial associations *requires* the allegation that state action was *specifically intended to interfere* with the family relationship." *Gorman*, 910 F.3d at 48 (2d Cir. 2018) (emphasis added); *see also Phillips v. City of Orange*, 894 F. Supp. 2d 345, 380 n.32 (S.D.N.Y. 2012) (collecting cases where district courts in the Second Circuit found that intimate association claims are limited "to situations in which the state actor *intentionally targets* the familial relationship" (emphasis added)). Accordingly, Plaintiff's § 1983 claim for loss of her familial association with Fleming, raised in her individual capacity, is dismissed.

Case 9:23-cv-00362-BKS-ML   Document 58   Filed 05/06/26   Page 39 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

## VII. PLAINTIFF'S ADA AND RA CLAIMS ARE DISMISSED AGAINST HHC

Counts Two and Three allege that Commissioner Ponte, the City, and several Rikers correctional officers (the "ADA Defendants") violated Fleming's rights under the ADA and the RA because they failed to provide segregated housing and wheelchair access to "accommodate his mental and medical disabilities." (FAC ¶¶ 201–11.) Plaintiff has plausibly alleged that these deprivations contravene Fleming's rights under these statutes.

Plaintiff also names HHC in her second and third causes of action. (*Id.*) Defendant HHC correctly highlights, however, that "Plaintiff does not ... plead any facts showing that [it] [was] responsible for assigning housing, inmate segregation, or providing wheelchairs." (Med. Defs.' Mem. at 14.) Because those facts are the basis of Plaintiff's ADA and RA claims, her second and third causes of action are dismissed as to HHC.

Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the RA requires that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a). Because the standards under both statutes are generally the same and the subtle distinctions between the statutes are not implicated in this case, "[courts] treat claims under the two statutes identically." *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003).

**\*17** In order to state a *prima facie* violation of these acts, Plaintiff must allege that Fleming (1) "[was] a qualified individual with a disability"; (2) "[the ADA Defendants] [are] subject to the acts"; and (3) "[Fleming] was denied the opportunity to participate in or benefit from [the ADA Defendants'] services, programs, or activities or [the ADA Defendants] otherwise discriminated against him by reason of his disability." *Wright v. N.Y. St. Dep't. of Corrs.,* 831 F.3d 64, 72 (2d Cir. 2016) (citing *Henrietta,* 331 F.3d at 272). The ADA Defendants concede that Fleming was a qualified individual with a disability, in the form of "an acute medical condition, and a psychiatric condition[,]" and that they are

subject to the ADA and RA. (City Defs.' Mem. at 23–24; Med. Defs.' Mem. at 13.)

Plaintiff has plausibly alleged that the ADA Defendants denied Fleming access to a wheelchair to attend his scheduled court appearance on May 17, 2017 (FAC ¶¶ 179–82.). In fact, the hearing allegedly had to be rescheduled because Plaintiff was deemed too weak to attend without the wheelchair. (*Id.*)

Furthermore, Plaintiff plausibly states that the ADA Defendants housed Fleming with the general prison population on at least two occasions, despite his severe mental illness and in defiance of his "protective custody status." (*Id.* ¶¶ 72, 78–80, 86–91.) The amended complaint explains that "the court ordered [Fleming] into protective custody" after the April 21, 2015 assault. (*Id.* ¶ 72.) According to Plaintiff, on June 8, 2015, Fleming was taken to the courthouse to attend his sentencing hearing. The ADA Defendants then defied the court's protective custody by allegedly forcing Fleming into the jail's "general population holding pen" to await his sentencing hearing. (*Id.* at 78–81.) Plaintiff also alleges that when Fleming protested, the ADA Defendants violently assaulted him. (*Id.*)

Similarly, on August 16, 2015, Plaintiff alleges that the ADA Defendants forced Fleming into the general population housing unit at the AMKC facility. (*Id.* ¶¶ 86–92.) When Fleming complained that he was being "threatened by gangs in the AMKC facility and asked that he not be housed with gang members," one of the ADA Defendants allegedly told him that "he would be 'smacked around' if he complained." (*Id.* ¶ 90.) According to Plaintiff, "[Fleming] became frightened, started panicking, and in despair and fear unconsciously removed all his clothing in protest. Instead of contacting mental health staff, [one of the ADA Defendants] responded by physically assaulting [Fleming]." (*Id.* ¶ 92.)

Taken as true, these allegations raise genuine issues of material facts concerning (1) whether the ADA Defendants refused to isolate Fleming pursuant to the court's protective order, and provide him with a wheelchair; (2) whether these deprivations denied Fleming "meaningful access" to his medical care and court appearances; and (3) whether a reasonable accommodation existed to prevent this deprivation, such as segregated housing for mentally ill inmates in the jail and the AMKC facility. *Wright,* 831 F.3d at 72 ("In examining this claim, we ask whether a plaintiff with disabilities 'as a practical matter' was denied 'meaningful access' to services, programs or activities to which he or

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 40 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

she was 'legally entitled.' ") (quoting *Henrietta,* 331 F.3d at 273); *Fulton v. Goord,* 591 F.3d 37 (2d Cir. 2009) (remanding case to district court to determine whether a reasonable accommodation existed, and whether it "might have allowed [plaintiff] to participate in the" program to which she was legally entitled). Accordingly, Plaintiff plausibly states a *prima facie* failure to accommodate claim under the ADA and RA against the ADA Defendants for not placing Fleming in segregated housing for mentally ill patients, and for not providing him with a wheelchair to attend the May 17, 2017 court hearing.

## VIII. PLAINTIFF'S PROSECUTION-RELATED *BRADY* CLAIMS ARE DISMISSED

**\*18** Count Sixteen alleges that police officers Defendants John Does 36–38 "deliberately suppressed evidence favorable to [Fleming], including an exculpatory video that would have established [Fleming's] innocence," in violation of his constitutional rights pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963). (FAC ¶ 265.) She also alleges that they included "[Fleming] in a grossly suggestive line-up that caused [Fleming] to be misidentified as the perpetrator of a series of robberies of which he was innocent." (*Id.* ¶ 267.) As a result of the suppression of this exculpatory evidence, Plaintiff alleges that Fleming's detention was unreasonably prolonged. (*Id.* ¶ 266.)

In *Heck v. Humphrey*, the Supreme Court held that in order to recover damages under § 1983 for unconstitutional conviction or imprisonment, Plaintiff "must prove that [Fleming's] conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." 512 U.S. 477, 486–87 (1994). Plaintiff's "prosecution-related claims fail as a matter of law because [Fleming] pleaded guilty to the armed robbery for which he was prosecuted." (FAC ¶ 265.) Applying *Heck*, the Second Circuit has "emphatically and properly confirmed that *Brady*-based § 1983 claims necessarily imply the invalidity of the challenged conviction in the trial (or plea) in which the *Brady* violation occurred." *Poventud v. City of N.Y.*, 750 F.3d 121, 132–33 (citing *Amaker v. Weiner*, 179 F.3d 48, 51–52 (2d Cir. 1999)).

Accordingly, Plaintiff § 1983 *Brady* claims are dismissed as a matter of law because Fleming's conviction was not reversed,

expunged, declared invalid, or called into question by a writ of habeas corpus.

## IX. PLAINTIFF'S NEGLIGENCE CLAIM IS NOT DISMISSED

Count Seven alleges that Rikers correctional officers and medical staff, John Does 1–38, were negligent at "overseeing [Fleming's] day-to-day physical and medical monitoring and care." (FAC ¶¶ 223–26.) Defendants argue that this claim is "inconsistent with plaintiff's factual allegations of *intentional* acts of wrongdoing by these same defendants." (City Defs.' Mem. at 22.)

But Federal Rule of Civil Procedure 8 "permits pleading inconsistent theories in the alternative." *Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49, 55 n. 3 (2d Cir. 2004). "The flexibility afforded by [Rule 8] is especially appropriate in civil rights cases, in which complex inquiries into the parties' intent may sometimes justify raising multiple, inconsistent claims." *Id.* (citing *MacFarlane v. Grasso*, 696 F.2d 217, 224–25 (2d. Cir. 1982)). Therefore, a court "may not construe [one claim] as an admission against another alternative or inconsistent claim." *Henry v. Daytop Village, Inc.*, 42 F.3d 89, 95 (2d Cir. 1994) (citing *McCalden v. Cal. Library Ass'n.*, 995 F.2d 1214, 1219 (9th Cir. 1990)). Accordingly, for purposes of a motion to dismiss, Plaintiff's negligence claim against the Rikers correctional officers and medical staff is not precluded by its allegations that they behaved intentionally.

## X. PLAINTIFF'S NEGLIGENT HIRING AND RETENTION CLAIMS ARE DISMISSED

Counts Nine and Ten allege that Commissioner Ponte, the City, HHC, and Physician Affiliate Group of New York ("PAGNY") are liable for negligently hiring correctional officers and medical personnel. (FAC ¶¶ 231–38.) Under New York law, however, "[i]f the employee acted within the scope of her employment, the employer and the employee's supervisors may be held liable for the employee's negligence only under a theory of *respondeat superior*." *Velez v. City of N.Y.*, 730 F.3d 128, 137 (2d Cir. 2013) (citing *Karoon v. N.Y.C. Transit Auth*, 659 N.Y.S.2d 27, 29 (1st Dep't 1997)). This is because if the employee was not negligent, there is no basis for imposing liability on the employer, and if the employee was negligent, the employer must pay the judgment regardless of the hiring...." *Karoon,* 659 N.Y.S.2d at 29. Accordingly,

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 41 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

Plaintiff's negligent hiring claims are dismissed as a matter of law.

## XI. PLAINTIFF'S MEDICAL MALPRACTICE AND WRONGFUL DEATH CLAIMS ARE DISMISSED

**\*19**  Counts Fourteen and Fifteen allege that several medical professionals at Rikers, Elmhurst Hospital, and Bellevue Hospital, including Dr. Holman, Nurse Mahmood, and PA Larosa, committed medical malpractice that resulted in the wrongful death of Fleming. (FAC ¶¶ 254–63.) Specifically, she alleges that they deviated from the accepted medical standard of care to detect and treat Fleming's internal bleeding, psychiatric disorders, and mental illness. (*Id.* ¶ 255.)

"To establish a claim of medical malpractice under New York law, [Plaintiff] must prove (1) that [Defendants] breached a standard of care in the community, and (2) that the breach proximately caused [Fleming's] injuries." *Milano by Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995) (quoting *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d. Cir. 1994)).

Here, Plaintiff's allegations against Dr. Holman, Nurse Mahmood, and PA Larosa are insufficient to state a claim for medical malpractice and or wrongful death because they lack any substantial factual allegations against any of these Defendants. (Med. Defs.' Mem. at 14–17.) In fact, Dr. Holman is not mentioned at all in Plaintiff's amended complaint, other than being listed as one of the Defendants in the caption and in the fourteenth cause of action. Plaintiff does not even allege that Dr. Holman saw Fleming as a patient, much less that he treated him in any way. Similarly, Plaintiff only raises a wrongful death cause of action against Nurse Mahmood and PA Larosa for failing to administer Fleming's prescribed psychiatric medications and for failing to "investigate the reasons for [Fleming's] non-appearance" at his outpatient oncology appointments, respectively. (*Id.* ¶¶ 103, 106, 110, 112, 114, 122.) These allegations are insufficient to plausibly allege that either of these Defendants deviated from the accepted medical standard of care that caused his death. *Diggs v. City of N.Y.*, No. 17 Civ. 1127 (VEC), 2018 WL 5924413, at \*3 (S.D.N.Y. Aug. 17, 2018) ("Where a complaint fails to contain any substantive allegations concerning a defendant named in the caption, it fails to state a claim as to that defendant." (citing *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y 1999), *aff'd sub nom.*, *Dove v. O'Hare*, 201 F.3d 354 (2d Cir. 2000))).

Accordingly, the medical malpractice and wrongful death claims are dismissed as to Dr. Holman, Nurse Mahmood, and PA Larosa.

## XII. PLAINTIFF'S CLAIM FOR A DECLARATORY JUDGMENT IS DISMISSED

Count Nineteen seeks a declaratory judgment that "[Fleming's] plea was not voluntary and was entered into under duress." (FAC ¶¶ 276–80.) But declaratory judgment, like an injunction, is a form of prospective relief that is only available if Plaintiff shows "a sufficient likelihood that he [or she] will again be wronged in a similar way." *Marcavage v. City of N.Y.*, 689 F.3d 98, 103 (2d Cir. 2012) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983)). Plaintiff's allegations regarding Fleming's plea are entirely retrospective. Plaintiff does not allege that there is a risk of future harm. Accordingly, Plaintiff's nineteenth cause of action for a declaratory judgment is dismissed.

## XIII. CONCLUSION

Defendants' motions to dismiss Counts Nine and Ten (negligent hiring and detention), Eleven and Eighteen (§ 1983 *Monell* claims), Sixteen (§ 1983 claims for malicious prosecution pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963)), Seventeen (§ 1983 claim for loss of familial relationship), and Nineteen (declaratory judgment) are GRANTED. The Medical Defendants' motion to dismiss Counts Two (ADA claims) and Three (RA claims) is GRANTED. The Medical Defendants' motion to dismiss Counts Fourteen (medical malpractice) and Fifteen (wrongful death) against Dr. Richard Holman, Nurse Mahmood, and PA Larosa, and Count One (§ 1983 claims for deliberate indifference to medical needs) against Dr. Joon Park is GRANTED.[18]

**\*20**  Accordingly, the Clerk of Court is instructed to close the motions at ECF Nos. 72 and 85.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4392522

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 42 of 102

**Footnotes**

1    Plaintiff raises causes of action for (1) deprivation of Fleming's constitutional rights enforceable under 42 U.S.C. § 1983; (2) violations of Title II of the ADA; (3) violations of Section 504 of the RA; (4) assault and battery; (5) vicarious liability for assault and battery; (6) negligence in prescribing excessive quantities of opioid medications; (7) negligence in supervising and overseeing inmates' day-to-day physical and medical care; (8) vicarious liability for negligence; (9) negligent hiring and detention as to medical personnel; (10) negligent hiring and detention as to correctional officers; (11) deprivation of Fleming's constitutional rights pursuant to *Monell v. Department of Social Services.*, 436 U.S. 658 (1978); (12) medical malpractice by Rikers medical personnel; (13) medical malpractice by Bellevue Hospital medical personnel; (14) medical malpractice by Elmhurst Hospital medical personnel; (15) wrongful death; (16) deprivation of Fleming's constitutional rights against John Does 36–38 pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); (17) deprivation of Plaintiff's constitutional rights enforceable under 42 U.S.C. § 1983 (18) deprivation of Plaintiff's constitutional rights pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978); and (19) declaratory judgment. (FAC ¶¶ 195–280.)

2    At oral argument on the Defendants' motions to dismiss, Plaintiff withdrew all claims against Bellevue Hospital Center and Elmhurst Hospital Center. (Tr. of May 21, 2019 Oral Arg. ("Tr."), ECF No. 122, at 3:6–4:3.)

3    The Supreme Court has held that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of St. Police*, 491 U.S. 58, 71 (1989). Accordingly, all of Plaintiff's claims against Commissioner Ponte in his official capacity are dismissed because they are duplicative of her *Monell* claim against the City.

   All claims should be dismissed against the DOC because the New York City Charter provides that "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." (City Defs.' Mem. at 14 (citing N.Y. City Charter Ch. 18 § 396).) Accordingly, all claims against the DOC are dismissed because it is a non-suable entity. *See Adams v. Galletta*, 966 F. Supp. 210, 212 (S.D.N.Y. 1997) ("where a plaintiff has named the Department of Corrections as a defendant, he has sued a non-suable entity." (citations omitted)).

4    The following factual allegations are taken from the amended complaint (as well as documents attached to it or incorporated by reference) and are deemed to be true for purposes of the Defendants' motions to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

5    Plaintiff states that Fleming reported the bloody stool "to Dr. Jennifer Wu and/or Dr. Lanatra and/or Dr. Nierodzik." (FAC ¶ 111.)

6    Plaintiff states that Fleming reported the abdominal pain and bloody stool "to Dr. Maungoo and/or Dr. Win." (*Id.* ¶ 120.)

7    Plaintiff states that Fleming reported the abdominal pain and bloody stool "to Dr. Maungoo and/or Dr. Win." (*Id.* ¶ 120.)

8    Plaintiff states that "Dr. Wu and/or Dr. Lanatra and/or Dr. Nierodzik" refused to further treat Fleming. (*Id.* ¶ 153.)

9    Count Eighteen for deprivation of her *individual* rights under the Fourteenth Amendment, pursuant to *Monell*, is also dismissed for the same reasons.

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 43 of 102

Fleming v. City of New York, Not Reported in Fed. Supp. (2019)

Plaintiff has not served her amended complaint on three (3) named Rikers correctional officers included in her first cause of action, Defendants (1) Saint-Fleur, (2) Owens, and (3) Whitaker.

Plaintiff served her amended complaint on four named Rikers Medical Defendants included in her first cause of action, Defendants (1) Dr. Maung Maungoo, (2) Dr. Myat Win, (3) Dr. Joon Park, and (4) Dr. Antonio Martinez.

The City and HHC are not subject to § 1983 liability unless Plaintiff plausibly alleges a *Monell* claim. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*, 436 U.S. at 692 (1978)). Accordingly, because this Court already determined that Plaintiff failed to do so, Count One is dismissed against the City and HHC.

Defendants do not challenge Plaintiff's allegations of excessive force. (City Defs.' Mem. at 2.) Accordingly, Plaintiff's first cause of action for use of excessive force in violation of the Fourth Amendment stands against the C.O. Defendants.

For the same reasons, this Court also dismisses Plaintiff's vague and conclusory allegation that Drs. Maungoo and Win "failed to make a mental health referral" for Fleming after his return from Bellevue, despite knowing, "[o]n information and belief, ... that [Fleming] was severely mentally ill." (FAC ¶ 131.)

Defendant further argues that it is a matter of "common knowledge" that "it is safer for an immune-suppressed cancer patient to be separated from other prisoners." This Court need not address this unsupported claim.

The amended complaint also states that on July 7, 2016, after complaining for months of abdominal pain and bloody stools, Drs. Win and Maungoo finally performed a CAT scan on Fleming. According to Plaintiff, however, they "failed to order or administer an appropriate contrast solution, and failed to properly advise [Fleming] to abstain from eating before the CAT scan." (FAC ¶ 128.) Consequently, the CAT scan results were inconclusive. (*Id.*) Plaintiff also alleges that Drs. Maungoo and Win refused to re-do the CAT scan, impeding them from realizing that Fleming's cancer had metastasized to his liver. (*Id.*)

Conversely, "[i]n cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* (internal citation and quotation marks, and alteration omitted); *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003).

Plaintiff "requests leave to file a Second Amended Complaint in the event the Court finds that any of the factual allegations are insufficiently plead." (City Opp'n at 36.) Plaintiff may submit a motion to amend attaching a proposed amended complaint, provided the amendments submitted are not futile. *See AEP Energy Srvs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3rd 699, 726 (2d Cir. 2010) ("Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact.").

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3168699
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darrell LECKIE, Plaintiff,
v.
CITY OF NEW YORK; and New York City Health
and Hospital Corporation, HHC Dentist Allan Matthew,
D.D.S, NYC DOC John-Jane Doe Correction Officers
1-10, individually and in their official capacities;
HHC John-Jane Doe Medical Providers 11-20,
individually and in their official capacities, Defendants.
Darrell Leckie, Plaintiff,
v.
Debbie Napoli, R.N. (Provider No. 280), Jordan Laguio,
M.D (Provider No. 104), Khondkar Rakib, D.D.S
(Provider No. 703), Tammy Hyatt, RDH, and John-Jane
Doe 1-10 New York State Department of Correction
and Community Supervision Medical Providers, and
John-Jane Doe 11-20 New York State Department of
Correction and Community Supervision Correction
Officers, "Doe" Ada Compliance Officer; "Doe" IGP
Supervisor, "Doe" Deputy Superintendent for Programs,
"Doe" Deputy Superintendent for Administration,
"Doe" staff members of IGRC, all defendants
individually and in their official capacities, Defendants.

19 Civ. 6719 (PGG) (RWL)
|
21 Civ. 7212 (PGG) (RWL)
|
Signed May 1, 2023

**Attorneys and Law Firms**

Anna Berezovski, Gary A. Lichtman, New York, NY, Katherine Elizabeth Smith, The Law Office of Katherine E. Smith, New York, NY, for Plaintiff in 19 Civ. 6719, 21 Civ. 7212.

Alejandra Rosa Gil, Heidell, Pittoni, Murphy & Bach, White Plains, NY, Austa Starr Devlin, Laura Anne DelVecchioo, Heidell, Pittoni, Murphy & Bach, LLP, New York, NY, Mandy Nguyen, Vigorito, Barker, Patterson, Nichols & Porter, LLP, New York, NY, Mercedes Cesaratto, New York City Law Department, New York, NY, for Defendant City of New York in 19 Civ. 6719.

Alejandra Rosa Gil, Heidell, Pittoni, Murphy & Bach, White Plains, NY, Austa Starr Devlin, Laura Anne DelVecchioo, Heidell, Pittoni, Murphy & Bach, LLP, New York, NY, Mandy Nguyen, Vigorito, Barker, Patterson, Nichols & Porter, LLP, New York, NY, for Defendant New York City Health and Hospital Corporation in 19 Civ. 6719.

Alejandra Rosa Gil, Heidell, Pittoni, Murphy & Bach, White Plains, NY, for Defendant Matthew Allan in 19 Civ. 6719.

Sarande Dedushi, NYS Office of The Attorney General, New York, NY, for Defendants Debbie Napoli, R.N., Jordan Laguio, M.D., Khondkar Rakib, D.D.S., RDH Tammy Hyatt in 21 Civ. 7212.

**MEMORANDUM OPINION & ORDER**

PAUL G. GARDEPHE, United States District Judge:

**\*1** In these actions, Plaintiff Darrell Leckie asserts claims under 42 U.S.C. §§ 1983 and 1988 for deliberate indifference to a serious medical need, as well as related statutory and tort causes of action, against medical providers, correction officers, and New York State and City government entities. Leckie alleges that, while he was incarcerated at Rikers Island and in state prisons, he was denied treatment for his infected tooth, which required extraction. Leckie alleges that Defendants' delay in arranging for the extraction of his tooth caused him to suffer intense pain, and ultimately led to sepsis and to a loss of hearing in one ear.

In 19 Civ. 6719 ("Leckie I"), Leckie asserts claims against the City of New York (the "City"), the New York City Health and Hospital Corporation ("Health & Hospitals"), Dentist Allan Matthew, and John/Jane Doe correction officers and medical providers, individually and in their official capacities (collectively, the "City Defendants"). The claims in Leckie I relate to alleged mistreatment at Rikers Island. (Leckie I Second Am. Cmplt. ("SAC") (Dkt. No. 110))

In 21 Civ. 7212 ("Leckie II"), Leckie brings claims against Registered Nurse Debbie Napoli; Dr. Jordan Laguio; Dentist Khondkar Rakib, Registered Dental Hygienist Tammy Hyatt; and John/Jane Doe correction officers, medical providers, and state employees responsible for disability accommodation, individually and in their official capacities (collectively, the "State Defendants"). (Leckie II Cmplt. (Dkt. No. 5)) The claims in Leckie II relate to mistreatment in state prisons

operated by the New York State Department of Correction and Community Supervision (the "DOC").

The Leckie I SAC was filed on February 24, 2021, and the City Defendants moved to dismiss on March 23, 2021, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. Nos. 110, 115) The Leckie II Complaint was filed on August 27, 2021, and on April 14, 2022, the State Defendants moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), and to transfer any surviving claims to the Northern District of New York. (Dkt. Nos. 5, 31) Plaintiff moved to consolidate the two actions on April 14, 2022. (Leckie II Dkt. No. 35)

This Court referred the parties' motions to Magistrate Judge Robert W. Lehrburger for a Report and Recommendation ("R&R"). (Leckie I Dkt. No. 124; Leckie II Dkt. No. 38) On June 30, 2022, Judge Lehrburger issued a thorough 61-page R&R recommending (1) that the motions to dismiss be granted in part; (2) that the State Defendants' motion to transfer be denied; and (3) that Leckie's motion to consolidate be granted. (R&R (Dkt. No. 129)) [1]

For the reasons stated below, the R&R will be adopted in part; Defendants' motions to dismiss will be granted in part; the State Defendants' motion to transfer will be denied; and Leckie's motion to consolidate will be granted.

## BACKGROUND [2]

 **\*2**  The R&R sets out the factual background and procedural history of the instant actions in detail. (R&R (Dkt. No. 129) at 2-9) [3] The relevant background and procedural history are briefly summarized below.

### I. FACTUAL BACKGROUND
According to the complaints, Leckie was admitted to City custody in April 2018, and soon after complained of pain in his mouth and jaw to Doe Correction Officers and Medical Providers and to a non-defendant doctor. There was a delay in producing Leckie for a dental appointment, but on April 24, 2018, Defendant Matthew, a dentist, examined Leckie and determined that one of his teeth required extraction. No extraction was performed, however, despite Leckie's repeated complaints of "great pain" in his mouth and jaw. (R&R (Dkt. No. 129) at 3; Leckie I SAC (Dkt. No. 110) ¶ 25)

Leckie was transferred to State custody on August 30, 2018, and immediately complained of jaw pain to multiple State Defendants. (R&R (Dkt. No. 129) at 3) Defendant Napoli, a nurse, performed an intake examination that day. The Leckie II Complaint alleges that Defendant Napoli "failed to refer ... [P]laintiff to a dental provider"; however, in the next paragraph, the Complaint alleges that Defendant Rakib, a dentist, and Defendant Hyatt, a dental hygienist, examined Leckie the next day, August 31, 2018. (Leckie II Cmplt. (Dkt. No. 5) ¶¶ 30-31) Rakib and Hyatt determined that Leckie should be referred to an oral surgeon to extract tooth #31, but never made the referral. (R&R (Dkt. No. 129) at 4)

Over the next two months, Leckie was transferred back and forth between City and State custody. He continued to complain of pain, but was repeatedly ignored or given only palliative treatment. (Id.) On October 12, 2018, he saw Rakib and Hyatt again, but they gave him only over-the-counter pain medications and did not refer him to an oral surgeon. A week later – on October 19, 2018 – Leckie "presented to the dental clinic with high fever, nausea, and inability to eat." (Id.) Defendants Hyatt and Laguio, a medical doctor, both saw Leckie. Neither Hyatt nor Laguio referred Leckie to an oral surgeon. Laguio noted Leckie's medical history – which indicated that Leckie needed to be referred to an oral surgeon for a tooth extraction – and diagnosed Leckie with a dental abscess and dental infection. He prescribed oral antibiotics and pain medication rather than immediately referring Leckie for a tooth extraction. (Id. at 4-5)

By October 22, 2018, Leckie's symptoms had worsened to include high fever, neck swelling, and an inability to move his jaw. Rakib, Hyatt, and Laguio transferred Leckie to a prison infirmary. After twelve hours in the infirmary, during which his condition worsened, Leckie was transferred to Ellenville Regional Hospital, and then Westchester Medical Center. Leckie was diagnosed with sepsis and underwent surgery to drain his abscess. He was intubated for two days as a result of post-operative complications. The infection caused Leckie to permanently lose hearing in his right ear. (Id. at 5)

After his hospitalization, Leckie was returned to City custody, and subsequently transferred back and forth between City and State custody. While in State custody, Leckie requested an accommodation related to his hearing loss, but the Doe disability personnel Defendants ignored or denied his request. (Id. at 5-6)

### II. PROCEDURAL HISTORY

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 46 of 102

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

**\*3**  The Complaint in Leckie I was filed on July 18, 2019, the First Amended Complaint was filed on December 21, 2019, and the SAC was filed on February 24, 2021. (Dkt. Nos. 1, 41, 110) The City Defendants moved to dismiss the SAC on March 23, 2021. (Dkt. No. 115) The Complaint in Leckie II was filed on August 27, 2021. (Dkt. No. 5) On April 14, 2022, the State Defendants moved to dismiss and to transfer any surviving claims to the Northern District of New York. Leckie cross-moved to consolidate the instant actions. (Dkt. Nos. 31, 35)

This Court referred the Leckie I motion to dismiss and the Leckie II motion to dismiss to Judge Lehrburger for an R&R on November 19, 2021 and May 6, 2022, respectively. (Leckie I, Dkt. No. 124; Leckie II, Dkt. No. 38) Judge Lehrburger issued his R&R on June 30, 2022. (Dkt. No. 129) The State Defendants filed objections on July 14, 2022, and Leckie filed an opposition to the State Defendants' objections on July 28, 2022. (Dkt. Nos. 40-41) Neither Leckie nor the City Defendants have filed objections to the R&R.

## III. THE R&R'S RECOMMENDATIONS AND THE STATE DEFENDANTS' OBJECTIONS

The Leckie I SAC asserts causes of action for negligence/ medical malpractice **as** to the City, Health and Hospitals, and the Doe Defendants; deliberate indifference in violation of Section 1983 and failure to intervene as to all City Defendants; and intentional and negligent infliction of emotional distress as to all City Defendants. Leckie also asserts a Monell claim against the City and Health & Hospitals. (Leckie I SAC (Dkt. No. 110) at 6-11) The Leckie II Complaint asserts causes of action for deliberate indifference and failure to intervene, in violation of Section 1983, as to all State Defendants; violations of the reasonable accommodation and disparate treatment provisions of Title II of the Americans with Disabilities Act (the "ADA"); retaliation in violation of the ADA; and violations of the reasonable accommodation and disability discrimination provisions of Section 504 of the Rehabilitation Act of 1973. Leckie's ADA and Rehabilitation Act claims are brought against the Doe State employees responsible for disability accommodation. (Leckie II Cmplt. (Dkt. No. 5) at 11-21)

In Leckie I, Judge Lehrburger recommends that Leckie's Monell claim and his claims against the Doe Defendants be dismissed. Judge Lehrburger recommends that Defendants' motion otherwise be denied. (R&R (Dkt. No. 129) at 57)

In Leckie II, Judge Lehrburger recommends that Leckie's claims against Defendant Napoli, the Doe Defendants, and the individual State Defendants in their official capacities be dismissed. He further recommends that Leckie's claims under the ADA, the Rehabilitation Act, and New York state law be dismissed. The R&R recommends that the State Defendants' motion to dismiss otherwise be denied. (Id. at 58)

The R&R also recommends that Leckie's motion to consolidate be granted, and that the State Defendants' motion to transfer be denied. (Id. at 10-18)

In their objections to the R&R, the State Defendants contend that their motion to dismiss Leckie's Section 1983 claims against Defendants Hyatt and Laguio should be granted because (1) Leckie has not adequately pled deliberate indifference to a serious medical need as to Hyatt and Laguio; and (2) Hyatt and Laguio are entitled to qualified immunity. (Def. Objs. (Dkt. No. 40))

## DISCUSSION

## I. LEGAL STANDARDS

### A. Review of a Magistrate Judge's Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). " 'The district judge evaluating a magistrate judge's recommendation may adopt those portions of the recommendation, without further review, where no specific objection is made, as long as they are not clearly erroneous.' " Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241 (RMB) (FM), 2011 WL 611826, at \*1 (S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Inv. Servs., Inc., 280 F. Supp. 2d 208, 212 (S.D.N.Y. 2003)). A decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

**\*4**  Where a timely objection has been made to a magistrate judge's recommendation, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However,

Case 9:23-cv-00362-BKS-ML   Document 58   Filed 05/06/26   Page 47 of 102

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

"[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review.' " Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (second alteration in original) (quoting Vega v. Artuz, 97 Civ. 3775 (LTS)(JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)). "To the extent ... that the party ... simply reiterates the original arguments, [courts] will review the Report strictly for clear error." IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., 07 Civ. 6865 (LTS)(GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citing Pearson-Fraser v. Bell Atl., No. 01 Civ. 2343 (WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003) and Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)); see also Ortiz v. Barkley, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and recommendation for clear error where objections are merely perfunctory responses, ... rehashing ... the same arguments set forth in the original petition." (quotation marks and citations omitted)).

Moreover, a party cannot invoke de novo review by citing new facts or making new arguments that the party could have raised in the briefing before the magistrate judge but did not. See Bolling v. City of New York, No. 18CIV5406PGGRWL, 2021 WL 961758, at *6 (S.D.N.Y. Mar. 15, 2021) ("[D]istrict courts 'will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance.' ") (quoting Brown v. Martuscello, No. 16-CV-6084 (CS)(PED), 2019 WL 3491461, at *2 (S.D.N.Y. Aug. 1, 2019)); United States v. Gladden, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019) (declining to consider a " 'new argument[ ] raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but [was] not.' ") (quoting Hubbard v. Kelley, 752 F. Supp. 2d 311, 313 (W.D.N.Y. 2009)).

### B. Rule 12(b)(1) Motion to Dismiss

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([i.e.,] subject-matter jurisdiction) ...." Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). Where subject matter jurisdiction is challenged, a plaintiff "bear[s] the burden of

'showing by a preponderance of the evidence that subject matter jurisdiction exists.' " APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (quoting Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003)). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)[,] a district court may consider evidence outside the pleadings." Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), aff'd, 561 U.S. 247 (2010) (citing Makarova, 201 F.3d at 113).

In reviewing a Rule 12(b)(1) motion, a court "must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiffs." J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). The court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but ... may not rely on conclusory or hearsay statements contained in the affidavits." Id. A court may also "consider 'matters of which judicial notice may be taken.' " Greenblatt v. Gluck, No. 03-CV-597 (RWS), 2003 WL 1344953, at *1 n.1 (S.D.N.Y. Mar. 19, 2003) (quoting Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993)).

### C. Rule 12(b)(6) Motion to Dismiss

**\*5** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Under this standard, a plaintiff is required only to set forth a "short and plain statement of the claim," Fed. R. Civ. P. 8(a), with sufficient factual "heft 'to sho[w] that the pleader is entitled to relief.' " Twombly, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)).

To survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level," (Id. at 555), and a plaintiff's claims must be "plausible on [their] face." Id. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " Id. (quotation marks omitted) (quoting Twombly, 550 U.S. at 557) Moreover, where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief,"

Twombly, 550 U.S. at 558, or where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." Id. at 570. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). A complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).

In resolving a motion to dismiss, a court may "consider ... the complaint and any documents attached thereto or incorporated by reference and documents upon which the complaint relies heavily." Bldg. Indus. Elec. Contractors Ass'n v. City of New York, 678 F.3d 184, 187 (2d Cir. 2012) (quotation marks and citation omitted). However, "[w]here ... the allegations pled in the complaint are contradicted by documents on which the complaint relies[,] the reviewing court need not accept as true an allegation pled nor draw inferences in its favor." Alexander v. Bd. of Educ. of City Sch. Dist. of City of New York, 107 F. Supp. 3d 323, 331 (S.D.N.Y. 2015), aff'd sub nom. Alexander v. Bd. of Educ. of City of New York, 648 F. App'x 118 (2d Cir. 2016) (quotation marks and citation omitted). Moreover, allegations raised for the first time in an opposition brief cannot defeat a motion to dismiss, because allegations in an opposition brief do not amend a complaint. See Capers v. Kirby Forensic Psychiatric Ctr., No. 13-CV-6953(AJN), 2016 WL 817452, at *2 (S.D.N.Y. Feb. 25, 2016) (citing O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.")).

#### D. Motion to Transfer

**\*6**  Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." In the Second Circuit, courts apply a two-step analysis: "[f]irst, the court must determine whether the action could have been brought in the proposed transferee forum. If so, the court must determine whether convenience of the parties and witnesses and the interests of justice favor transfer." CVS Pharmacy,

Inc. v. AstraZeneca Pharms. L.P., 2020 WL 4671659, at *4 (S.D.N.Y. Aug. 12, 2020). In making this determination, courts consider the following factors:

> (1) the convenience of witnesses; (2) the convenience of the parties; (3) the locus of operative facts; (4) the availability of process to compel the attendance of the unwilling witnesses; (5) the location of relevant documents and the relative ease of access to sources of proof; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded to the plaintiff's choice of forum; (9) trial efficiency; and (10) the interest of justice, based on the totality of circumstances.

Salaam v. City of New York, 2021 WL 3077555, at *2 (S.D.N.Y. May 27, 2021) (citing Keitt v. New York City, 882 F. Supp. 2d 412, 458-59 (S.D.N.Y. 2011)).

"The party requesting the transfer bears the burden of making a 'strong case for transfer.' " Megna v. Biocomp Labs., 220 F. Supp. 3d 496, 497 (S.D.N.Y. 2016) (quoting New York Marine and Gen. Ins. Co. v. Lafarge North America, Inc., 599 F.3d 102, 113 (2d Cir. 2010)).

#### E. Motion to Consolidate

Fed. R. Civ. P. 42(a) provides that a district court may consolidate "actions before the court involv[ing] a common question of law or fact." " 'A determination on the issue of consolidation is left to the sound discretion of the Court,' " In re UBS Auction Rate Sec. Litig., No. 08 Civ. 2967 (LMM), 2008 WL 2796592, at *1 (S.D.N.Y. July 16, 2008) (quoting Albert Fadem Trust v. Citigroup Inc., 239 F. Supp. 2d 344, 347 (S.D.N.Y. 2002)), and involves weighing considerations of convenience, judicial economy, and cost reduction while ensuring that the "paramount concern for a fair and impartial trial" is honored. Johnson v. Celotex Corp., 899 F.2d 1281, 1284-85 (2d Cir. 1990).

### II. ANALYSIS

#### A. Leckie's Motion to Consolidate

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 49 of 102

Leckie moves to consolidate any surviving claims in the instant actions:

> [Leckie II] should be consolidated with [Leckie I], both pending before Your Honor, as they both involve common questions of law and facts. Both cases relate to [Leckie]'s dental treatment from April 24, 2018 until December 20, 2018, while [he] went back and forth between City ... and State ... custody. Specifically, in both cases, [P]laintiff alleges that the City and the State [D]efendants were deliberately indifferent to his medical needs, which resulted in substantial delay of approximately six ... months, causing severe and permanent injuries.

(Leckie II Pltf. Opp. (Dkt. No. 36) at 10)

The R&R recommends granting the motion to consolidate. Judge Lehrburger notes that "[a] federal court may consolidate actions before it if they 'involve a common question of law and fact.' 'Consolidation is warranted where it promotes judicial economy and serves to eliminate the waste associated with duplicative discovery and multiple trials, and the danger of inconsistent verdicts.' " (R&R (Dkt. No. 129) at 10 (quoting Fed. R. Civ. P. 42(a)(2) and Stevens v. Hanke, No. 20-CV-4765, 2022 WL 489054, at *2 (S.D.N.Y. Feb. 17, 2022))) Judge Lehrburger finds that consolidation is appropriate here because (1) "both cases raise the common question of whether Leckie's medical condition was sufficiently serious to form the basis for claims under § 1983"; (2) "[b]oth actions implicate facts culminating in the same injury, raising overlapping questions of causation"; (3) "discovery efforts already undertaken in Leckie I will be useful in resolving Leckie II"; and (4) "the State Defendants do not object to consolidation beyond their contention that Leckie II should be transferred to the Northern District." (Id. at 11-12)

**\*7** No party has objected to Judge Lehrburger's recommendation regarding consolidation. Accordingly, this Court reviews Judge Lehrburger's recommendation for clear error. See Gilmore, 2011 WL 611826, at *1. The Court agrees with Judge Lehrburger that both complaints "involve

a common question of law or fact," Fed. R. Civ. P. 42(a) – i.e., the seriousness of Plaintiff's medical condition and the adequacy of the treatment he received – such that consolidation will "promote[ ] judicial economy and serve[ ] to eliminate the waste associated with duplicative discovery and multiple trials, and the danger of inconsistent verdicts." Stevens, 2022 WL 489054, at *2. Accordingly, there is no clear error in the recommendation. This Court will adopt the recommendation and grant Plaintiff's motion to consolidate.

### B. The State Defendants' Motion to Transfer

The State Defendants have moved to transfer "any surviving claims ... to the Northern District of New York." They argue that transfer is appropriate because (1) "substantially all the evidence and all the witnesses relating to the incident would be found in Ulster Correctional Facility, which is located in the Northern District of New York"; (2) "[a]t the time of the alleged incident, Defendants were performing their official duties by rendering treatment to Plaintiff while he was housed at Ulster Correctional Facility"; (3) "three of the four [State] Defendants still perform their official duties in correctional facilities in the Northern District of New York, and only one [Rakib] currently performs his official duties in the Southern District of New York"; (4) "the witnesses to the events, alleged to have occurred at Ulster Correction[al] Facility, also likely reside in the Northern District of New York"; and (5) " 'the fact that a claim ... against [the City Defendants] arose in [the Southern] [D]istrict does not make that district a proper venue for other parties as to whom the claim arose somewhere else.' " (Leckie II Def. Br. (Dkt. No. 32) at 13-14 (quoting Wright & Miller, 15 Fed. Prac. & Proc. § 3807 (2d ed. 1986 & Supp. 2003))) Judge Lehrburger recommends that the State Defendants' motion to transfer be denied.

Judge Lehrburger begins his analysis by summarizing the factors to be considered for a discretionary change of venue: " 'inter alia: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.' " (R&R (Dkt. No. 129) at 13 (quoting Corley v. United States, 11 F.4th 79, 89 (2d Cir. 2021))) Judge Lehrburger then notes that "[n]o party disputes that venue is proper in the Southern District. Accordingly, the applicable standard is that for a discretionary change of venue." (Id. at 14-15)

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 50 of 102

Judge Lehrburger finds that "the plaintiff's choice of forum clearly weighs in favor of the case remaining in this Court, as both actions were filed here, and Plaintiff opposes the motion to transfer." (Id. at 15) As to convenience of the witnesses, Judge Lehrburger finds that this factor "weighs against transfer," because witnesses located in the Northern District have already been deposed, whereas Leckie "contemplates seeking testimony from medical providers who treated him for sepsis and dental abscess at Westchester Medical Center, which is located in the Southern District, ... who have not yet been deposed." (Id. at 15-16) As to the location of documents and access to sources of proof, Judge Lehrburger "finds [that] this factor til[ts] in favor of maintaining venue in the Southern District," because there has already been "substantial document discovery of Leckie's medical records and other documents" located in the Northern District, while records "pertaining to Leckie's treatment, and lack of treatment, while ... in [City] custody ... are located within the Southern District." As to the convenience of the parties, Judge Lehrburger finds that this factor "is, at best for the State Defendants, a neutral factor," given that "Leckie resides in the Eastern District" and "[Defendant] Rakib at least works in the Southern District, while Laguio, Hyatt, and Napoli continue to work in the Northern District." (Id. at 16-17) Regarding the need to compel unwilling witnesses, the R&R finds that this factor is neutral, because Leckie "may need to compel the testimony of witnesses at Westchester Medical Center," and "Defendants have already been willing to offer their witnesses for remote deposition." (Id. at 17) Finally, as to the locus of operative facts, the R&R finds that, "after consolidation, the events occurring while Leckie was in [City] custody will be a second 'center of gravity' " in addition to the Northern District, and that in any event this factor is not "enough to disturb Leckie's choice of forum." (Id. at 17) For all these reasons, the R&R recommends denying the motion to transfer. (Id. at 17-18)

**\*8** No party has objected to Judge Lehrburger's recommendation regarding the motion to transfer. Accordingly, this Court reviews his recommendation for clear error. See Gilmore, 2011 WL 611826, at \*1.

This Court finds no clear error in Judge Lehrburger's analysis. Because many of the parties, witnesses, and documents are located in or near the Southern District, and because the allegations concern events that occurred while Leckie was in City custody in the Southern District as well as in State custody in the Northern District, there is no basis for disturbing Leckie's choice of forum. Accordingly, this Court

will adopt Judge Lehrburger's recommendation, and the State Defendants' motion to transfer will be denied.

## C. Motions to Dismiss Leckie's Section 1983 Deliberate Indifference Claims

### 1. Whether Leckie Has Stated a Claim for Deliberate Indifference Under Section 1983

#### a. Defendants' Arguments

All Defendants but State Defendant Rakib have moved to dismiss Leckie's Section 1983 deliberate indifference claims, arguing that he has not alleged a sufficiently serious medical condition nor culpability on the part of Defendants.

##### i. The City Defendants' Arguments

The City Defendants argue that "Plaintiff's SAC fails to plausibly allege that he was suffering from a serious medical condition," because Leckie "does not allege that his dental pain interfered with eating, sleeping or any other daily activities, nor does he articulate the severity or length of his alleged dental pain while in [City] custody." (Leckie I Def. Br. (Dkt. No. 117) at 10) According to Defendants, "Plaintiff's vague allegations that he was experiencing 'great pain' while in [City] custody [are] insufficient to establish a serious medical condition." (Id. (quoting Leckie I SAC (Dkt. No. 110) ¶ 25))

The City Defendants also argue that "Plaintiff did not plead reckless or intentional action (or inaction) by any individual defendant." (Id. at 11) As to Defendant Matthew, the City Defendants argue that "[P]laintiff concedes that [Matthew] took x-rays and ordered extraction of tooth #31 on April 23, 2018." According to Defendants, "Plaintiff ... has failed to establish the personal involvement of Dr. Matthew beyond the initial dental consultation," and Plaintiff's claim that " 'he continued to complain to [Defendants including Matthew] over the course of months about the great pain he was experiencing' ... is insufficient to establish deliberate indifference by Dr. Matthew, [because] Plaintiff does not allege when he complained to Dr. Matthew, what he told Dr. Matthew about his dental condition, or how Dr. Matthew responded to these alleged complaints." (Id. (quoting Leckie I SAC (Dkt. No. 110) ¶ 25)) The City Defendants further argue that, at the initial dental consultation, "Matthew

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

Case 9:23-cv-00362-BKS-ML   Document 58   Filed 05/06/26   Page 51 of 102

recommended, and [P]laintiff refused, extraction of tooth #31." (Id.) (citing Apr. 24, 2018 Exam Notes (Dkt. No. 116-5))

As to the culpability of the Doe Correction Officers and Medical Providers, the City Defendants argue that Leckie "relies on group pleading," and that "[c]omplaints that rely on group pleading and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim." (Id. at 12 (quotation omitted)) They also argue that Leckie "fails to allege what actions, or inactions, by the John/Jane Doe [D]efendants directly contributed to his alleged deprivation of medical care," and that "[P]laintiff's inability to identify the John/Jane Doe correction officers and medical providers at this point in the litigation does not excuse the lack of factual allegations in the SAC." (Id. at 13-14)

### ii. The State Defendants' Arguments

**\*9** The State Defendants argue that "Plaintiff fails to state a claim against Defendants Napoli, Hyatt, or Laguio for deliberate indifference to medical needs." (Leckie II Def. Br. (Dkt. No. 32) at 8) As to Napoli, they state that "Plaintiff merely alleges that during his intake examination on August 30, 2018, Plaintiff informed Defendant Napoli of his jaw pain and that she purportedly failed to refer him to a dental provider, [y]et in the very next paragraph Plaintiff acknowledges that he was examined by the dentist, Defendant Rakib, the very next day, August 31, 2018 ... [who] took his x-rays, and noted that Plaintiff should be referred for an extraction of tooth 31." (Id. at 8-9 (citing Leckie II Cmplt. (Dkt. No. 5) ¶¶ 29-32)) The State Defendants contend that "[t]he alleged one-day delay in seeing a dentist is the only 'delay' that could be charged to Defendant Napoli, and it is constitutionally de minim[is], and does not evidence deliberate indifference in any event." (Id. at 9)

As to Defendant Laguio, the State Defendants argue that – according to Leckie's Complaint – "the moment [Plaintiff] saw Dr. Laguio complaining of fever, nausea, and the inability to eat on October 19, 2018, Dr. Laguio immediately treated his conditions with antibiotics, and [Leckie] was then referred to a hospital only three days later when he did not respond to the initial antibiotic treatment." (Id. at 9 (citing Leckie II Cmplt. (Dkt. No. 5) ¶¶ 41-44, 50)) The State Defendants further argue that "any alleged delay of treatment chargeable to Dr. Laguio ... was de minim[is]"; that "the allegations, at most, reflect a difference of opinion [as to] whether beginning

with a course of antibiotics was appropriate," which "does not implicate the Eighth Amendment"; and that "[e]ven assuming that the initial use of antibiotics was medically incorrect, it could amount only to medical malpractice." (Id.)

As to Defendant Hyatt, the State Defendants characterize Plaintiff's Complaint as alleging "that Nurse Hyatt was deliberat[ely] indifferent to Plaintiff's medical needs because she failed to overrule the dentist, Defendant Rakib, when he allegedly delayed [referring Plaintiff for a tooth extraction]." (Id. at 10 (citing Leckie II Cmplt. (Dkt. No. 5) ¶¶ 32, 34)) The State Defendants argue that "it would not be plausible to infer that Nurse Hyatt had the authority to make such a reference herself, or to overrule the examining dentist." (Id.) They also argue that Plaintiff's "allegations that Nurse Hyatt did not refer Plaintiff to urgent care when he presented at [the] dental clinic with fever, nausea, and inability to eat on October 19, 2018, [are] similarly infirm," because "[t]he very next paragraph in the Complaint states that Plaintiff was examined and treated by Dr. Laguio later that very day." (Id. (emphasis in original)) According to the State Defendants, "Plaintiff's allegations ... fail to establish that there was any delay [in treatment] chargeable to Defendant Hyatt, let alone one of constitutional significance, or that Defendant Hyatt possessed a 'sufficiently culpable state of mind.'" (Id. (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)))

### b. The R&R's Recommendations

The R&R recommends that the motion to dismiss Leckie's deliberate indifference claims against Defendants Matthew, Hyatt, and Laguio be denied, but that the motion to dismiss be granted as to Defendant Napoli and the Doe Defendants. [4]

### i. Sufficiently Serious Medical Need

As to medical need, Judge Lehrburger notes that "untreated dental conditions have been considered serious medical conditions in this Circuit." (R&R (Dkt. No. 129) at 24 (citing Harrison v. Barkley, 219 F.3d 132, 136-37 (2d Cir. 2000) ("[B]ecause a tooth cavity will degenerate with increasingly serious implication if neglected over sufficient time, it presents a serious medical need within the meaning of our case law.") (quotation omitted); Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) ("Any person who has spent a night tossing and turning in suffering from an

abscessed tooth knows that dental pain can be excruciatingly severe."); Gonzalez v. McGue, No. 99-CV-3455, 2001 WL 13341, at *3 (S.D.N.Y. Jan. 5, 2001) (discussing failure to treat a "degenerative tooth cavity"); Dean v. Coughlin, 623 F. Supp. 392, 404) (S.D.N.Y. 1985) ("Inmates' [non-prophylactic] dental needs – for fillings, crowns, and the like – are serious medical needs as the law defines that term.")) Judge Lehrburger finds that – given the applicable case law – "Leckie's allegations easily establish serious medical need at the time he was in custody of both [the City] and [the State]," because (1) while he was in City custody, Defendant Matthew "recognized that Leckie's tooth had deteriorated to the point of needing to be extracted"; and (2) while he was in State custody, "his condition was already sufficiently serious" when he arrived, and "only worsened from there," leading to " 'severe mouth and jaw pain ... high fever, nausea, and inability eat ...dental abscess and dental infection,' " and eventual sepsis and hearing loss. (Id. at 25 (quoting and citing Leckie II Cmplt. (Dkt. No. 5) ¶¶ 27, 31-32, 35, 41, 44, 47, 49, 53))

**\*10** As to the State Defendants' argument that Leckie's deliberate indifference claim amounts to no more than a delay in treatment (see Leckie II Def. Br. (Dkt. No. 32) at 9-10), Judge Lehrburger finds that "Leckie has pled facts sufficient to establish that the delay in treatment was sufficiently serious to state a claim for relief," because he "plausibly alleges that treatment was delayed or denied while in [State] custody for nearly two months," and that "[a]s a result of that delay, Leckie had to be hospitalized for sepsis and is left with permanent hearing loss from the infection originating in his tooth." (R&R (Dkt. No. 129) at 26-27 (citing Mattison v. Johnson, No. 9:17-CV-1198, 2019 WL 6074039, at *5 (N.D.N.Y. Nov. 15, 2019); Smith v. Carpenter, 316 F.3d 178, 187 (2d Cir. 2003); Christian v. Saunders, No. 17-CV-2587, 2018 WL 3300695, at *9-10 (S.D.N.Y. Feb. 28, 2018), report and recommendation adopted, 2018 WL 1441401 (S.D.N.Y. Mar. 22, 2018); Grimmett v. Corizon Medical Associates of New York, No. 15-CV-7351, 2017 WL 2274485, at *4 (S.D.N.Y. May 24, 2017); and Gomez v. Westchester County, No. 12-CV-6869, 2015 WL 1054902, at *9 (S.D.N.Y. Mar. 10, 2015), aff'd, 649 F. App'x 93 (2d Cir. 2016)))

#### ii. The Defendants' Culpability

As to the culpability of City Defendant Matthew, Judge Lehrburger finds that – given that Dr. Matthew "[r]ecommend[ed] extraction" – he "knew, and at the very least should have known, that Leckie was suffering from a condition that posed an excessive risk to health or safety." Accordingly, Plaintiff's allegation that Matthew "failed to follow up and failed to respond to a follow-up written request directed to him ... suffice[s] to plausibly state a claim for deliberate indifference." (Id. at 29-30 (citing Hayes v. Charles, No. 10-CV-00380, 2013 WL 4718497, at *6-7 (W.D.N.Y. Sept. 3, 2013) (defendant who failed to schedule a follow-up appointment to fill plaintiff's cavity for four months despite written request, and defendant who examined plaintiff but took no action to secure dental treatment or prescribe effective painkillers when plaintiff subsequently complained to him of pain, could be found to have acted with deliberate indifference)) (further citations omitted))

As to the City Defendants' argument "that Leckie initially refused the extraction that Dr. Matthew recommended," Judge Lehrburger notes that on a Rule 12(b)(6) motion to dismiss "the Court cannot consider the document submitted by Defendants [in support of this argument, as] it is not a document referenced in Leckie's complaint, one on which he relied, or [one] that falls under another exception that would permit the Court to consider a document outside the complaint." (Id. at 30-31 (citing Kleinman v. Elan Corp., plc, 706 F.3d 145, 152 (2d Cir. 2013); and Nicosia v. Amazon.com, Inc., 834 F.3d 220, 234 (2d Cir. 2016)) (further citations omitted))

As to the culpability of State Defendant Napoli, however, Judge Lehrburger finds that Leckie's "allegations are insufficient to state a claim for deliberate indifference": "The allegation that Napoli failed to refer Leckie to a dental provider is not plausible, as Leckie alleges in the very next paragraph of the Complaint that he was examined by dentist Dr. Rakib and dental hygienist Hyatt the following day." (Id. at 33) Judge Lehrburger further finds that Leckie's "allegations of ignored complaints and palliative care" as to Nurse Napoli are "conclusory" and "insufficient," because "Leckie does not plead Napoli's knowledge of the seriousness of his condition," and because "it is not reasonable to infer that Leckie would direct his complaints to, and receive follow-up care from, the nurse who performed his general intake examination, rather than the dental providers he saw thereafter." (Id. at 33-34) The R&R recommends that Plaintiff's deliberate indifference claim against Napoli be dismissed.

**\*11** As to the culpability of State Defendant Hyatt, the R&R concludes that "[t]here are ... sufficient facts to allege [her] deliberate indifference to Leckie's serious medical needs." In

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 53 of 102

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

this regard, Judge Lehrburger notes that "Hyatt was present at Dr. Rakib's exams of Leckie and knew that he needed his tooth extracted[,] .... yet [s]he did nothing to ensure that occurred, even though Leckie continued to complain about pain, [and] even after seeing how his condition had deteriorated by October 19, 2018." (Id. at 34 (citing Leckie II Cmplt. (Dkt. No. 5) ¶¶ 31-32, 35-36, 39, 41-43)) As to the State Defendants' argument that "[t]he allegation that Nurse Hyatt did not refer Plaintiff to urgent care when he presented at [the] dental clinic ... on October 19, 2018 is ... infirm.... [because] [t]he very next paragraph in the Complaint states that Plaintiff was examined and treated by Dr. Laguio later that very day" (Leckie II Def. Br. (Dkt. No. 32) at 10 (emphasis in original)), Judge Lehrburger finds that "even if Hyatt referred Leckie to urgent care on October 19, 2018, that does not absolve her of liability for the period between when she first saw Leckie on August 31, 2018 to when he saw Dr. Laguio over a month and a half later." (R&R (Dkt. No. 129) at 35) Judge Lehrburger rejects the State Defendants' argument that "it would not be plausible to infer that Nurse Hyatt had the authority to make ... a reference [to an oral surgeon] herself, or to overrule the examining dentist [with respect to his decision not to make a referral]" (Leckie II Def. Br. (Dkt. No. 32) at 10), because (1) "the facts as pled do not indicate any need for Hyatt to 'overrule' her superior," given that the Complaint alleges that Hyatt's supervisor, Rakib, "recognized that Leckie's tooth needed to be extracted"; and (2) "it is no less reasonable to infer that a dental hygienist or nurse would be able to complete referrals on behalf of the treating dentist." (R&R (Dkt. No. 129) at 36 (citing Leckie II Cmplt. (Dkt. No. 5) ¶¶ 31-33, 35, 39; Iacovangelo v. Correctional Medical Care, Inc., 624 F. App'x 10, 13 (2d Cir. 2015); and Leniart v. Borchet, No. 3:20-CV-1098, 2020 WL 5765607, at *6 (D. Conn. Sept. 28, 2020))) Judge Lehrburger concludes that, "[a]t the motion to dismiss stage, Leckie is entitled to the reasonable inference that Hyatt could have taken some action to initiate a referral to a surgeon; Hyatt's alleged lack of authority is therefore insufficient for her dismissal." (Id.)

As to the culpability of State Defendant Laguio, Judge Lehrburger rejects the State Defendants' characterization of Leckie's claim as "involving merely a 'difference of opinion' as to proper treatment." He instead finds that Plaintiff "has plausibly established that the care provided to him [by Dr. Laguio] was inadequate in light of the consistent determination by several medical professionals that extraction of the infected tooth was the proper course of treatment and Leckie's subsequent steep decline over the [days] following [his appointment with Defendant Laguio]." (Id. at 37-38)

And as to the State Defendants' argument that Leckie has alleged, at most, malpractice by Laguio, the R&R finds that "the suggestion that Dr. Laguio believed [Leckie's] condition [to be] benign violates the requirement on a motion to dismiss that reasonable inferences be drawn in favor of the non-moving party"; "the inference Defendants seek to draw is not plausible in light of Leckie's serious symptoms [and allegations demonstrating that] .... Dr. Laguio ... knew that the proper course of treatment was extraction of the infected tooth, but chose 'an easier and less efficacious treatment plan.' " (Id. at 38 (quoting Chance, 143 F.3d at 703; citing Leckie II Cmplt. (Dkt. No. 5) ¶ 43)) Accordingly, the R&R recommends denying the motion to dismiss the deliberate indifference claim against Hyatt and Laguio. (Id. at 39)

As to the City and State Doe Defendants, Judge Lehrburger concludes that "Leckie fails to plead sufficient facts to allege ... deliberate indifference," because he "asserts [only] general allegations of complaints of pain and ignored requests for medical appointments – and one instance of [City] Doe Corrections Officers failing to produce him to a dental appointment." Leckie does not plead "facts showing, or from which a reasonable inference could be drawn, that any Doe Defendant was actually aware of the risk to his health ... or should have been so aware." The R&R therefore recommends dismissal of the deliberate indifference claims "against the Doe Defendants in both Leckie I and Leckie II." (Id. at 39)

### c. The State Defendants' Objections

The State Defendants object to Judge Lehrburger's recommendation that their motion to dismiss be denied as to the deliberate indifference claims against Laguio and Hyatt.

As to Laguio, the State Defendants complain that Judge Lehrburger "incorrectly concludes that [he] is somehow responsible for every alleged delay in providing treatment to Plaintiff while he was in [State] custody.... The first time State Defendant Laguio, who is not a dentist, treated Plaintiff for his tooth infection was October 19, 2018, and he provided treatment, antibiotics, and pain medication on the same day. There was thus no delay in treatment chargeable to State Defendant Laguio." (Def. Objs. (Dkt. No. 40) at 4-5)

**\*12** The State Defendants also argue that the " 'relatively short three-day delay' between the time that Plaintiff saw State Defendant Laguio ... and the time when he was transferred to an outside hospital ... [does not] constitute a

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 54 of 102

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

sufficiently serious delay in treatment." "[U]nlike all cases relied upon by the R&R for this proposition, Dr. Laguio did provide treatment for Plaintiff's infection during this three-day period." (Id. at 5 (quoting R&R (Dkt. No. 129) at 27))

Finally, the State Defendants argue that "[t]here are no non-conclusory allegations to show that State Defendant Laguio treated Plaintiff prior to October 19, 2018, or that he was aware that hospitalization and emergency tooth extraction [were] required, rather than a course of antibiotics for the infection. State Defendant Laguio is not even a dentist.... [Plaintiff's allegations] constitute[ ] only a disagreement in the course of treatment, which does not rise to the level of an Eighth Amendment violation." (Id.)

The State Defendants' objections regarding Laguio repeat arguments made in their motion papers. (Leckie II Def. Br. (Dkt. No. 32) at 9) Accordingly, this portion of the R&R will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211.

As to Hyatt, the State Defendants argue that the R&R "erroneously charges her with a two-month delay of treatment [of] Plaintiff. However, as stated in [the State] Defendants' motion to dismiss, State Defendant Hyatt is a dental hygienist and not a dentist, and she "was only present during Plaintiff's examination[s] by State Defendant Rakib on August 31, 2018 and October 12, 2018.... Hyatt referred Plaintiff to be seen by a medical provider on the same day he presented with complaints on October 19, 2018." (Id. at 6 citing (R&R (Dkt. No. 129) at 26-28)) The State Defendants contend that Plaintiff's "allegations ... are insufficient to show that [Hyatt] was deliberatively indifferent to Plaintiff's medical needs.... Hyatt did not have the training to make medical decisions," and "referred [Leckie] to State Defendant Laguio for treatment on October 19, 2018, the same day that she saw him." (Id.)

The State Defendants' objections regarding Hyatt will be reviewed only for clear error because (1) the delay in treatment argument was made in the State Defendants' moving papers (see Leckie II Def. Br. (Dkt. No. 32) at 10); and (2) the lack of training argument is improperly raised for the first time on appeal. See Phillips, 955 F. Supp. 2d at 211; Gladden, 394 F. Supp. 3d at 480.

There are no objections to the R&R's other recommendations concerning Plaintiff's deliberate indifference claims. Accordingly, those recommendations will likewise be

reviewed only for clear error. See Gilmore, 2011 WL 611826, at *1.

#### d. Analysis

As to Defendant Laguio, the R&R correctly finds that Plaintiff adequately alleges that (1) "Dr. Laguio knew from [Leckie's] medical records that [Leckie's] infected tooth needed to be, and had not yet been, extracted, but nonetheless only prescribed antibiotics and returned Leckie to the general prison population with no monitoring or plan to actually refer him to an oral surgeon for the extraction" (R&R (Dkt. No. 129) at 37 (citing Leckie II Cmplt. (Dkt. No. 5) ¶¶ 43, 44, 46)); and (2) after Dr. Laguio decided to only prescribe antibiotics, "[w]ithin days, Leckie's already serious infection spread to his blood, requiring hospitalization." (Id.; see Leckie II Cmplt. (Dkt. No. 5) ¶¶ 46-47 ("Defendant Laguio returned Plaintiff to the general population, where his condition further deteriorated.... Thereafter, on Monday, October 22, 2018, Plaintiff still had a high fever, his neck had become swollen, and he was unable to move his jaw.")) And contrary to the State Defendants' Objections, Judge Lehrburger cites Second Circuit law in support of his conclusion that inefficacious treatment can amount to deliberate indifference. (R&R (Dkt. No. 129) at 38-39 (citing Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974) (decision by "prison medical officials merely to stitch the stump of [plaintiff's] ear" rather than "sewing the severed portion of the ear back on" could amount to deliberate indifference))) In sum, there is no error in Judge Lehrburger's determination that Plaintiff has pled facts sufficient to show that Defendant Laguio knew that Leckie's tooth had to be extracted, that Laguio's decision to instead prescribe antibiotics can plausibly be construed as deliberate indifference, and that the resulting delay in the extraction of Leckie's infected tooth led to sufficiently serious complications so as to provide a basis for liability.

**\*13** As to Defendant Hyatt, the Leckie II Complaint alleges that she knew as early as August 31, 2018 "that Plaintiff must be referred to an oral surgeon for extraction of tooth #31" and that she was consistently kept apprised of Leckie's condition, but that Hyatt never referred Leckie for a tooth extraction. (Leckie II Cmplt. (Dkt. No. 5) ¶¶ 31-42) The State Defendants' argument that Hyatt referred Leckie to Laguio on October 19, 2018 – the same day she saw him – is thus not persuasive. As Judge Lehrburger points out, "[t]he eleventh-hour referral (to a non-dentist) is of no moment in light of the earlier repeated failures to refer Leckie for the treatment

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 55 of 102

that Dr. Rakib and Hyatt knew he needed." (R&R (Dkt. No. 129) at 35-36) As to Hyatt's objection that she lacked the training necessary to know that a referral for an extraction was indicated, at this stage of the litigation she cannot overcome Leckie's well-pled allegation that, regardless of her educational background, "Hyatt noted that Plaintiff must be referred to an oral surgeon." (Leckie II Cmplt. (Dkt. No. 5) ¶ 32) This Court cannot find as a matter of law that a dental hygienist would not recognize the need to have an infected tooth extracted. Accordingly, this Court finds no error in the R&R's recommendation as to Hyatt, and will adopt it.

As to Matthew, Napoli, and the Doe Defendants – given Judge Lehrburger's detailed analysis of Plaintiff's allegations and his application of Second Circuit case law – this Court finds no clear error, and will adopt his recommendations.

In sum, this Court adopts all of the R&R's recommendations as to Plaintiff's deliberate indifference claims. The motion to dismiss will be granted as to Napoli and the Doe Defendants, but otherwise denied.

### 2. Whether the State Defendants Are Entitled to Dismissal on Qualified Immunity Grounds

The State Defendants argue that "Defendants Napoli, Hyatt, and Laguio are, at a minimum, entitled to qualified immunity." [5] (Leckie II Def. Br. (Dkt. No. 32) at 10) According to the State Defendants, "[t]he issues on qualified immunity are: (1) whether Plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether the right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." (Id.) (quoting Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013))

As to these three elements – and without citing any supporting case law – the State Defendants assert that "Plaintiff has not alleged a constitutional violation against these defendants"; that "[a] reasonable official[ ] in the position of Defendant Nurse[ ] ... Hyatt could have believed that [his or her] alleged 'delay' in scheduling Plaintiff to see a medical provider – a delay counted in hours – did not violate the Constitution"; and that "a reasonable official in Defendant Laguio's position could have believed that first attempting to treat Plaintiff's jaw condition with antibiotics, and referring hi[m] to a hospital

three days later when he failed to improve, did not violate Plaintiff's constitutional rights." (Id. at 11)

Judge Lehrburger concludes that Hyatt and Laguio are not entitled to qualified immunity as a matter of law. In so concluding, Judge Lehrburger notes that "it is well-established by the Supreme Court and in this Circuit that [a] failure to treat, or [a] delay in treating, a degenerative medical or dental condition can suffice to state a § 1983 claim. Despite the clearly established law to the contrary, and as alleged by Leckie, Defendants ... Hyatt, and Laguio failed to act to ensure Leckie received the tooth extraction that all were aware he needed to resolve his pain and infection." (R&R (Dkt. No. 129) at 45 (citing Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); Harrison, 219 F.3d at 139; Chance, 143 F.3d at 702-04; Grimmett v. Corizon Med. Assocs. of New York, No. 15CV7351JPOSN, 2017 WL 2274485, at *4-5 (S.D.N.Y. May 24, 2017); Dean, 623 F. Supp. at 402)) Judge Lehrburger further finds that "[b]ecause an incarcerated person's right to adequate medical care (including dental care) is clearly established, and the facts alleged indicate [that] Defendants ... Hyatt and Laguio did not act objectively reasonably in light of that clearly established law, qualified immunity does not serve as a basis for dismissal." (Id. (citing Harrison, 219 F.3d at 136; Kearsey v. Williams, No. 99-CV-8646, 2005 WL 2125874, at *7 (S.D.N.Y. Sept. 1, 2005)))

*14 The State Defendants object to the R&R's finding on qualified immunity as to Hyatt and Laguio. They argue that "the R&R's recommendation to deny qualified immunity to State Defendants Hyatt and Laguio rests upon a definition of the clearly established right regarding adequate medical care in impermissibly broad terms." (Def. Objs. (Dkt. No. 40) at 7) The State Defendants also assert that

> in their motion to dismiss, State Defendants Hyatt and Laguio essentially argued that to defeat their qualified immunity defense, Plaintiff must point to clearly established precedent from the Supreme Court or Second Circuit, or other persuasive authority, that established that: (1) State Defendant Hyatt could have believed that her alleged 'delay' in scheduling Plaintiff to see a medical provider – a delay counted in hours – violated the Constitution,

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 56 of 102

or (2) that a reasonable official in Defendant Laguio's position could have believed that first attempting to treat Plaintiff's jaw condition with antibiotics and referring Plaintiff to a hospital three days later when he failed to improve, violated Plaintiff's constitutional rights. No such precedent exists. Plaintiff's contentions amount to no more than a disagreement about the course of treatment, which does not implicate the Constitution.

(Id. at 7-8)

Despite this assertion, the State Defendants did not argue – either "essentially" or otherwise – that "Plaintiff must point to clearly established precedent from the Supreme Court or Second Circuit, or other persuasive authority, that established that: (1) State Defendant Hyatt could have believed that her alleged 'delay' in scheduling Plaintiff to see a medical provider – a delay counted in hours – violated the Constitution, or (2) that a reasonable official in Defendant Laguio's position could have believed that first attempting to treat Plaintiff's jaw condition with antibiotics and referring Plaintiff to a hospital three days later when he failed to improve, violated Plaintiff's constitutional rights." (Def. Objs. (Dkt. No. 40) at 7; compare Leckie II Def. Br. (Dkt. No. 32) at 11 (arguing that reasonable officials in Hyatt's and Laguio's positions could have believed their alleged actions were constitutional, but not arguing – as the State Defendants now contend – that it was Plaintiff's burden to identify cases indicating that reasonable officials in Hyatt's and Laguio's positions would have believed that their alleged actions were unconstitutional)) Accordingly, Defendants have presented a new argument for the first time in an objection, which warrants only clear error review. See Gladden, 394 F. Supp. 3d at 480.

As Judge Lehrburger notes – and contrary to the State Defendants' burden argument – (1) "[s]ince qualified immunity is an affirmative defense, [D]efendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time," Varrone v. Bilotti, 123 F.3d 75, 78 (2d Cir. 1997); and (2) "refus[ing] treatment of a properly diagnosed [dental] condition that was progressively degenerative, potentially dangerous and

painful, and that could be treated easily and without risk" constitutes deliberate indifference. Harrison, 219 F.3d at 139; accord Chance, 143 F.3d at 703 ("A cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff, the deterioration of the teeth due to a lack of treatment, or the inability to engage in normal activities.") (citations omitted). (R&R (Dkt No. 129) at 44-45) The State Defendants have not shown that Hyatt and Laguio's alleged actions are objectively reasonable in light of this clearly established precedent; instead, they merely, and incorrectly, assert that Leckie's allegations plead only a "difference of opinion." "[A]t [the] motion to dismiss stage, [this] [C]ourt [cannot] say as a matter of law that [D]efendant[s'] actions were objectively reasonable," JG & PG ex rel. JGIII v. Card, No. 08 CIV. 5668 (KMW), 2009 WL 2986640, at *8 (S.D.N.Y. Sept. 17, 2009) (citation omitted), either as to Hyatt's failure to refer Leckie for a tooth extraction or as to Laguio's delay in referring Leckie to an oral surgeon and his decision to prescribe antibiotics instead. For these reasons, this Court finds no clear error in the R&R's recommendation, and will adopt it.

### D. Defendants' Motions to Dismiss Leckie's Other Claims

**\*15**  There are no objections to the R&R's recommendations regarding other aspects of Defendants' motions to dismiss. Summarized below are Defendants' arguments and the R&R's corresponding recommendations.

#### 1. Leckie's Failure to Intervene Claims

The City Defendants move to dismiss Plaintiff's failure to intervene claim, arguing that "Plaintiff's allegation that 'those defendants who were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct, and failed to intervene' is conclusory and insufficient to sustain a failure to intervene claim." (Leckie I Def. Br. (Dkt. No. 117) at 18 (quoting Leckie I SAC (Dkt. No. 110) ¶ 51))

Only the City Defendants moved to dismiss Leckie's failure to intervene claim. (Leckie I Def. Br. (Dkt. No. 117) at 18; compare Leckie II Def. Br. (Dkt. No. 32) at 2, passim) As to Defendants Matthew, Rakib, Hyatt, and Laguio – the Defendants against whom Leckie's deliberate

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 57 of 102

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

indifference claims survive – Judge Lehrburger recommends that "Leckie's failure to intervene claims ... be construed as being pled in the alternative." "At a later juncture, Leckie will have to specify which Defendants will be subject to trial under which theory," but at the motion to dismiss stage, "courts allow causes of action for direct participation and failure to intervene to be pled in the alternative where a plaintiff has sufficiently pled a constitutional violation, with the caveat that the plaintiff later specify which defendants he seeks to hold liable for the direct constitutional violation versus which he seeks to hold liable for failure to intervene." (Id. at 40-41 (citing Buari v. City of New York, 530 F. Supp. 3d 356, 393 (S.D.N.Y. 2021); Lanorith v. Truscelli, No. 15-CV-617, 2017 WL 3634600, at *13 (E.D.N.Y. Aug. 22, 2017); and Cumberbatch v. Port Authority of New York & New Jersey, No. 03 CIV. 749, 2006 WL 3543670, at *11 (S.D.N.Y. Dec. 5, 2006)))

As to Defendant Napoli and the Doe Defendants, however, the R&R recommends that Plaintiff's failure to intervene claims be dismissed. Judge Lehrburger finds that "[t]he complaint does not establish that Napoli had a reasonable opportunity to intervene or that she was aware of the need for Leckie's tooth to be extracted or that the other Defendants were failing to provide the needed treatment." As to the Doe Defendants, Judge Lehrburger concludes that "[t]he allegations are impermissibly conclusory and fail to plead facts that would allow a reasonable inference that any Doe Defendant was present when the named Defendants failed to provide medical care and had the opportunity to intervene." (Id. at 42-43)

This Court finds no error in Judge Lehrburger's conclusions.

### 2. Leckie's *Monell* Claims

The City Defendants move to dismiss Plaintiff's Monell claims against the City and Health & Hospitals. They contend that "[P]laintiff does not plead any facts demonstrating that he suffered a constitutional violation by any individual defendant" (Leckie I Def. Br. (Dkt. No. 117) at 15), and that "[P]laintiff does not plausibly allege that the alleged deprivations were caused by a policy or practice attributable to [t]he City or [Health & Hospitals]." (Id. at 16) And while acknowledging that "a court may infer a municipal policy from acts or omissions of the municipality's policymakers," they argue that "[P]laintiff does not refer to any specific incidents, other than Mr. Leckie's, to establish a custom

that resulted in the deprivation of medical care to inmates that resulted in civil rights violations." They further contend that "[P]laintiff does not claim that any of the individual defendants were acting as final policymakers when they rendered care to Mr. Leckie." (Id. at 16-17) Finally, they argue that "[P]laintiff does not sufficiently allege a causal connection between the alleged custom or policy of providing inadequate medical care and [P]laintiff's injuries." (Id. at 17)

**\*16** In analyzing Plaintiff's Monell claim, Judge Lehrburger notes that Plaintiff alleges that the City and Health & Hospitals "adopted policies of: '(i) ignoring the medical complaints of inmates; (ii) failing to order/perform necessary medical procedures; [and] (iii) subjecting inmates to cruel and unusual treatment in allowing inmates to suffer from readily treatable medical/ dental conditions.' " (R&R (Dkt. No. 129) at 36 (quoting Leckie I SAC (Dkt. No. 110) ¶ 68))

He then sets out the standard for Monell liability:

> To prevail on claims of municipal liability under § 1983, "a plaintiff must identify the existence of a municipal policy or practice that caused the alleged constitutional violation. A plaintiff must also demonstrate a sufficient causal relationship between the violation and the municipal policy or practice." .... To prove the existence of a municipal policy or custom, a plaintiff may allege: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." .... "Proof of a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy."

(Id. at 46-47 (quoting Mitchell v. City of New York, 841 F.3d 72, 80 (2d Cir. 2016) (in turn citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694-95 (1978)); Johnson v. City of New York, No. 06-CV-9426, 2011 WL 666161 at *3 (S.D.N.Y. Feb. 15, 2011) (citations omitted); and Williams v. City of New York Department of Correction, No. 19-CV-9528, 2020 WL 3893929, at *6 (S.D.N.Y. July 10, 2020) (further quotation omitted)))

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 58 of 102

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

Judge Lehrburger goes on to find that "Leckie only provides conclusory allegations of the existence of an unconstitutional policy of denying incarcerated people adequate dental care, with no specific facts beyond his own experience. He does not allege that the incidents that happened to him happened to others, or that the Defendants have been responsible for similar violations in the past, and so the facts pled are insufficient to impose municipal liability." (Id. at 47) Judge Lehrburger also rejects Leckie's argument that the Court should "find[ ] municipal liability based upon the allegation of a single incident in the context of custom and usage and failure to train and supervise" (Leckie I Pltf. Opp. (Dkt. No. 120) at 20), because (1) "the SAC does not include a claim for failure to supervise," and (2) "[t]he brief and conclusory allegations in the SAC come nowhere near plausibly alleging facts that could ... 'demonstrate that a municipality's failure to train amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact,' " as required to make out a Monell claim for failure to train or supervise. (R&R (Dkt. No. 129) at 47-48 (quoting Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 391 (S.D.N.Y. 2013)))

This Court finds no error in Judge Lehrburger's conclusions regarding Leckie's Monell claim.

### 3. Section 1983 Claims Against Individual Defendants in their Official Capacities

**\*17** The State Defendants argue that Leckie's Section 1983 claims against them in their official capacities "are treated as claims against the State itself and are barred" by the Eleventh Amendment. (Leckie II Def. Br. (Dkt. No. 32) at 7 (citing Pennhurst Interstate Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984); Hafer v. Melo, 502 U.S. 21, 25 (1991); and Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989))) In response, Leckie "agrees to withdraw claims made against the State Defendants within their official capacities only." (Leckie II Pltf. Opp. (Dkt. No. 36) at 22) The R&R therefore deems these claims "[a]bandoned" and recommends that "claims under § 1983 against the individual State Defendants in their official capacities ... be dismissed." (R&R (Dkt. No. 129) at 49)

This Court finds no error in Judge Lehrburger's recommendation.

### 4. Leckie's Claims under the ADA and Rehabilitation Act

The State Defendants move to dismiss Leckie's claims under the ADA and the Rehabilitation Act. (Leckie II Def. Br. (Dkt. No. 32) at 11-12; Leckie II Cmplt. (Dkt. No. 5) ¶¶ 80-117) According to the State Defendants, Leckie's claims for declaratory and injunctive relief under these statutes are moot, and he lacks standing to bring such claims, because he was released from State custody before asserting these claims in the Leckie II Complaint. (Leckie II Def. Br. (Dkt. No. 32) at 11 ("Plaintiff pleads that he was released from [State] custody before the complaint was filed, and he thus lacks standing to seek injunctive relief relating to his incarceration. At a minimum, Plaintiff's release has rendered any such claims moot.") (citing Amador v. Superintendents, No. 03 Civ. 650, 2005 WL 2234050, at \*5 (S.D.N.Y. Sept. 13, 2005); City of Los Angeles v. Lyons, 461 U.S. 95, 105-06 (1983); and Verley v. Wright, No. 2 Civ. 1182, 2007 WL 2822199, at \*9 (S.D.N.Y. Sept. 27, 2007)))

As to Leckie's claim for damages under the ADA and the Rehabilitation Act, the State Defendants argue that " '[n]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials.' These claims against Defendants, therefore, should be dismissed because Plaintiff cannot seek money damages against individual Defendants." (Leckie II Def. Br. (Dkt. No. 32) at 12 (quoting Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001))) In the alternative, the State Defendants argue that "Plaintiff makes no factual allegations whatsoever against these Defendants to show that they discriminated against him because of a disability, that they personally failed to reasonably accommodate him, or that they retaliated against him." (Id.)

Judge Lehrburger concludes that Leckie's ADA and Rehabilitation Act claims should be dismissed. As to Leckie's request for declaratory and injunctive relief, Judge Lehrburger notes that "[i]njunctive relief ... is generally rendered moot when a prisoner is released from incarceration," and that "[t]he same is true for claims of declaratory relief." (R&R (Dkt. No. 129) at 49-50 (citing Khalil v. Laird, 353 F. App'x 620, 621 (2d Cir. 2009), and Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006))) As to Leckie's "argu[ment] that injunctive and declaratory relief would not be moot in the event he is re-incarcerated during

Case 9:23-cv-00362-BKS-ML Document 58 Filed 05/06/26 Page 59 of 102

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

the pendency of his case," Judge Lehrburger correctly rejects this argument as "speculative." (Id. at 50 (citing Leckie II Pltf. Opp. (Dkt. No. 36) at 20))

As to Leckie's claim for damages, the R&R recommends dismissing those claims as not cognizable against the State Defendants, because "money damages are not an available remedy against individual defendants under Title II of the ADA or Section 504 of the Rehabilitation Act." (Id. at 51 (citing Garcia, 280 F.3d at 107))

**\*18** This Court finds no error in Judge Lehrburger's recommendation.

\* \* \* \*

For the reasons stated above, this Court will adopt Judge Lehrburger's recommendations as to Leckie's failure to intervene claim, Monell claim, Section 1983 claims against the individual State Defendants in their official capacities, and ADA and Rehabilitation Act claims.

### E. Supplemental Jurisdiction Over Leckie's State Law Claims

The City Defendants argue that, "if no federal claims remain after motion practice, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims." (Leckie I Def. Br. (Dkt. No. 117) at 18 (capitalization altered)) The City Defendants do not address supplemental jurisdiction in the event that some or all of Leckie's federal claims survive.

The State Defendants argue that this Court lacks subject matter jurisdiction over Leckie's state law claims because, "[u]nder N.Y. Corrections Law § 24(1), so long as the alleged conduct of the corrections employees is within the scope of their employment and in the discharge of their official duties, a federal court may not entertain state-law claims for damages against the corrections employees. Any such claims must be brought, if at all, as claims against the State itself in the New York State Court of Claims." (Leckie II Def. Br. (Dkt. No. 32) at 7 (citing Baker v. Coughlin, 77 F.3d 12, 15 (2d Cir. 1996); N.Y. Corrections Law § 24(1))).

As to Leckie's surviving state law claims against the City Defendants – negligence, medical malpractice, negligent infliction of emotional distress, and intentional infliction of emotional distress (Leckie I SAC (Dkt. No. 110) ¶¶ 39-45, 54-65) – Judge Lehrburger finds that the City

Defendants have "provide[d] no argument to dismiss the[se] state law claims," and recommends that this Court exercise supplemental jurisdiction over them. In so concluding, Judge Lehrburger notes that "the state law claims are not the focus of either the SAC or the parties' briefing[,] .... [that] the tort claims alleged in the complaint do not involve novel or complex issues of state law[,] .... [and that] judicial economy and convenience favor exercising supplemental jurisdiction, [given that] essentially all of the same evidence and witnesses would be relevant to both the federal and state law claims." (R&R (Dkt. No. 129) at 53-54 (citing Blackrock Balanced Capital Portfolio v. HSBC Bank USA, National Association, 95 F. Supp. 3d 703, 709 (S.D.N.Y. 2015), and Mueller v. Long Island Railroad Co., No. 89 Civ. 7384, 1997 WL 189123, at \*3 (S.D.N.Y. April 17, 1997)))

As to Leckie's state law claims against the State Defendants, the R&R notes that Leckie "generally purports to bring an action pursuant to, inter alia, 'the laws of the State of New York,' but does not allege any specific state law causes of action." Judge Lehrburger finds that this pleading deficiency "alone is [a] basis for dismissal of any purported state law claims." (Id. at 54 (quoting Leckie II Cmplt. (Dkt. No. 5) ¶ 1)) "[T]o the extent any state law claims are alleged," the R&R recommends that they "be dismissed for lack of jurisdiction because N.Y. Corrections Law § 24(1) provides that any such claims against corrections employees must be brought against New York State itself in the New York State Court of Claims." (Id. at 54-55) The R&R rejects "Leckie's contention that a reasonable jury could possibly find the State Defendants acted outside the scope of their employment" (Leckie II Pltf. Opp. (Dkt. No. 36) at 22-23), finding that "all of the acts and omissions alleged by Leckie against the individual State Defendants occurred in the course of performing their jobs as medical professionals for [the State]." (R&R (Dkt. No. 129) at 56 (citing Davis v. McCready, 283 F. Supp. 3d 108, 123-24 (S.D.N.Y. 2017) ("Courts in the Second Circuit have long held that Section 24 precludes a plaintiff from raising state law claims in federal court against state employees in their personal capacities for actions arising within the scope of their employment."); Flint v. Jun, 541 F. Supp. 3d 284, 287-88 (W.D.N.Y. 2021) (same)))

**\*19** No party has objected to the R&R's recommendations as to supplemental jurisdiction, and this Court finds no clear error in Judge Lehrburger's recommendations, which will be adopted. Accordingly, this Court will exercise supplemental jurisdiction over the surviving state law claims against the

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 60 of 102

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

City Defendants, but will not exercise jurisdiction over the state law claims against the State Defendants.

## F. Whether Dismissal Should Be With or Without Prejudice

The R&R recommends that the following claims be dismissed without prejudice: (1) the deliberate indifference and failure to intervene claims against the City Doe Defendants; (2) Leckie's claims for declaratory and injunctive relief under the ADA and Rehabilitation Act, "as the basis for dismissal is mootness"; (3) "all claims, if any, asserted under state law as 'Article III deprives federal courts of the power to dismiss a case with prejudice where federal subject matter jurisdiction does not exist' "; and (4) the deliberate interference and failure to intervene claims against the State Doe Defendants. (R&R (Dkt. No. 129) at 57-59 (quoting Hernandez v. Conriv Realty Associates, 182 F.3d 121, 123 (2d Cir. 1999)))

The R&R recommends that the following claims be dismissed with prejudice: (1) the Monell claims against the City and Health & Hospitals, because "[n]othing in the SAC (or Leckie's previous pleadings) suggests – let alone plausibly pleads facts to support – a policy or practice of deliberate indifference, failure to intervene, or the like with respect to detainees or prisoners in need of dental or medical care[,] ... even though the City produced documentation of its policies and procedures"; (2) "the claims against Napoli, given that the allegations are that Leckie was seen the very next day by a dentist and there is no indication that Napoli had any further involvement"; (3) "claims for damages under the ADA and Rehabilitation Act, because the only defendants are individuals, and money damages against individual defendants are not an available remedy"; and (4) "all claims against [the State] Defendants in their official capacities[,] as Leckie has abandoned these claims and they are barred by the Eleventh Amendment." (Id.)

This Court concludes that Leckie's claims for declaratory and injunctive relief under the ADA and the Rehabilitation Act should be dismissed with prejudice, because the mootness of those claims cannot be cured in an amended complaint. See Pierce v. Fordham Univ., Inc., No. 15-CV-4589 (JMF), 2016 WL 3093994, at *7 (S.D.N.Y. June 1, 2016) (denying leave to amend because " 'better pleading will not cure' the mootness of Plaintiff's claims against the Government

Defendants") (quoting Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)), aff'd, 692 F. App'x 644 (2d Cir. 2017); Rodriguez v. Touchette, No. 5:19-CV-143-GWC-JMC, 2020 WL 2322615, at *7 (D. Vt. May 11, 2020) ("Because [plaintiff's] action is barred for mootness, failure to exhaust administrative remedies, and the doctrine of sovereign immunity, the defects in his Complaint cannot be cured by amendment."), report and recommendation adopted, No. 5:19-CV-143, 2020 WL 3896848 (D. Vt. July 9, 2020). The preclusive effect of this ruling is, of course, limited to the facts and analysis underlying the mootness determination. See Hell's Kitchen Neighborhood Ass'n v. Bloomberg, No. 05 CIV. 4806 (SHS), 2007 WL 3254393, at *6 (S.D.N.Y. Nov. 1, 2007) (construing prior discontinuance "with prejudice" on mootness grounds as limited to "the question decided therein, i.e., the mootness of the claims") (quotation omitted); Bank v. Spark Energy Holdings, LLC, No. 13-CV-6130 ARR LB, 2014 WL 2805114, at *4-5 (E.D.N.Y. June 20, 2014) (same).

**\*20** No party has objected to Judge Lehrburger's remaining recommendations on this point, which this Court will adopt.

## CONCLUSION

For the reasons stated above, the R&R is adopted in part. Defendants' motions to dismiss (Leckie I, Dkt. No. 115; Leckie II, Dkt. No. 31) are granted in part and denied in part as set forth above. Leckie's motion to consolidate (Leckie II, Dkt. No. 35) is granted. The State Defendants' motion to transfer venue (Leckie II, Dkt. No. 31) is denied. The Clerk of Court is direct to consolidate 19 Civ. 6719 and 21 Civ. 7212, and to terminate the motions. (19 Civ. 6719, Dkt. No. 115; 21 Civ. 7212, Dkt. Nos. 31, 35).

The Court will conduct a conference in these matters pursuant to Rule 16 of the Federal Rules of Civil Procedure on May 11, 2023, at 11:00 a.m., in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3168699

Leckie v. City of New York, Not Reported in Fed. Supp. (2023)

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 61 of 102

**Footnotes**

1      The R&R appears on both the Leckie I and Leckie II dockets. References to the R&R in this Order are to the Leckie I docket.

2      Because the parties have not objected to Judge Lehrburger's factual statement, this Court adopts it in full. See Silverman v. 3D Total Solutions, Inc., No. 18 CIV. 10231 (AT), 2020 WL 1285049, at *1 n.1 (S.D.N.Y. Mar. 18, 2020) ("Because the parties have not objected to the R&R's characterization of the background facts ..., the Court adopts the R&R's 'Background' section and takes the facts characterized therein as true."); Hafford v. Aetna Life Ins. Co., No. 16-CV-4425 (VEC)(SN), 2017 WL 4083580, at *1 (S.D.N.Y. Sept. 13, 2017) ("The parties do not object to the Magistrate Judge's ... recitation of the facts of this case, and the Court adopts [the factual statement] in full.").

3      The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

4      The R&R also recommends that the motion to dismiss Plaintiff's deliberate difference claim against State Defendant Rakib be denied. (R&R (Dkt. No. 129) at 34-37) As the State Defendants point out in their objections, however, "State Defendant Rakib did not move to dismiss Plaintiff's claims for medical indifference." (Def. Objs. (Dkt. No. 40) at 3) Accordingly, the R&R will not be adopted as to this recommendation.

5      Having concluded above that Plaintiff's allegations as to Napoli are insufficient, this Court does not conduct a qualified immunity analysis as to her. See Rosado v. Vill. of Goshen, No. 7:16-CV-6916 (NSR), 2019 WL 1437522, at *9 (S.D.N.Y. Mar. 31, 2019) ("Given that Plaintiff has failed to state a valid claim, the issue of qualified immunity is moot.").

---

**End of Document**          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4543051
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Reginald SIMMS, Plaintiff,
v.
THE CITY OF NEW YORK, John Doe and
Jane Doe, the names of the last defendants being
fictitious, the true names of the defendants
being unknown to the plaintiffs, Defendants.

No. 10–CV–3420 (NGG)(RML).
|
Sept. 28, 2011.

**Attorneys and Law Firms**

Osondu O. Anyadike, Ugochukwu Uzoh, Ugo Uzoh, P.C., Brooklyn, NY, for Plaintiff.

Brian Jeremy Farrar, New York Law Dept., New York, NY, for Defendants.

**MEMORANDUM AND ORDER**

NICHOLAS G. GARAUFIS, District Judge.

**\*1** Plaintiff Reginald Simms ("Simms") objects to the entirety of the Report and Recommendation ("R & R") (Docket Entry # 13) of Magistrate Judge Robert Levy recommending that his complaint against the City of New York ("City") be dismissed for failure to state a claim upon which relief can be granted.[1] (Docket Entry # 16.) For the following reasons, the court agrees with Judge Levy that Simms's complaint fails to allege a plausible claim for relief under 42 U.S.C. § 1983, and grants the City's motion to dismiss (Docket Entry # 6) with respect to that claim. That done, the court declines to continue to exercise supplemental jurisdiction over Simms's remaining state-law claims, which are dismissed without prejudice.

**I. BACKGROUND**

On October 14, 2010, Simms filed an amended complaint ("Complaint") raising claims against the City under 42 U.S.C. § 1983 and several provisions of the New York State Constitution. (Docket Entry # 4.) He alleges that certain acts

by the New York City Police Department and the Kings County District Attorney's Office ("D.A.'s Office") violated a number of his individual rights secured by the United States and New York constitutions. Specifically, Simms alleges that he was maliciously prosecuted for a burglary he did not commit.[2] (Am.Compl.¶ 23.) He asserts that he was arrested by the police in Brooklyn without probable cause; that the police lied to the D.A.'s Office about the circumstances surrounding his arrest; and that, based on this information, the D.A's Office went forward with a prosecution before eventually dropping the case in July 2007. (Am.Compl.¶¶ 9, 10, 12, 16, 17, 20.) Simms alleges that this malicious prosecution resulted from the City's failure to properly train its police officers and prosecutors, and that such failure is endemic. (Am.Compl.¶¶ 27–33.) Simms claims that he was harmed in various ways by the ordeal and seeks relief in the form of compensatory and punitive damages. (Am.Compl.¶¶ 21, 41.)

The City moved to dismiss the Complaint pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure on November 24, 2010, and court referred the motion to Judge Levy for a report and recommendation. (*See* Docket Entry of Sept. 23, 2010.) On May 19, 2011, Judge Levy submitted to the court his recommendation that the City's motion be granted, and this objection followed.

**II. DISCUSSION**

Where, as here, a party objects to the entirety of a magistrate judge's report and recommendation, the court reviews the report de novo. *See* 28 U.S.C. § 636(b)(1)(C). Accordingly, the court now examines the Complaint to determine if it states a claim upon which relief can be granted.

A plaintiff can only obtain relief for claims that are properly pled. For a claim to meet the minimum pleading standard set forth in Rule 8(a)(2) of the Federal Rules of Civil Procedure, it must contain more than a mere recitation of the elements of a cause of action or series of legal conclusions. *See Ashcroft v. Iqbal,* —— U.S. ——, —— – ——, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009). The complaint instead must provide enough factual content that, when taken as true, would allow a court to draw a "reasonable inference" that the plaintiff is entitled to relief. *Id.* at 1949. This means that a claim for relief must be plausible; it must raise more than "the mere possibility of misconduct" by a defendant. *Id.* at 1949–50.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.                1

**\*2** Assuming that all of the facts asserted by Simms are true and construing the Complaint in the light most favorable to him, *see In re Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007), the court nevertheless determines that Simms has failed to allege a plausible § 1983 claim against the City.

To begin with, the constitutional injury Simms alleges—malicious prosecution—relates only to his treatment by the police and not to that by the DA.'s Office. To establish a § 1983 claim for malicious prosecution, a plaintiff must show a violation of his fourth-amendment rights and all of the elements that make up a malicious prosecution claim under relevant state law. *Manganiello v. City of New York,* 612 F.3d 149, 160–61 (2d Cir.2010). In New York, these elements are: (1) initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of that proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as motivation for the prosecution. *Id.* at 161 (citing *Broughton v. State,* 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)). At the pleading stage, actual malice may be inferred from a lack of probable cause. *Cf. Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 131 (2d Cir.1997) ("[L]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment."). While it is clear that Simms asserts facts that, if true, would establish or give rise to a reasonable inference that the elements of the state tort were met as to the arresting officers, he does not adequately plead that the D.A.'s Office lacked probable cause to initiate a prosecution. On the contrary, by asserting that the arresting officers "falsely stated to prosecutors ... that plaintiff knowingly entered or remained unlawfully in a building with intent to commit a crime therein" (Am.Compl.¶ 16), the Complaint gives rise to precisely the opposite inference. While it is *possible* that the prosecutors knew or suspected that the police were lying to them, without more asserted facts, such a scenario is not plausible.

This distinction—between the alleged culpability of the D.A.'s Office and that of the police—matters because, as is well known, the City cannot be held vicariously liable under § 1983 for constitutional torts committed solely by its employees. *Monell v. New York Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, the City is only liable for wrongs for which it is itself responsible; that is, for those torts caused by official government policy, custom, or practice. *Id.; see also DeCarlo v. Fry,* 141 F.3d 56, 61–62 (2d Cir.1997). As Simms only sufficiently pleads an injury inflicted by police officers, his

§ 1983 claim turns exclusively on the City's policies and customs concerning the police department and not on those related to local prosecutors.

Simms alleges that he was victimized as a result of the City's failure to properly train its police officers and its deliberate indifference to the consequences of such failure. (Am.Compl.¶¶ 27, 29) A municipality's failure to properly train its employees can under certain circumstances give rise to *Monell* liability, *see City of Canton v. Harris,* 489 U.S. 378, 387–90, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), but a claim based on this theory still must be properly pled under *Iqbal.* [3] Here, there is not enough factual material in the Complaint for the court to reasonably infer that the police misconduct Simms alleges was the result of anything other than the individual acts of the arresting officers.

**\*3** Much of the portion of the Complaint that addresses the City's alleged failure to train its police officers is conclusory, and therefore must be disregarded. *See Iqbal,* 129 S.Ct. at 1949–50. Simms asserts that the City, "acting through the New York Police Department, had actual or de facto policies, practices, customs and or usages of failing to properly train, supervise or discipline its police officers concerning the correct practices in conducting investigations ... and [the] obligation to effect an arrest only when probable cause existsfor such arrest" (Am.Compl.¶ 27.) While this assertion does specify what type of training the officers lacked, it does not provide any facts that would allow the court to infer what city policies, practices, or customs contributed to or caused the deficiency. Simms's assertion that the failure was a product of the City's "deliberate indifference" (*id.* at ¶ 29) does not cure the problem because it is nothing but a pure legal conclusion. In sum, these passages contain little more than boilerplate, which the court cannot accept as true.

Thus, the court is left with a scant three factual assertions, which, when read together, do not amount to a plausible claim that any City policy, practice, or custom contributed to Simms's injury. First, Simms asserts that police commanders were allowed to set "productivity goals" for their subordinates. (Am.Compl.¶ 31.) It is not reasonable, however, to equate "productivity goals"—whatever that open-ended concept may mean—with malicious prosecutions. Even less relevant is Simms's second assertion that another judge in this courthouse determined that certain allegations made in an unrelated consolidated action against the City were sufficient to survive a motion to dismiss. (*See* Am. Compl. ¶ 32 (citing *Colon v. City*

*of New York,* Nos. 09–CV–8, 09–CV–9 (JBW), 2009 U.S. Dist. LEXIS 1105020, at *5, 2009 WL 4263362 (E.D.N.Y. Nov. 25, 2009) .) Neither the judge nor a jury found as a fact that the City employed harmful practices or policies. Instead, the court merely ruled in that a cause action based on such a theory was properly pled. *See Colon.* 2009 U.S. Dist. LEXIS 1105020, at *5, 2009 WL 4263362. Notably, the plaintiffs alleged different injuries than Simms alleges, *see id.,* at *2–*3, blamed different City policies, *see id.,* and, presumably, included more factual material in their complaints pertaining to the City's practices, customs, and policies. Finally, Simms's assertion that he was falsely arrested a second time (Am.Compl.¶¶ 33–34) is not enough, even when paired with his allegations about the instant arrest, to create a reasonable inference that the City failed to train its police officers. Rather, given the size of the City's police force, the plausible explanation for these incidents is that Simms twice had the misfortune of encountering unethical police officers.

Because Simms has not plausibly alleged that City was itself responsible for his injury, his § 1983 claim is dismissed.

 **\*4** Simms's § 1983 claim against the City was the only federal claim remaining in this action. Now that it has been dismissed, the court is left exclusively with Simms's state-law claims. The Second Circuit has "generally held that where all federal claims have been dismissed at a relatively early stage, the district court should decline to exercise supplemental jurisdiction over pendent state law claims." *Astra Media Group. LLC v. Clear Channel Taxi Media, LLC,* 414 F. App'x 334, 337 (2d Cir.2011) (summary order) (citing Second Circuit cases). It is early in this litigation and the court has dismissed all of Simms's federal claims. The court therefore declines to continue to exercise supplemental jurisdiction over Simms's state-law claims and dismisses them without prejudice.

### III. CONCLUSION
For the foregoing reasons, the City's motion to dismiss is GRANTED. Simms's § 1983 claim is dismissed and his state-law claims are dismissed without prejudice to re-file in state court.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4543051

---

### Footnotes

1    In oral argument before Judge Levy, Simms withdrew his claims against the other named defendants, unknown police officers referred to as John Doe and Jane Doe. (*See* Tr. of Oral Argument (Docket Entry # 12) at 3–5.)

2    The Complaint also alleges that Simms was falsely arrested, but Simms conceded at oral argument before Judge Levy that this claim is time-barred by the applicable statute of limitations. (*See* Tr. of Oral Argument at 4.)

3    In his objection to the R & R, Simms relies on language in the Second Circuit's decision in *Amnesty America v. Town of West Hartford* that suggests that conclusory allegations about a municipality's failure to train its employees may be sufficient because "it is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." (Pl's Objection to R & R at 9 (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 130 n .10 (2d Cir.2004)) (internal quotation marks omitted).) The court notes that *Amnesty* was decided before *Iqbal* and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), which substantially reworked the federal pleading standards. Since those decisions, courts in this district have generally required that plaintiffs provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train. *See Araujo v. City of New York,* No. 08–CV–3715 (KAM), 2010 U.S. Dist. LEXIS 26082, at *28, 2010 WL 1049583 (E.D.N.Y. Mar. 19, 2010); *Abreu v. City of New York,* 657 F.Supp.2d 357, 361 (E.D.N.Y.2009); *Bradley v. City of New*

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 65 of 102

*York,* No. 08–CV–1106 (NGG), 2009 U.S. Dist. LEXIS 51532, at *9–*10, 2009 WL 1703237 (E.D.N.Y. June 18, 2009). *But see Ferrari v. County of Suffolk,* No. 10–CV–4218 (JS), 2011 U.S. Dist. LEXIS 61337, at *29–*30, 2011 WL 2297125 (E.D.N.Y. June 7, 2011) (Seybert, J.) (citing *Amnesty* for the proposition that failure-to-train claims are afforded a lenient pleading standard and noting that *Iqbal* and *Twombly* are "context specific"); *Michael v. County of Nassau,* No. 09–CV–5200 (JS), 2010 U.S. Dist. LEXIS 82764, at *11 n. 2, 2010 WL 3237143 (E.D.N.Y. Aug. 11, 2010) (Seybert, J.) (same).

The Court declines to give *Amnesty* the broad reading that Simms urges. For one thing, *Amnesty'* s discussion of pleading standards is dictum. The Second Circuit in that case reviewed a grant of summary judgment. For another, an interpretation of *Amnesty* that allows plaintiffs to plead only the bare elements of their cause of action simply cannot be squared with *Iqbal* and *Twombly.* It may well be that plaintiffs cannot be expected to know the details of a municipality's training program without discovery, *see Amnesty,* 361 F.3d at 130 n. 10, but that does not relieve them from the obligation to plead facts sufficient for a court to reasonably infer that some type of municipal policy, practice, or custom—including deliberate indifference to the population's constitutional rights—caused an employee training program to be deficient. The court does not speculate about what types of facts could meet this standard, but, suffice it to say, allegations limited to one or two specific constitutional violations by individual officers—all that is asserted here, *see infra*—are not enough to give rise to such an inference.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by Rivera v. Westchester County, S.D.N.Y., September 23, 2020

2015 WL 1379652
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Steven TIEMAN, Plaintiff,
v.
CITY OF NEWBURGH, Po Joseph Palermo,
Po John Maguire, Po Eric Eltz, Po Patrick Kelly,
Po Anthony Guidice, Po Christopher Lahar,
Town of Newburgh, Sgt William Ransom,
Unknown Police Officers 1–5, Defendants.

No. 13–CV–4178 (KMK).
|
Signed March 26, 2015.

**Attorneys and Law Firms**

David A. Zelman, Esq., The Law Office of David A. Zelman, Brooklyn, NY, for Plaintiff.

Roberta D. Asher, Esq., Asher & Associates, New York, NY, for Plaintiff.

David Lewis Posner, Esq., McCabe & Mack LLP, Poughkeepsie, NY, for Defendant City of Newburgh.

Carl Steven Sandel, Esq., Drew William Sumner, Esq., Morris Duffy Alonso & Faley, New York, NY, for Defendants Town of Newburgh and SGT William Ransom.

*OPINION & ORDER*

KENNETH M. KARAS, District Judge.

**\*1** Plaintiff Steven Tieman brought suit against Defendants City of Newburgh (the "City"); City of Newburgh Police Officers Joseph Palermo, John Maguire, Eric Eltz, Patrick Kelly, Anthony Giudice, Christopher Lahar, and Unknown Police Officers 1–5; the Town of Newburgh (the "Town"); Town of Newburgh Sergeant William Ransom; and State Trooper Moises Nales. The City of Newburgh moves to dismiss all claims against the City and against Defendants Palermo, Maguire, Eltz, Kelly, Guidice, and

Lahar (collectively, the "City Police Officer Defendants"), and for the Court to reject Plaintiff's request to file his Proposed Amended Complaint ("PAC"). The Town of Newburgh moves to dismiss all claims against the Town and against Defendant Ransom, and for the Court to reject Plaintiff's PAC. For the following reasons, the Town's Motion To Dismiss is granted and the City's Motion To Dismiss is denied in part and granted in part.

I. *Background*

*A. Factual Background*

The following factual summary is derived from Plaintiff's PAC, which the Court takes as true for the purpose of these Motions To Dismiss. [1] These claims arise out of an incident that occurred on June 17, 2010, at approximately 5:45 p.m. (Pl.'s Mem. of Law in Opp'n ("Pl.'s Mem.") Ex. A(PAC), at ¶ 10 (Dkt. No. 46).) Plaintiff alleges that he "was lawfully driving on a public street in Newburgh, New York, when he was approached by a police officer, upon information and belief, [Defendant Eltz], who was wearing plain clothes." (*Id.*) [2] Without warning and "for no apparent reason," Defendant Eltz "began to yell" at Plaintiff, and "told him to get out of the car." (*Id.* ¶ 11.) Plaintiff further alleges that he "was frightened and thought he was being robbed, so he drove away." (*Id.*) Defendant Eltz and other police officers, including Defendants Maguire, Kelly, Guidice, Lahar, and Palermo, gave chase to Plaintiff. (*Id.* ¶ 12.) "At some point thereafter, and prior to Plaintiff stopping his vehicle," Defendants Ransom and Nales joined the chase. (*Id.*) "After a brief car chase, [P]laintiff pulled over to the side of the road, put his pickup truck in park, turned off the engine, and raised his hands to surrender." (*Id.* ¶ 13.) Plaintiff alleges that, when he stopped his vehicle, Defendant Nales was located near Plaintiff's vehicle. (*Id.*)

Next, Plaintiff alleges that "one of the defendant police officers, on information and belief [Defendant Maguire], opened the truck door and ordered his police dog to attack [P]laintiff." (*Id.* ¶ 14.) Plaintiff "was thereupon attacked by the police dog, and punched numerous times by [Defendant Maguire]." (*Id.*) Plaintiff alleges that he was "not resisting the police officers in any way," but he nonetheless was dragged from his truck and thrown to the ground by Defendant Maguire and other officers, and was "beaten severely by the defendant officers, who at this point were laughing and telling the dog what a good job he had done." (*Id.* ¶ 15.) Plaintiff alleges that at that point "[t]here were at least fifteen or twenty

police officers surrounding" him. (*Id.*) Plaintiff alleges that though he was "handcuffed and secured by the police officers, the police dog was again ordered to attack" him, which attack was "completely unjustified, and resulted in numerous further physical injuries." (*Id.* ¶ 16.)

**\*2** Plaintiff alleges that the injuries he suffered as a result of this assault "included deep dog bites and lacerations to his left side and left leg; bruising to his jaw, head, back, and arms; lacerations to his right elbow; and a broken left ring finger (caused by a dog bite)." (*Id.* ¶ 17.) Plaintiff alleges that he was arrested, taken to the Newburgh City police station, then taken for medical treatment at St. Luke's Hospital, and then to Orange County Jail, where he received further medical treatment. (*Id.* ¶ 18.) Plaintiff alleges that his wounds became infected while in jail, and that he suffered severe and permanent injuries, including "scarring and weakness in his limbs," "severe physical pain," and "serious and permanent psychological and emotional injuries, including depression, flashbacks, nightmares, unreasonable fear of dogs and police officers, and inability to concentrate." (*Id.* ¶¶ 19–21.)

According to Plaintiff, the City "has a policy or practice of using excessive force when effectuating arrests, and fails to train and/or discipline its employees to prevent violations of arrestee's [sic] constitutional rights." (*Id.* ¶ 22.) Additionally, Plaintiff claims that the City "has an extensive history of lawsuits and other complaints alleging the use of excessive force by its employees." (*Id.* ¶ 23.) In particular, according to Plaintiff, "[p]ublic court records reveal at least nine suits filed in the five years before the incident [that is the basis for this Action] which allege that police officers employed by [the City] used excessive force during the course of an arrest," "[a]t least five" of which incidents "involved allegations of unnecessary and excessive dog bites." (*Id.*) Plaintiff has listed and described the following lawsuits:

> In *Burley. et al. v. City of Newburgh, et al.,* 07–CV–3336, the plaintiffs alleged that on May 11, 2005, police officers employed by [the City] falsely arrested one plaintiff and sprayed him with pepper spray, threw him to the ground, and kicked him in the face causing him to lose consciousness. The other plaintiff alleged that police officers employed by [the City] falsely arrested him, hit him in the face, and kicked him in the ribs.

> In *Bryant v. City of Newburgh, et al.,* 06–CV–4200, the plaintiff alleged that he was falsely arrested with excessive force by police officers employed by [the City] on both May 17, 2005 and June 22, 2006.

In *Garcia. et al. v. City of Newburgh, et al.,* 08–CV–1198, [the] plaintiff alleged that on March 30, 2007, he was falsely arrested with excessive force by police officers employed by [the City], including [Defendant Kelly].

In *Cooper. et al. v. City of Newburgh, et al.,* 09–CV–2234, four plaintiffs alleged that on March 31, 2007, July 8, 2007, August 8, 2007, and August 9, 2007, respectively, [City] police officers arrested one of the plaintiffs with excessive force. The complaint alleged that during the course of each arrest, officers directed police dogs to "bite and hold" causing serious injuries to each plaintiff.

**\*3** In *Follini v. City of Newburgh, et al.,* 08–CV–6347, [the] plaintiff alleged that on July 22, 2007, police officers employed by [the City], including [Defendant Palermo], falsely arrested [the] plaintiff with excessive force, including pushing [the] plaintiff to the ground, repeatedly administering a taser while [the] plaintiff was on the ground, and administering pepper spray directly to [the] plaintiff's face.

In *Allen v. City of Newburgh[,] et al.,* 08–CV–6771, the plaintiff alleged that on August 12, 2007, officers employed by [the City] arrested him with excessive force, causing injuries including loss of consciousness, shoulder dislocation, facial bruising, and muscle spasms.

In *Baynes v. City of Newburgh, et al.,* 08–CV–6442, [the] plaintiff alleged that on August 25, 2007, police officers employed by [the City], including [Defendant Palermo] and [Defendant Kelly], physically assaulted, maced, and tased[ ] both [the] plaintiff and additional arrestees who were not resisting arrest.

In *Fahey, et al. v. Lt. Peter Leach, et al.,* 08–CV–8280, [the] plaintiffs alleged that on September 30, 2007, multiple [City] police officers assaulted [the] plaintiffs at a gas station and at the police precinct.

In *Whitfield v. City of Newburgh, et al.,* 08–CV–8516, the deceased plaintiff, through his estate, alleged that on July 8, 2008, officers employed by [the City] administered a taser to [the] plaintiff and ordered a police dog to attack [the] plaintiff multiple times, causing his death.

(*Id.* ¶¶ 24–32 (italics omitted).) Plaintiff further alleges that the City "routinely reached settlement agreements" with the Plaintiffs in these cases. (*Id.* ¶ 33.) In particular, Plaintiff claims that *"Garcia* settled in 2008, *Bryant, Cooper* and

*Bavnes* settled in 2010, *Fahey* and *Allen* settled in 2011, and *Follini* settled in 2012." (*Id* .) Plaintiff further asserts that while the "amount of each settlement agreement [is] not publically available, upon information and belief, most, if not all, of the above-mentioned cases settled for amounts well in excess of nuisance value." (*Id.* ¶ 34.) Additionally, Plaintiff alleges, upon information and belief, that "the officers that were the subject of these lawsuits were not disciplined by [the City] for their actions." (*Id.*)

Plaintiff alleges two other bases for the City's "notice of allegations of excessive force." (*Id.* ¶ 35.) Specifically, Plaintiff alleges that the City "was also on notice of allegations of excessive force by its officers through public forums, including on February 11, 2008," on which date "the Newburgh City Council held a public comment session, at which numerous residents testified regarding the excessive and unnecessary use of police dogs during arrests, as well as additional perceived problems within the Police Department, including the lack of a civilian review board." (*Id.*) Additionally, Plaintiff alleges that "[o]n August 1, 2013, Matrix Consulting Group published their Final Report entitled 'An Assessment of the Culture, Community Relations, Use of Force, Training, Disciplinary Practices of the Police Department–City of Newburgh, New York,' " (the "Matrix Report"). (*Id.* ¶ 36.) According to Plaintiff, the Matrix Report stated generally that "discipline guidelines and decisions are unstructured," noted that "assigning a specific investigator and requiring a formal report" was not "previously required," and stated that "only 43% of sworn officers who responded to the polling in the report agreed that they received appropriate training to do their job well." (*Id.*)

**\*4** Finally, Plaintiff makes a number of general allegations regarding the City and Town. First, Plaintiff alleges that the "City of Newburgh and Town of Newburgh have been aware for years (from lawsuits, notices of claim and complaints filed with the municipalities themselves and their police departments) that many of their police officers are insufficiently trained with respect to the laws and regulations regarding use of force during an arrest." (*Id.* ¶ 40.) Plaintiff further alleges that the "municipalities are ... aware that such improper training has often resulted in a deprivation of civil rights," and that despite having such notice, "the municipalities have failed to take corrective action," which "caused the officers in the present case to violate plaintiff's civil rights." (*Id.*) Additionally, Plaintiff alleges that the City and Town "have been on notice that the defendant police officers lack the objectivity,

temperament, maturity, and discretion to be members of their respective police departments," and despite such notice, "the municipalities have retained the individual defendants as police officers." (*Id.* ¶ 41.) Plaintiff also alleges that "upon information and belief, in 2010, Defendants had a policy or routine practice of using excessive force when effectuating arrests," and that upon information and belief, "it was the policy and/or custom of defendant City of Newburgh to inadequately train, supervise, discipline, and/or terminate their officers, staff, agents and employees, thereby failing to adequately discourage further constitutional violations on the part of their officers, staff, agents and employees." (*Id.* at ¶¶ 42–43.) Furthermore, Plaintiff alleges that "as a result of the above described policies and customs, the officers, staff, agents and employees of defendant [City], believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated." (*Id.* at ¶ 44.) Plaintiff concludes that "the above described policies and customs demonstrate a deliberate indifference on the part of the policymakers of [the City] to the constitutional rights of arrestees and were the cause of the violations of Plaintiff's rights alleged herein." (*Id.* ¶ 45.)

### B. Procedural Background

Plaintiff filed suit against the City, the City Police Officer Defendants, the Town, Defendant Ransom, and Defendant Nales on June 14, 2013. (*See* Dkt. No. 2.) [3] On January 9, 2014, the Court held a pre-motion conference with all Parties. (*See* Dkt. (minute Entry for Jan. 9, 2014).) Following that conference, Plaintiff submitted a letter explaining the basis for filing an amended complaint, and attaching his PAC. (*See* Dkt. No. 20.) [4] Plaintiff never formally moved to file his PAC, which contains all of the factual allegations in his Complaint, as well as additional allegations.

**\*5** On May 23, 2014, the City moved to dismiss the claims against the City and the City Police Officer Defendants, and to oppose the filing of Plaintiff's PAC as to the claims against the City and the City Police Officer Defendants. (*See* Dkt. No. 25.) Similarly, the Town moved to dismiss the claims against the Town and Defendant Ransom, and to oppose the filing of Plaintiff's PAC as to the claims against the Town and Defendant Ransom. (*See* Dkt. No. 29.)

### II. Discussion

### A. 12(b)(5) Motion To Dismiss

The City of Newburgh moves to dismiss the claims against the City Police Officer Defendants for failure to serve, pursuant to Federal Rule of Civil Procedure 12(b)(5).

#### 1. Standard of Review

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l. Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 430–31, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007). Valid service is a prerequisite for a federal court to assert personal jurisdiction over a claim. *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). "When a defendant moves to dismiss under Rule 12(b)(5), the plaintiff bears the burden of proving adequate service." *Dickerson v. Napolitano,* 604 F.3d 732, 752 (2d Cir.2010) (brackets and internal quotation marks omitted).

In deciding a Rule 12(b)(5) motion, the Court "must look to matters outside the complaint to determine what steps, if any, the plaintiff took to effect service." *C3 Media & Mktg. Grp., L.L.C. v. Firstgate Internet, Inc.,* 419 F.Supp.2d 419, 427 (S.D.N.Y.2005) (internal quotation marks omitted); *see also PH Int'l Trading Corp. v. Nordstrom, Inc.,* No. 07–CV–10680, 2009 WL 859084, at *3 (S.D.N.Y. Mar. 31, 2009) ("A court may, on a Rule 12(b)(5) motion to dismiss, consider affidavits and documents submitted by the parties without converting the motion into one for summary judgment under Rule 56." (brackets and internal quotation marks omitted)). For a plaintiff to satisfy his burden of proving adequate service, *see Mende v. Milestone Tech., Inc.,* 269 F.Supp.2d 246, 251 (S.D.N.Y.2003), "[c]onclusory statements that a defendant was properly served are insufficient to overcome a defendant's sworn affidavit that he was never served," *Howard v. Klynveld Peat Marwick Goerdeler,* 977 F.Supp. 654, 658 (S.D.N.Y.1997), *aff'd,* 173 F.3d 844 (2d Cir.1999). Similarly, defective service is not cured or overcome "on the mere assertion that a defendant had actual notice." *Weston Funding, L.L.C. v. Consorcio G Grupo Dina, S.A. de C.V.,* 451 F.Supp.2d 585, 589 (S.D.N.Y.2006) (internal quotation marks omitted).

#### 2. Analysis

The Parties agree that service was attempted as follows. "[A] summons addressed to each defendant was delivered to the City Clerk's office, 83 Broadway, Newburgh, N.Y. 12550" in August 2013. (Pl.'s Mem. 9.) Plaintiff asserts that this service was proper because 83 Broadway "is the usual and typical place to serve Newburgh officers," the process server Michael Root of Majestic Process Service, Inc. went to the police department at 55 Broadway, Newburgh, N.Y. 12550, and was told by a sergeant "that the place to serve Newburgh officers was 83 Broadway," and "Mr. Root asked Ms. [Autumn] Resto, a paralegal at Newburgh City Hall, if she could accept service on behalf of the officer[s]," "she checked with a supervisor, read the documents, and agreed to accept service on behalf of the officers." (*Id.* at 9–10; *see also id.* Ex. C (Decl. of Michael Root) ("Root Decl.") ¶¶ 1, 3–7.)

**\*6** In support of its Motion To Dismiss, the City submitted an affidavit from Michelle Kelson, Corporation Counsel for the City of Newburgh. (*See* Aff. of Michelle Kelson (April 24, 2014) ("April 24 Kelson Aff.") ¶ 1 (Dkt. No. 27).) Ms. Kelson avers that she was notified that the City Clerk's office had received "several summons[es] and one copy of the verified complaint" for this case, and that there was "one summons for the City and one for each individual police officer." (*Id.* ¶ 2). Ms. Kelson appended the documentation that that City Clerk's office received-seven summonses and one copy of the verified complaint. (*Id.* at Ex. A.) The City also submitted an affidavit from Ms. Resto, who averred:

> My instructions from the Corporation Counsel are to take whatever legal papers are given to me. I do not offer an opinion as to whether giving me these papers is proper service. I have no authority to accept service on behalf of an individual employee of the City of Newburgh. I have never been appointed an agent to accept service on behalf of any Newburgh employee.

(Aff. of Autumn Resto ("Resto Aff.") ¶ 3 (Dkt. No. 49).) In Reply, the City submitted a second affidavit from Ms. Kelson, who averred:

> Employees in my office, including Ms. Resto, have standing instructions to take legal papers delivered to this office. No one here, including myself, is authorized to accept service on behalf of any employee of the City of Newburgh. Pursuant to CPLR § 311(A) (3), the

Corporation Counsel's office is a designated agent for receipt of process for the City but not its employees.

No employee of the Corporation Counsel's office has been designated as an agent to receive[ ] process pursuant to CPLR § 318.

The Corporation Counsel's office is on the second floor of City Hall located at 83 Broadway, Newburgh, New York. It is a separate building from the police station which is located a few hundred yards away at 55 Broadway. No police officers report to City Hall at the beginning or end of their shifts or receive their work assignments here. All police officers' place of business is the police department. The individual defendants in this case are not stationed at City Hall and, as to the performance of their job duties, City Hall is just another location within the City to which they are occasionally dispatched for official police business.

(Aff. of Michelle Kelson (June 17, 2014) ("June 17 Kelson Aff.") ¶¶ 2–4 (Dkt. No. 48).)

Under Federal Rule 4(e), Plaintiff could serve the City Police Officer Defendants pursuant to state law, *see* Fed.R.Civ.P. 4(e)(1), or by delivering a copy of the summons and of the Complaint to each individual personally, leaving a copy of each at each individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there, or by delivering a copy of each to an agent authorized by appointment or law to receive service of process, *See* Fed.R.Civ.P. 4(e)(2). The City argues, and Plaintiff does not contest, that service was not properly effected pursuant to Rule 4(e)(2). The summons and complaint were not delivered to each person individually, nor were they delivered to each individual's dwelling or usual place of abode. Finally, service was not effected by delivering a copy of the summons and complaint to an agent authorized by appointment or law to receive service of process; the evidence shows that Ms. Resto was not an agent authorized to receive service for the City Police Officer Defendants, nor does Plaintiff even dispute that fact. (Resto Aff. ¶ 3.)

 **\*7**  Thus, the question is whether the City Police Officer Defendants were properly served under state law, as is permissible under Federal Rule of Civil Procedure 4(e)(1). Section 308 of the New York C.P.L.R. ("CPLR") governs personal service upon natural persons, and provides that service may be effected

1. by delivering the summons within the state to the person to be served; or

2. by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business in an envelope bearing the legend "personal and confidential" and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served, ... or

3. by delivering the summons within the state to the agent for service of the person to be served as designated under rule 318[.]

N.Y. C.P.L.R. § 308. Again, service was not effected by personal delivery to the City Police Officer Defendants or by delivery at their dwelling places or usual places of abode, nor is there any evidence that Ms. Resto was an agent for service designated under CPLR § 318. Thus, the question is whether the City Police Officer Defendants were served by delivery of the summonses to a person of suitable age and discretion at their actual place of business and by mailing the summonses to the individuals at their last known residences or actual places of business.[5]

Here, Plaintiff has failed to establish that the City Police Officer Defendants were served at their "actual place of business" pursuant to CPLR § 308(2). "A person's 'actual place of business' must be where the person is physically present with regularity, and that person must be shown to regularly transact business at that location." *Selmani v. City of New York,* 100 A.D.3d 861, 954 N.Y.S.2d 580, 581–82 (App.Div.2012); *see also Sajimi v. City of New York,* No. 07–CV–3252, 2011 WL 135004, at \*3 (E.D.N.Y. Jan. 13, 2011) ("The term 'actual place of business' has been defined as a place where the defendant is regularly physically present or regularly transacts business."); *Varela v. Flintlock Const., Inc.,* 148 F.Supp.2d 297, 301 (S.D.N.Y.2001) ("Actual place of business is statutorily defined as any location that the defendant, through regular solicitation or advertisement, has held out as its place of business. For a location to be a person's actual place of business for service pursuant to CPLR § 308(2), that person must be shown to regularly transact business at that location." (citation and internal quotation

marks omitted)). Plaintiff makes no such showing. Indeed, the only evidence submitted on this issue is from Ms. Kelson, who averred, "No police officers report to City Hall at the beginning or end of their shifts or receive their work assignments here. All police officers' place of business is the police department. The individual defendants in this case are not stationed at City Hall and, as to the performance of their job duties, City Hall is just another location within the City to which they are occasionally dispatched for official police business." (June 17 Kelson Aff. ¶ 4.) Plaintiff has failed to meet his burden of proving that service was effected at Defendants' place of business. *See GMA Accessories, Inc. v. Solnicki,* No. 07–CV–3219, 2010 WL 3749213, at *4 (S.D.N.Y. Sept. 24, 2010) (noting that the plaintiff has the burden of showing service was made at the defendant's place of business and holding that the plaintiff failed to meet this burden when it failed to submit any evidence). [6] Accordingly, service was improper under New York law. *See Davis v. City of New York,* No. 07–CV–1395, 2008 WL 2511734, at *3 (S.D.N.Y. June 19, 2008) (holding that an attempt to effect service on individual police officers at the office of the city's corporation counsel was invalid because the "police precinct to which they report and where they conduct their business is their actual place of business" and the plaintiff "made no effort to serve the officers personally or at their actual residences"); *Moultry v. City of Poughkeepsie,* 154 F.Supp.2d 809, 812 (S.D.N.Y.2001) (holding that service was improper under New York law where the plaintiff tried to serve police officer defendants at the city chamberlain's office, and the defendants worked at police department headquarters, reported to work at headquarters at the beginning and end of each shift, and "[u]nless they [were] testifying in [c]ity [c]ourt, the officers ha[d] no official police business in [c]ity [h]all, and they [did] not work for or with the [c]ity [c]hamberlain"). Furthermore, even if Mr. Root went to the Police Department at 55 Broadway, was told by a sergeant to go to the City Attorney at 83 Broadway, and was told by Ms. Resto that she could accept service on behalf of the officers, as Mr. Root declared, service was still improper. (*See* Root Decl. ¶¶ 3–7.) *See Moultry,* 154 F.Supp.2d at 811–12 (holding that service on individual police officers at the city chamberlain's office was improper even though a clerk for the chamberlain accepted service on behalf of the individual police officers and "told the process server that he had come to the right place, and that she was empowered to accept personal service for the individual police officers"). [7]

**\*8** Additionally, when effecting service under state law, a plaintiff must, at the very least, serve a summons and

notice. Specifically, "[i]f the complaint is not served with the summons, the summons shall contain or have attached thereto a notice stating the nature of the action and the relief sought, and ... the sum of money for which judgment may be taken in case of default." N.Y. C.P.L.R. § 305(b). Here, Plaintiff served a summons for the City and summonses for each of the six individual City Police Officer Defendants, but only one copy of the Complaint. (*See* April 24 Kelson Aff. Ex. A.) None of the summonses contained any notice of the claims. (*Id.*) Thus, at least five of the summonses served on the City Police Officer Defendants did not have attached or contain either a copy of the Complaint or notice of the claims, and therefore were invalid under New York law.

Next, Plaintiff argues that, if the Court found service to be improper, it "should be cognizant of the fact that, at the time of the filing of this case, Plaintiff was pro se" and therefore should be granted special leniency regarding procedural matters. (Pl.'s Mem. 11.) However, Plaintiff was pro se for only a very short portion of this case. Plaintiff filed his Complaint pro se on June 14, 2013. (Dkt. No. 2.) On August 21, 2013, Roberta D. Asher [8] entered a notice of appearance on behalf of Plaintiff. (Dkt. No. 4.) [9] Thus, when service was attempted on August 29, 2013, Plaintiff was represented by counsel. (Pl.'s Mem. Ex. D.) Therefore, the Court sees no reason to extend special solicitude to Plaintiff regarding his inadequate service on the basis of his temporarily pro se status. *Cf. Marchand v. Simonson,* 16 F.Supp.3d 97, 106–07 (D.Conn.2014) (noting that the court would "take[ ] into consideration [the] plaintiff's pro se status at the time he filed his amended complaint," but that because the plaintiff was represented at the time he filed opposition to a motion, the court "need not apply the liberal pro se construction in considering [the] plaintiff's opposition" (italics omitted)); *Neely v. RMS Residential Mortg. Solution, L.L.C.,* No. 12–CV–1523, 2013 WL 752636, at *12 (E.D.N.Y. Feb. 26, 2013) ("Although the [c]ourt liberally construed [the][p]laintiff's pro se [o]riginal [c]omplaint, since [the] [p]laintiff is now represented by counsel, the [c]ourt has no obligation to construe the [p]roposed [a]mended [c]omplaint liberally[.]" (brackets, italics, and internal quotation marks omitted)); *Eaves v. Strayhorn,* No. 09–CV–394, 2010 WL 2521449, at *9 (S.D.Ohio June 15, 2010) ("[The] [p]laintiff cannot use the initial pro se filing to obscure the fact that he, with counsel, allowed the statute of limitations to run before re-filing his complaint." (italics omitted)); *Khan v. Abercrombie & Fitch, Inc.,* No. 01–CV–6163, 2003 WL 22149527, at *10 (S.D.N.Y. Sept. 17, 2003) (refusing to allow a plaintiff to amend her

complaint at a late stage of litigation despite her argument she should be afforded deference based on her pro se status, where she was pro se when the case was filed but "has been represented by counsel since the earliest stages of [the] action").

**\*9** Prior to 1993, "the former Rule 4(j) ... provided that if service was not made within 120 days, and the serving party cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice ." *Zapata v. City of New York,* 502 F.3d 192, 195 (2d Cir.2007) (internal quotation marks omitted). Following the 1993 amendments, the relevant rule, now codified in Rule 4(m), states, "If a defendant is not served within 120 days after the complaint is filed, the court ... must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Fed.R.Civ.P. 4(m). Thus, the amendment provided "district courts [with] discretion to grant extensions even in the absence of good cause." *Zapata,* 502 F.3d at 196; *see also Henderson v. United States,* 517 U.S. 654, 662, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996) ("[I]n 1993 amendments to the Rules, courts have been accorded discretion to enlarge the 120–day period even if there is no good cause shown." (internal quotation marks omitted)).

Here, Plaintiff has not shown good cause—or indeed even tried to argue that good cause existed, instead merely arguing that service was proper and that Plaintiff should get solicitude as he previously was pro se. (Pl.'s Mem. 9–11.) "Good cause is deemed to exist in exceptional circumstances where the plaintiff's failure to serve process in a timely manner was the result of circumstances beyond its control." *Ligon v. City of New York,* No. 12–CV–2274, 2013 WL 3502127, at \*1 (S.D.N.Y. July 12, 2013) (internal quotation marks omitted). "[A]ttorney inadvertence or negligence does not establish good cause," nor does "ignorance of the law." *Novak v. Nat'l Broad. Co. Inc.,* 131 F.R.D. 44, 45–46 (S.D.N.Y.1990). "Additionally, a mistaken belief that service was proper does not establish good cause." *Bernstein v. Vill. of Piermont,* No. 11–CV–3677, 2012 WL 6625231, at \*3 (S.D.N.Y. Dec. 20, 2012) (internal quotation marks omitted). The Court sees no basis for making a finding that there was good cause for Plaintiff's failure to timely serve the City Police Officer Defendants.

Thus, the only remaining question is whether, in the absence of good cause, the Court should exercise its discretion to grant an extension. Importantly, if the Court were to dismiss the claims against the City Police Officer Defendants, Plaintiff would not be able to bring the claims again because they would be time-barred. Because Section 1983 "does not provide a specific statute of limitations," "courts apply the statute of limitations for personal injury actions under state law." *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir.2013). "Section 1983 actions filed in New York are therefore subject to a three-year statute of limitations." *Id.* The events giving rise to this suit occurred on June 17, 2010. (Compl. ¶ 10 (Dkt. No. 2); PAC ¶ 10.) Thus, the statute of limitations expired on June 17, 2013, three days after this suit was filed. (*See* Dkt. No. 2.) "Where, as here, good cause is lacking, but the dismissal without prejudice in combination with the statute of limitations would result in a dismissal *with* prejudice," there must be "sufficient indications on the record that the district court weighed the impact that a dismissal or extension would have on the parties." *Zapata,* 502 F.3d at 197 (footnote omitted).

**\*10** When courts are deciding whether to exercise their discretion to extend the service deadline in the absence of good cause, they are to consider the following factors: "(1) whether the applicable statute of limitations would bar the refiled action; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether the defendant had attempted to conceal the defect in service; and (4) whether the defendant would be prejudiced by the granting of plaintiff's request for relief from the provision." *E. Refractories Co. v. Forty Eight Insulations, Inc.,* 187 F.R.D. 503, 506 (S.D.N.Y.1999). Regarding the first factor, as explained above, the applicable statute of limitations would bar the refiled action, so Plaintiff would be prejudiced if the Court declined to grant an extension. Though this factor weighs in favor of an extension, it "does not guarantee an extension for every case that may be time-barred if refiled." *Bunim v. City of New York,* No. 05–CV–1562 et al., 2006 WL 2056386, at \*3 (S.D.N.Y. July 21, 2006) (internal quotation marks omitted). Therefore, the Court must consider the other factors. There are no indications that the City Police Officer Defendants have actual notice of the claims asserted or that they attempted to conceal the defect in service. However, there are also no allegations that these Defendants would be prejudiced if the Court granted an extension. *See Alvarado v. Am. Freightways, Inc.,* No. 04–CV–9536, 2005 WL 1467893, at \*6 (S.D.N.Y. June 21, 2005) (holding that allowing service after the statute of limitations has expired does not, by itself,

constitute prejudice). Here, because Plaintiff "would be time-barred from refiling and the defendants allege no prejudice if Rule 4(m) relief is granted, the balance of equities tips in favor of [Plaintiff]." *Id.; see also Gore v. RBA Grp., Inc.,* No. 03–CV–9442, 2009 WL 884565, at *7 (S.D.N.Y. Mar. 27, 2009) ("Since the statute of limitations would bar the plaintiff from re-filing his suit against [the defendant] and nothing in the record indicates that an extension of the time for service will prejudice the defendant, the balance of equities tips in favor of the plaintiff."). "Granting ... [P]laintiff[ ] a discretionary extension also furthers the principle that litigation should generally be resolved on the merits." *Alvarado,* 2005 WL 1467893, at *6. Therefore, the Court will grant Plaintiff 21 days from the date of this Opinion to properly serve the City Police Officer Defendants, or else face dismissal of his claims against these Defendants. However, no further extensions will be given, in the absence of good cause.

*B. 12(b)(6) Motion To Dismiss and Opposition to PAC*

Next, the City and Town move under Rule 12(b)(6) to dismiss the Complaint for failure to state a claim under *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and the Town moves to dismiss the claims against the Town Police Officer Ransom. Additionally, the Defendants move that the Court deny Plaintiff's request to file his PAC.

*1. Standard of Review*

**\*11** Federal Rule of Civil Procedure 15 supplies the legal standard applicable to a motion to amend a complaint. Rule 15(a)(2) provides that leave to amend a complaint shall be "freely" given when "justice so requires." Fed.R.Civ.P. 15(a)(2). However, " '[i]t is within the sound discretion of the district court to grant or deny leave to amend.' " *Barbata v. Latamie,* No. 11–CV–7381, 2012 WL 1986981, at *2 (S.D.N.Y. June 4, 2012) (quoting *Green v. Mattingly,* 585 F.3d 97, 104 (2d Cir.2009)). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir.2007) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). However, "[o]utright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion." *Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 101 (2d Cir.2002). "When the plaintiff has submitted a proposed amended complaint, the district judge may review that pleading for adequacy and need not allow its filing if it does not state a claim upon which relief can be granted." *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991); *see also Alaska Laborers Emp'rs Ret. Fund v. Scholastic Corp.,* No. 07–CV–7402, 2011 WL 3427208, at *2 (S.D.N.Y. Aug.3, 2011) ("[A] court should not grant a plaintiff the right to amend [a complaint] when such amendment ... could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." (citations and internal quotation marks omitted)). The adequacy of the proposed amended complaint is judged by the same standard as that applied to a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See id.; see also Gen. Elec. Capital Fin., Inc. v. Bank Leumi Trust Co. of N.Y.,* No. 95–CV–9224, 1999 WL 33029, at *5 (S.D.N.Y. Jan.21, 1999).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (second alteration in original) (citations omitted). Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.,* and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. Plaintiffs must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. But if a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the [ ] complaint must be dismissed." *Id.; see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (alteration in original) (citation omitted) (quoting Fed.R.Civ.P. 8(a)(2))).

**\*12** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S.

89, 93–94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *see also Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir.2013) ("In addressing the sufficiency of a complaint we accept as true all factual allegations and draw from them all reasonable inferences ."); *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.,* 737 F.3d 166, 176 (2d Cir.2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we ... accept all factual allegations in the complaint as true ...." (alterations and internal quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res ., Inc.,* 992 F.Supp.2d 302, 304 n. 1 (S.D.N.Y.2014) (citing *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir.2012)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.

Moreover, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (noting that the court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" (citation omitted)).

### 2. Analysis

#### a. Section 1983 Claims Against the City and Town

Plaintiff brings claims under 42 U.S.C. § 1983 against the City and Town. "To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.,* 723 F.3d 399, 405–06 (2d Cir.2013). "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell,*

436 U.S. at 691. Thus, "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008); *cf. Salvatierra v. Connolly,* No. 09–CV–3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *adopted by* 2011 WL 9398 (S.D.N.Y. Apr.16, 2010); *Arnold v. Westchester County,* No. 09–CV–3727, 2010 WL 3397375, at *9 (S.D.N.Y. Apr.16, 2010) (dismissing a claim against the county because the complaint "[did] not allege the existence of an unconstitutional custom or policy"), adopted sub nom. *Arnold v. Westchester Cnty. Dep't of Corr.,* 2010 WL 3397372 (S.D.N.Y. Aug.15, 2010). The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *see also Newton v. City of New York,* 566 F.Supp.2d 256, 270 (S.D.N.Y.2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 478, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (italics omitted); *see also Vassallo v. Lando,* 591 F.Supp.2d 172, 201 (E.D.N.Y.2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 122, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of New York,* 228 F.Supp.2d 327, 336 (S.D.N.Y.2002), *aff'd,* 75 F. App'x 827 (2d Cir.2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton,* 566 F.Supp.2d at 271; *see also City of Okla. v. Tuttle,* 471 U.S. 808, 823–24,

105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle,* 200 F.Supp.2d 411, 427 (S.D.N.Y.2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

**\*13** A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon v. City of New York,* 705 F.Supp.2d 261, 276–77 (S.D.N.Y.2010) (citations omitted); *see also Roe,* 542 F.3d at 36 (describing the second category for establishing *Monell* liability); *Patterson v. County of Oneida,* 375 F.3d 206, 226–27 (2d Cir.2004) (describing methods of establishing *Monell* liability). Moreover, a plaintiff also must establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See Tuttle,* 471 U.S. at 824 n. 8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis in original)); *Roe,* 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." (quoting *Brown,* 520 U.S. at 404)); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York,* No. 06–CV–9426, 2011 WL 666161, at \*3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection-an

affirmative link-between the policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

At this stage, of course, Plaintiff need not prove these elements, but still must plead them sufficiently to make out a plausible claim for relief. Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, *see Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), a complaint does not "suffice if it tenders naked assertion [s] devoid of further factual enhancement," *Iqbal,* 556 U.S. at 678 (alteration in original) (internal quotation marks omitted). Thus, to survive a motion to dismiss, Plaintiff cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Santos v. New York City,* 847 F.Supp.2d 573, 576 (S.D.N.Y.2012) (citing *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)). Put another way, mere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details.

**\*14** Of the four categories among which a *Monell* plaintiff must establish, Plaintiff's allegations do not include the first two. Plaintiff does not allege that there was a formal policy calling for the use of excessive force, nor does he allege any actions by government officials who were responsible for any offending policies. Rather, Plaintiff's allegations implicate the third and fourth categories-a consistent practice of use of excessive force, that supervisors were aware of and tolerated the use of excessive force, a failure to train officers in the use of force, and/or a failure to supervise officers with regard to their use of force when arresting suspects.

Plaintiff makes a number of general allegations against both the City and Town in his PAC. Plaintiff alleges that the event in question "was not an isolated incident," and, in fact, that the City and Town "have been aware for years (from lawsuits, notices of claim and complaints filed with the municipalities themselves and their police departments) that many of their police officers are insufficiently trained with respect to the laws and regulations regarding use of force during an arrest." (PAC ¶ 40.) Plaintiff further alleges that the municipalities are "aware that such improper training has often resulted in a deprivation of civil rights," and that "[d]espite such notice, the municipalities have

failed to take corrective action." (*Id.*) Additionally, Plaintiff alleges that the City and Town "are also liable because they have been on notice that the defendant police officers lack the objectivity, temperament, maturity, and discretion to be members of their respective police departments," and retaining the police officers amounts to "gross negligence and deliberate indifference." (*Id.* ¶ 41.) Plaintiff further alleges that "upon information and belief, in 2010, Defendants had a policy or routine practice of using excessive force when effectuating arrests." (*Id.* ¶ 42.)

Plaintiff's PAC also contains allegations specifically against the City, apart from the allegations generally against the City and Town. First, Plaintiff alleges that the City "has a policy or practice of using excessive force when effectuating arrests, and fails to train and/or discipline its employees to prevent violations of arrestee's [sic] constitutional rights." (*Id.* ¶ 22.) Plaintiff also alleges that "upon information and belief, it was the policy and/or custom of [D]efendant City of Newburgh to inadequately train, supervise, discipline, and/or terminate their officers, staff, agents and employees, thereby failing to adequately discourage further constitutional violations on the part of their officers, staff, agents and employees." (*Id.* ¶ 43.) Plaintiff alleges that "as a result of the above described policies and customs, the officers, staff, agents and employees of [the City] believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated," and that these customs and policies "demonstrate a deliberate indifference on the part of the policymakers of Defendant City of Newburgh to the constitutional rights of the arrestees and were the cause of the violations of Plaintiff's rights alleged herein." (*Id.* ¶¶ 44–45.) By themselves, these general allegations are "conclusory, and therefore must be disregarded." *Simms v. City of New York,* No. 10–CV–3420, 2011 WL 4543051, at *3 (E.D.N.Y. Sept.28, 2011) (dismissing conclusory allegations that did not provide any facts that would allow the court to infer what city policies or practices led to the alleged deficiency) (citing *Iqbal,* 556 U.S. at 678–79), *aff'd,* 480 F. App'x. 627 (2d Cir.2012); *see also Triano v. Town of Harrison,* 895 F.Supp.2d 526, 535–37 (S.D.N.Y.2012) (holding that "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details" and collecting cases); *Duncan v. City of New York,* No. 11–CV–3826, 2012 WL 1672929, at *3 (E.D.N.Y. May 14, 2012) (holding that "boilerplate statements" claiming that New York City had a custom of making and tolerating false

arrests and of using excessive force "[were] insufficient to state a claim of municipal liability under *Monell* "); *Moore v. City of New York,* No. 08–CV–8879, 2010 WL 742981, at *6 (S.D.N.Y. Mar.2, 2010) ("Allegations that a defendant acted pursuant to a policy or custom without any facts suggesting the policy's existence, are plainly insufficient." (internal quotation marks omitted)); *Bradley v. City of New York,* No. 08–CV–1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) ("The [c]omplaint's conclusory, boilerplate language-that the [c]ity 'fail[ed] to adequately train, discipline, and supervise' employees and 'fail[e]d to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior' of its employees-is insufficient to raise an inference of the existence of a custom or policy, let alone that such a policy caused [the][p]laintiffs to be arrested without probable cause." (citation omitted)).

**\*15** The only remaining allegation against the Town is that it "was a municipal corporation," and "was the employer and supervisor" of Defendant Ransom. (PAC ¶ 8.) Therefore, Plaintiff alleges, the Town "was responsible for [Defendant Ransom's] training, supervision and conduct," as well as "for enforcing the regulations of the Town of Newburgh Police Department and for ensuring that Town of Newburgh police personnel obey the laws of the State of New York and of the United States." (*Id.*) This allegation would only support a claim for vicarious liability, and does not state a claim for municipal liability under *Monell. See City of Canton,* 489 U.S. at 385 ("Respondeat superior or vicarious liability will not attach under § 1983." (italics omitted)); *Hughes v. Salerno,* No. 11–CV–9094, 2012 WL 6097775, at *4 (S.D.N.Y. Dec.5, 2012) ("*Monell* does not provide a cause of action for vicarious liability."). Therefore, Plaintiff's claim for municipal liability against the Town is dismissed and the Court denies Plaintiff's request to file his PAC with regard to this claim . [10]

Plaintiff does offer more specific allegations in support of his two theories of *Monell* liability against the City. For example, Plaintiff alleges that the City "has an extensive history of lawsuits and other complaints alleging the use of excessive force by its employees." (PAC ¶ 23.) As noted, Plaintiff specifically identifies nine lawsuits he represents were filed in the five years before the incident in question, at least five of which "involved allegations of unnecessary and excessive dog bites." (*Id.; see also id.* ¶¶ 24–32.) Plaintiff alleges that the "City of Newburgh routinely reached settlement agreements with the plaintiffs in the above-mentioned cases," and further alleges that "upon information and belief, most, if

not all, of the above-mentioned cases settled for amounts well in excess of nuisance value." (*Id* . ¶¶ 33–34.) Plaintiff also alleges "[u]pon information and believe," that "the officers that were the subject of these lawsuits were not disciplined by [the City] for their actions." (*Id.* ¶ 34.)

Additionally, Plaintiff alleges that the City of Newburgh "was also on notice of allegations of excessive force by its officers through public forums, including on February 11, 2008," when "the Newburgh City Council held a public comment session, at which numerous residents testified regarding the excessive and unnecessary use of police dogs during arrests, as well as additional perceived problems within the Police Department, including the lack of a civilian review board." (*Id.* ¶ 35.)

Finally, Plaintiff alleges that Matrix Consulting Group published its final report, titled "An Assessment of the Culture, Community Relations, Use of Force, Training, Disciplinary Practices of the Police Department–City of Newburgh, New York," on August 1, 2013. (*Id.* ¶ 36.) According to Plaintiff,

> **\*16** Among the many findings and recommendations in the report is that discipline guidelines and decisions are unstructured-the report therefore recommended, *inter alia,* that the Chief should direct improvements to the Internal Affairs process, including assigning a specific investigator and requiring a formal report, which was not previously required. In addition, only 43% of sworn officers who responded to the polling in the report agreed that they received appropriate training to do their job well. This report's findings support the proposition that [the City's] training and discipline procedures are inadequate to prevent violations of arrestees['] constitutional rights.

(*Id.*)

These allegations fail to plausibly state that there is a City practice of using excessive force during arrests, generally,

or using police dogs so consistent and widespread as to constitute a custom or usage. Under the third category of *Monell* claims, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law," *Brown,* 520 U.S. at 404, which is to say, that it is a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity," *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *see also Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.1996) (noting that a municipality's custom "need not be memorialized in a specific rule or regulation"); *Jeffes v. Barnes,* 208 F.3d 49, 61 (2d Cir.2000) (discussing *Jett* ). Therefore, a plaintiff may establish municipal liability by demonstrating that a municipality "indirectly caused the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy." *Miller v. County of Nassau,* 467 F.Supp.2d 308, 314 (E.D.N.Y.2006). To prevail on this theory of municipal liability, however, a plaintiff must prove that the custom at issue is permanent and well-settled. *See Praprotnik,* 485 U.S. at 127 (noting that the Supreme Court "has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law' " (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (internal quotation marks omitted))); *Davis* 228 F.Supp.2d at 346 (explaining that "[w]idespread means that [the unconstitutional acts in question] are common or prevalent throughout the [government body]; well-settled means that the [unconstitutional acts in question] have achieved permanent, or close to permanent, status."). As the Supreme Court emphasized in *Monell,* Congress enacted § 1983 to impose liability on municipalities "because of the persistent and widespread discriminatory practices of state officials," and out of recognition that such practices could become "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell,* 436 U.S. at 691 (citation and internal quotation marks omitted).

**\*17** The lawsuits cited by Plaintiff in the PAC, even when combined with the allegations regarding the public forum comments and the Matrix Report, are insufficient to plausibly support an inference of a widespread custom. To begin, even if the civil complaints involved comparable conduct to that

alleged here, "none result[ed] in an adjudication of liability." *Walker v. City of New York,* No. 12–CV–5902, 2014 WL 1259618, at *3 (S.D.N.Y. Mar.18, 2014); *see also Collins v. City of New York,* 923 F.Supp.2d 462, 479 (E.D.N.Y.2013) (holding that a "litany of other police-misconduct cases" discussed in the plaintiff's complaint "[were] insufficient to make a plausible case for *Monell* liability," because they either were different from the misconduct alleged in the complaint, post-dated the alleged misconduct in the case at hand, or "involve[d] something less (settlements without admissions of liability and unproven allegations) than evidence of misconduct"); *accord Strauss v. City of Chicago,* 760 F.2d 765, 768–69 (7th Cir.1985) (holding, even pre-*Twombly* and *Iqbal,* that allegations of complaints about similar conduct were insufficient to state a claim for a widespread custom under *Monell* because "the number of complaints filed, without more, indicates nothing," as "[p]eople may file a complaint for many reasons, or for no reason at all," and "[t]hat they filed complaints does not indicate that the policies that [the plaintiff] alleges exist do in fact exist"); *Rikas v. Babusch,* No. 13–CV–2069, 2014 WL 960788, at *3 (N.D.Ill. Mar.12, 2014) ("[T]he fact that prior lawsuits were filed against [one of the defendants accused of excessive force] does not support [the plaintiff's] *Monell* claim nor does it evidence a widespread municipal practice."); *Xian Ming Wu v. City of New Bedford,* No. 12–CV–11648, 2013 WL 4858473, at *2 (D.Mass. Sept.11, 2013) (holding that a complaint's reference to two other similar complaints is insufficient to survive a motion to dismiss). And though numerous cases, discussed below, look to unsubstantiated allegations in lawsuits and complaints by residents to establish municipal liability, these cases do so through the framework of deliberate indifference failure-to-train and failure-to-supervise cases and their reasoning is therefore not persuasive here. *See e .g., Walker,* 2014 WL 1259618, at *3 (holding that failure-to-train cases, such as *Fiacco v. City of Rensselaer,* 783 F.2d 319 (2d Cir.1986), are inapposite to *Monell* claims alleging a widespread custom). Simply put, the fact that there were allegations of thirteen instances of excessive force during arrests over four years (none of which involved findings or admissions of culpability) during which hundreds, if not thousands, of arrests were made does not plausibly demonstrate that the use of excessive force during arrest was so frequent and pervasive to constitute a custom. *Walker,* 2014 WL 1259618, at *1–3 (holding that the allegation that ten similar complaints were filed against New York City in the ten preceding years was insufficient to state a claim because the "paltry number of complaints (none resulting in an adjudication of liability),

spread over a period so long in a city so large, hardly suggests the frequency or pervasiveness of the purported custom that is required to state a *Monell* claim"). (*See also* Aff. of David L. Posner ("Posner Aff.") Ex. D (Matrix Report), at 59 (Dkt. No. 26) (noting that the City made "a total of 2,478 arrests in 2012").) [11]

**\*18**  Additionally, in Plaintiff's Memorandum in Opposition, he argues that the City has a police force of 75, and that Plaintiff alleges that there were at least 15 to 20 police officers surrounding him, meaning that "Plaintiff's allegations, taken as true, would mean that at least one-fifth of the entire City of Newburgh Police Department was present for the assault of Plaintiff, and both tolerated the abuse of plaintiff's constitutional rights and did not fear retribution." (Pl.'s Mem. 8.) However, the size of the City's police force is not a fact alleged in the Complaint or PAC, and the Court cannot consider additional factual allegations contained in Plaintiff's papers. *See Paul v. Bailey,* No. 09–CV–5784, 2013 WL 2896990, at *5 (S.D.N.Y. June 13, 2013) ("[A]s a general rule, ... courts should not consider factual allegations made for the first time in opposition papers."); *Friedman v. MiraMed Revenue Grp., L.L.C.,* No. 12–CV–5328, 2012 WL 5992163, at *3 (S.D.N.Y. Nov. 19, 2012) ("[T]he [c]ourt declines to consider the additional facts set forth in [the] plaintiff's opposition papers that are not in his complaint."). [12]  In any event, the allegation that 15 to 20 officers were present during Plaintiff's arrest does nothing to establish that the alleged excessive force happened as part of a well-established practice or custom. Instead, this allegation only supports, at best, a single instance where numerous officers allegedly used excessive force. This is not an akin to establishing a custom of use of excessive force. *See Tuttle,* 471 U.S. at 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* [.]"); *Triano,* 895 F.Supp.2d at 532 ("Normally, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (alteration and internal quotation marks omitted)). For the above reasons, Plaintiff fails to state a *Monell* claim for relief against the City of Newburgh on the theory that the City of Newburgh has a custom of using excessive force during arrests so widespread to have the force of law.

The Court next considers whether Plaintiff has adequately pleaded a claim for relief against the City under a deliberate indifference theory, the fourth category of *Monell* claims. "*Monell's* policy or custom requirement is satisfied where

a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir.2007) (citing *Jett,* 491 U.S. at 737); *see also City of Canton,* 489 U.S. at 394–95 (O'Connor, J., concurring in part and dissenting in part) ("Where ... a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of a background of events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution."); *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d Cir.2004) (citing *City of Canton* for the proposition that a "municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training"); *Johnson,* 2011 WL 666161, at *3 (explaining that a plaintiff may demonstrate the existence of a custom or policy by alleging "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees"). However, such a failure to act, train, or supervise can constitute a municipal custom "only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds,* 506 F.3d at 192 (citing *City of Canton,* 489 U.S. at 390); *see also Marte v. N.Y.C. Police Dep't,* No. 10–CV–3706, 2010 WL 4176696, at *2 (S.D.N.Y. Oct. 12, 2010) (noting that a municipality's failure to train its employees can support § 1983 liability only where " 'the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.' " (quoting *City of Canton,* 489 U.S. at 388)).

 **\*19** In *City of Canton,* the Supreme Court established the "deliberate indifference" standard in the context of a claim for failure to train, but "the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims," including claims for failure to supervise and failure to discipline. *Reynolds,* 506 F.3d at 192 (citing *Amnesty Am.,* 361 F.3d at 127 (failure to supervise); *Berry v. City of Detroit,* 25 F.3d 1342, 1354 (6th Cir.1994) (failure to discipline)); *see also Connick v. Thompson,* —— U.S. ——, ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (noting that "deliberate indifference" is a "stringent standard" requiring "proof that a

municipal actor disregarded a known or obvious consequence of his action" (internal quotation marks omitted)). [13] In this context, the Supreme Court has held that "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city 'policy or custom' that is actionable under § 1983.' " *Amnesty Am.,* 361 F.3d at 126 (quoting *City of Canton,* 489 U.S. at 388); *see also Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995) (holding that a plaintiff "may establish the pertinent custom or policy by showing that the municipality, alerted to the [unconstitutional action by its employees], exhibited deliberate indifference"); *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992) (stating that municipal liability lies where the subordinate's misconduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials").

Plaintiff has attempted to allege two types of deliberate indifference claims: failure to train and failure to supervise/ discipline. Indeed, "[a] § 1983 plaintiff injured by a police officer may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference." *Vann,* 72 F.3d at 1049. To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must "show that the need for more or better supervision to protect against constitutional violations was obvious," which may be established "by showing that there were repeated complaints of civil rights violations," and "deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Shepherd v. Powers,* No. 11–CV–6860, 2012 WL 4477241, at *9 (S.D.N.Y. Sept.27, 2012) (internal quotation marks omitted). The Second Circuit has set out three requirements that must be met before a municipality may be liable under either theory: first, that a policymaker knows " 'to a moral certainty' " that his or her employees will confront a given situation; second, " 'that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;' " and third, " 'that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.' " *Jenkins v. City of New York,* 478 F.3d 76, 94 (2d Cir.2007) (quoting *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992)).

**\*20** Applying these principles to this case, the Court concludes that Plaintiff has sufficiently alleged that the need for more or better supervision was obvious. There is no bright line rule for how many complaints of civil rights violations is sufficient to show the need for more supervision, nor is there a bright line rule for how recent those complaints must be. The City asserts that the complaints relied on by Plaintiff regarding excessive force incidents that occurred between 2005 and 2008 are too sparse and too remote to support an inference of obviousness. (Def.'s Mem. of Law in Supp. of Dismissal ("City's Mem.") 10 (Dkt. No. 28); Newburgh's Reply Br. in Supp. of 12(b)(5) and 12(b)(6) Dismissal ("City's Reply") 5–6 (Dkt. No. 47).) However, the City provides no authority to support the notion that a plaintiff must cite a certain number of complaints in a certain time period to make out a *Monell* claim. Indeed, the case law supports Plaintiff's position here. For example, in *McCants v. City of Newburgh,* No. 14–CV–556, 2014 WL 6645987 (S.D.N.Y. Nov.21, 2014), *clarified on denial of reconsideration,* 2014 WL 7398910 (S.D.N.Y. Dec.9, 2014), the court denied a motion to dismiss a *Monell* claim on deliberate indifference grounds. In that case, the court found it sufficient that the plaintiff's pleadings referred to other lawsuits demonstrating that the municipality "was on notice to the possible use of excessive force by its police officers on seventeen different occasions." *Id.* at \*4. There, the seventeen excessive force claims were made "in the seven-year time period prior to" the incident resulting in the suit. *Id.* In *Farrow v. City of Syracuse,* No. 12–CV–1401, 2014 WL 1311903, (N.D.N.Y. Mar. 31, 2014), the Northern District of New York noted in dicta that were the court deciding a motion to dismiss, the fact that "at least 15 excessive force complaints ha[d] been filed against the [c]ity in the past 5 years" would be sufficient state a plausible failure to train case. *Id.* at \*8 n. 7; *see also Shepherd,* 2012 WL 4477241, at \*10 (holding, on a motion to dismiss where the complaint relied on a Department of Justice ("DOJ") report finding evidence of unconstitutional activity in 2008 to support a claim that such a custom existed in 2010, that the court "[was] obligated to draw all reasonable inferences in [the] [p]laintiff's favor and thus [took] as true for purposes of th[e] motion practice the assertion that the deficiencies found by the DOJ existed at the time of the alleged assault against [the][p]laintiff"). The Court does not see any material difference between the seventeen excessive force claims in seven years in *McCants,* the fifteen excessive force claims in five years in *Farrow,* [14] and the thirteen claims alleged in nine lawsuits in five years here. [15] While there may be questions about the quantum of proof

Plaintiff has regarding these other complaints at summary judgment, Plaintiff's allegations allow the Court to plausibly infer that the City was on notice that the police officers were using excessive force in making arrests. *See Osterhoudt v. City of New York,* No. 10–CV–3173, 2012 WL 4481927, at \*1 (E.D.N.Y. Sept. 27, 2012) ("Mere allegations have little, if any, probative force and by themselves would hardly prevent summary judgment. But in the context of Rule 12, where plausibility is in issue, it is hard to ignore these cases, which suggest that the conduct complained of is not limited to the four corners of [the plaintiff's] complaint.").

**\*21** However, an allegation of numerous claims of excessive force by itself is insufficient to raise an inference of deliberate indifference due to failure to supervise. Instead, a plaintiff must allege that "meaningful attempts to investigate repeated claims of excessive force are absent." *Hart v. City of Binghamton,* No. 10–CV–1064, 2012 WL 1565085, at \*5 (N.D.N.Y. May 2, 2012) (internal quotation marks omitted). Put another way, "[f]or deliberate indifference to be shown, the response must amount to a persistent failure to investigate the complaints or discipline those whose conduct prompted the complaints." *Id.* (internal quotation marks omitted); *see also Lawrence v. City of Rochester,* No. 09–CV–6078, 2015 WL 510048, at \*7 (W.D.N.Y. Feb.6, 2015) ("Deliberate indifference may be inferred from the failure to train or supervise based on proof of repeated complaints of civil rights violations that are followed by no meaningful attempt on the part of the municipality to investigate or to forestall." (internal quotation marks omitted)); *Aretakis v. Durivage,* No. 07–CV–1273, 2009 WL 249781, at \*29 (N.D.N.Y. Feb. 3, 2009) (same). Here, Plaintiff does not offer any allegations plausibly establishing that the City failed to investigate the listed complaints of excessive force. The *only* allegation Plaintiff makes regarding the City's response to the other lawsuits and the complaints made in the public forum is that "[u]pon information and belief, the officers that were the subject of these lawsuits were not disciplined by [the City] for their actions." (PAC ¶ 34.) This is insufficient.

There are two ways to plausibly plead deliberate indifference with respect to failure to supervise/discipline. First, a plaintiff may plead (1) that there was a pattern of allegations of or complaints about similar unconstitutional activity and (2) that the municipality *consistently failed to investigate* those allegations. Second, a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality *consistently failed to discipline* those involved. However, what Plaintiff alleges here is (1) that

there was a pattern of allegations of or complaints about similar unconstitutional activity and (2) that those allegedly involved were not disciplined. This does not plausibly plead a claim for deliberate indifference. There is no basis for the Court to conclude that Plaintiff plausibly alleged that the past conduct was *actually* unconstitutional, and therefore it would not be deliberately indifferent of the City to fail to punish police officers for conduct that was not improper or that they did not commit. Indeed, to plausibly allege a deliberate indifference failure to discipline claim under the second strategy, Plaintiff must allege a consistent pattern of a failure to discipline unconstitutional action. *See Posr v. City of New York,* 835 F.Supp. 120, 125 (S.D.N.Y.1993) (holding, in granting a motion to dismiss a failure to discipline case, that while "[i]t is true that a consistent failure to discipline can give rise to a finding that a municipality has a policy of not disciplining," "[n]o court ... has ever held that a municipality is required to discipline every officer upon a finding of wrongdoing"), *aff'd,* 22 F.3d 1091 (2d Cir.1994); *see also Hart,* 2012 WL 1565085, at *4 (holding, in the context of a summary judgment motion, that "while [the][p]laintiff [had] cited to numerous cases concerning citizen complaints of the use of excessive force," he "[had] not provided evidence tending to indicate that any [of] the [ ] complaints were of substance," thus the "failure to find any of the officers engaged in excessive force alleged in the complaints does not mean *a fortiori,* that the [c]ity was deliberately indifferent to the well being of its citizens"); *cf. Bertuglia v. City of New York,* 839 F.Supp.2d 703, 738 (S.D.N.Y.2012) (denying a motion to dismiss a deliberate indifference claim where "[t]he plaintiffs have pleaded that the [c]ity has a longstanding, de facto policy of never disciplining prosecutors who commit specified types of prosecutorial misconduct and not otherwise training them to avoid misconduct"). Finally, Plaintiff's allegation that the Matrix Report concluded that the City's "discipline guidelines and decisions are unstructured" and recommended that certain changes be made is insufficient to plausibly plead that there was a consistent failure to investigate allegations of misconduct or punish incidents of unconstitutionally excessive force to meet the stringent standard of deliberate indifference. In particular, Plaintiff alleges no causal link between the allegedly "unstructured" discipline guidelines and the unconstitutional practice of not investigating allegations of use of excessive force. For the above reasons, the Court holds that Plaintiff has not plausibly alleged a failure to supervise/discipline case against the City.

**\*22** The Court now turns to the additional requirements for a failure to train claim. To allege a failure to train claim, a plaintiff must plausibly allege a specific deficiency in the municipality's training. In *Amnesty America,* the Second Circuit suggested that to state a claim for a municipality's failure to train its employees, a plaintiff "need only plead that the city's failure to train caused the constitutional violation," because "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." 361 F.3d at 130 n. 10. However, since *Twombly* and *Iqbal,* "courts in this district have generally required that plaintiffs provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train." *Simms,* 2011 WL 4543051, at *2 n. 3 (collecting cases), *aff'd sub nom. Simms v. City of New York,* 480 F. App'x 627 (2d Cir.2012); *see also Simms,* 480 F. App'x at 631 n. 4 ("While it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's training programs prior to discovery, this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim." (citation omitted)); *Santos,* 847 F.Supp.2d at 577 ("Because the existence of a municipal policy or practice, such as a failure to train or supervise, cannot be grounded solely on the conclusory assertions of the plaintiff, [the plaintiff's] claims against the [c]ity are dismissed with prejudice." (citation omitted)). To state a claim for municipal liability based on failure to train, Plaintiff therefore must allege facts that support an inference that the municipality failed to train its police officers, that it did so with deliberate indifference, and that the failure to train caused his constitutional injuries. *See Acosta v. City of New York,* No. 11–CV–856, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (dismissing *Monell* claim where plaintiff merely alleged that the city "failed to train its police officers as to display a deliberate indifference," because plaintiff "failed to set forth factual allegations that would support a plausible inference that the [c]ity's 'policies' or 'customs' caused ... [the] alleged violations of [the] plaintiff's rights"); *Simms,* 2011 WL 4543051, at *2 (dismissing failure to train claim where there was "not enough factual material in the [c]omplaint for the court to reasonably infer that the police misconduct [the plaintiff] allege [d] was the result of anything other than the individual acts of the arresting officers"); *Johnson,* 2011 WL 666161, at *4 (holding that a complaint that "contain[ed] only an unsupported conclusory allegation that the [c]ity failed to train the individual [d]efendants" could not withstand a motion to dismiss because the plaintiff did not plead any facts that "plausibly allege[d] a specific deficiency in the training or supervision program" (internal quotation marks omitted)); *Araujo v. City of New York,* No. 08–CV–3715, 2010 WL 1049583, at *9 (E.D.N.Y. Mar. 19, 2010) (dismissing failure

to train claim where the plaintiff alleged "no facts to indicate any deliberate choice by municipal policymakers to engage in unconstitutional conduct").

**\*23** Other than Plaintiff's boilerplate assertions discussed above, the sole fact Plaintiff pleaded with respect to the City's failure to train its officers is that, "only 43% of sworn officers who responded to the polling in the [Matrix Report] agreed that they received appropriate training to do their job well." (PAC ¶ 36.) This factual allegation is just not enough to nudge Plaintiff's claim from possible to plausible. The polling data is not specific as to training regarding the use of excessive force. Nor has Plaintiff pleaded any facts suggesting that an alleged training deficiency *caused* his constitutional injury, for example by identifying "procedural manuals or training guides" or by "highlight[ing] relevant particular aspects of police training or supervision." *Marte,* 2010 WL 4176696, at \*3. The allegation that, three years after the incident in question took place, only 43% of officers who responded to polling stated that they received appropriate training to do their job well does not allow the Court to plausibly conclude that, at the time of the incident, the City's training as to the use of force during arrest was insufficient and that that insufficiency led to Plaintiff's injuries. *See Hunter v. City of New York,* 35 F.Supp.3d 310, 325–26 (E.D.N.Y.2014) (dismissing a *Monell* failure to train claim because the pleadings did not plausibly state a claim that there was "a specific deficiency in the city's training program and that the deficiency is closely related to [the plaintiff's] ultimate injury, such that it actually caused [the plaintiff's] constitutional deprivation" (internal quotation marks omitted)); *Triano,* 895 F.Supp.2d at 539 (dismissing a *Monell* failure to train claim where the plaintiff "merely alleged that the [t]own fail[ed] to train its employees, without providing any supporting factual detail about alleged deficiencies in the training program, or regarding other instances of police misconduct which could be attributed to a failure to train"); *Khanukayev v. City of New York,* No. 09–CV–6175, 2012 WL 3538729, at \*4 (S.D.N.Y. Aug.13, 2012) (dismissing a failure to train claim where "the complaint [does not] ... allege ... the manner in which there was a failure to train"); *Doe v. City of New York,* No. 09–CV–9895, 2012 WL 2900483, at \*2 (S.D.N.Y. July 2, 2012) ("The [a]mended [c]omplaint contains no facts elaborating on (or even theorizing as to) the defective nature of the NYPD training program, let alone an allegation as to how a defect in training or supervision caused her harm."); *Simms,* 2011 WL 4543051, at \*3 ("While this assertion does specify what type of training the officers lacked, it does

not provide any facts that would allow the court to infer what city policies, practices, or customs contributed to or caused the deficiency."); *Johnson,* 2011 WL 666161, at \*4 (dismissing a failure to train claim where plaintiff did not plead "any facts that plausibly allege[d] a specific deficiency in the training or supervision program that accounts for deprivation of [his] constitutional rights" and "[did] not identify procedural manuals or training guides, nor [did he] highlight relevant particular aspects of police training or supervision" (internal quotation marks omitted)); *Brown v. City of New York,* No. 09–CV–2337, 2010 WL 4077925, at \*2 (S.D.N.Y. Oct.13, 2010) (dismissing a failure to train claim where the plaintiff "[did] not allege any ... specific deficiencies in the officers' training, nor [did] he allege any facts from which the court could infer that such ... deficiencies existed"); *Williams v. City of New York,* 690 F.Supp.2d 338, 345–46 (S.D.N.Y.2010) (dismissing a plaintiff's failure to train claim where the plaintiff's complaint "once mention[ed] the [c]ity's inadequate training program," but did "not set forth a single factual allegation relating to the program"). For the foregoing reasons, Plaintiff fails to state a claim against the City under *Monell.* However, the Court will give Plaintiff one last chance to plead a *Monell* claim against the City.

### b. Claims against Defendant Ransom

**\*24** Plaintiff's PAC contains the following allegation against Defendant Ransom. The City Police Officers "gave chase to [P]laintiff in a number of police vehicles," and "[a]t some point soon thereafter, and prior to Plaintiff stopping his vehicle," Defendant Ransom joined the chase. (PAC ¶ 12.) That is the only allegation specifically referring to Defendant Ransom. However, the Complaint and PAC also contain a number of allegations against "the defendant police officers," a term defined in the Complaint as the City Police Officer Defendants and unknown police officers 1–5, (Compl.¶ 4), and not defined in the PAC. Plaintiff alleges that, after he pulled over, Defendant Maguire "opened the truck door and ordered his police dog to attack [P]laintiff," and Plaintiff was attacked by the police dog and punched by Defendant Maguire. (PAC ¶ 14.) Plaintiff further alleges that although he was "not resisting the police officers in any way," he was "dragged from the truck and thrown to the ground by [Defendant Maguire] and additional officers," and was "thereupon beaten severely by the defendant officers, who at this point were laughing and telling the dog what a good job he had done." (*Id.* ¶ 15.) Then, after Plaintiff was handcuffed and secured, "the police dog was again ordered to attack" Plaintiff. (*Id.* ¶ 16.) Additionally, Plaintiff alleges that "the defendant police officers are liable for failing to intervene ...

because (1) the officers had a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officers' position would have known that the plaintiff's constitutional rights were being violated, and (3) the officers did not take reasonable steps to intervene." (*Id.* ¶ 39.)

In response to the Town's Motion To Dismiss, Plaintiff argues that Defendant Random "does not deny being present at the scene," and cites to Defendant Ransom's testimony at Plaintiff's criminal trial to establish his presence at the scene. (Pl.'s Mem. 11–13.) Plaintiff then argues that this is sufficient at the pleading stage because Plaintiff has sufficiently alleged that Defendant Ransom was present and Plaintiff need not plead the "specific involvement of each and every officer while he was being assaulted and bitten by a police dog [.]" (*Id.* at 12.) However, there is simply no basis for the Court to consider the testimony given at trial in the manner that Plaintiff would like. This testimony, attached as Exhibit B to Plaintiff's Memorandum in Opposition, is not attached to the PAC, nor is it integral to the PAC or incorporated by reference into the PAC. *See Rosenblum v. Thomson Reuters (Markets) L.L.C.,* 984 F.Supp.2d 141, 146 (S.D.N.Y.2013) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, ... documents incorporated by reference in the complaint [, and] a document, not incorporated by reference, where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." (footnotes and internal quotation marks omitted)). "To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents[.]" *Bill Diodato Photography L.L.C. v. Avon Products, Inc.,* No. 12–CV–847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (internal quotation marks omitted). "[T]o be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." *Id.* (internal quotation marks omitted). Here, Plaintiff clearly has notice of the document, since he is the one who submitted it to the Court. *See Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria,* 265 F.R.D. 106, 124 (S.D.N.Y.2010) ("[T]here is no dispute that, pursuant to the first prong of the integrality test, plaintiffs had 'actual notice' of the extraneous information since they enclosed the extrinsic documents with their opposition brief."). The Complaint and PAC make no reference whatsoever to Defendant Ransom's testimony at Plaintiff's criminal trial, and thus do not incorporate this document by reference.

Moreover, there is no evidence that Plaintiff relied on this trial testimony in framing the Complaint or PAC. And, the fact that it was Plaintiff, himself, who submitted this document as an attachment to his opposition memorandum, counsels against the Court considering it. *Id.* at 122–23 (noting that "[c]ourts in [the Second] Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss" and collecting cases).

**\*25** Finally, the Court "may also consider matters of which judicial notice may be taken, even if the corresponding documents are not attached to or incorporated by reference in the complaint." *Munno v. Town of Orangetown,* 391 F.Supp.2d 263, 268 (S.D.N.Y.2005). However, even if this trial testimony is appropriate for judicial notice, the Court would consider it "only to establish [its] existence and legal effect, or to determine what statements [it] contained not for the truth of the matters asserted." *Liang v. City of New York,* No. 10–CV–3089, 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013) (alterations and internal quotation marks omitted) (quoting *Twine v. Four Unknown N.Y. Police Officers,* No. 10–CV–6622, 2012 WL 6184014, at *7 (S.D.N.Y. Dec. 12, 2012)); *see also Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) ("If the court takes judicial notice, it does so in order to determine *what* statements [the document] contained —but *again not for the truth of the matters asserted.*" (internal quotation marks omitted)).

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotation marks omitted). There are two ways a plaintiff can establish personal involvement of a police officer in the use of excessive force. "A police officer is personally involved in the use of excessive force if the officer either: (1) directly participates in an assault; or (2) is present during the assault, and fails to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Vesterhalt v. City of New York,* 667 F.Supp.2d 292, 297 (S.D.N.Y.2009). Additionally, to be liable the officer must "observe[ ] or ha[ve] reason to know that an individual's constitutional right has been violated[.]" *Brooks v. County of Nassau,* —— F.Supp.3d ——, 2014 WL 5093277, at *5 (E.D.N.Y. Oct.9, 2014) (internal quotation marks omitted).

Plaintiff does not allege that Defendant Ransom directly participated in the assault, therefore the question is whether

he sufficiently alleges that Defendant Ransom was present and failed to intercede, even though he had a reasonable opportunity to do so. First, Plaintiff's allegation that all "the defendant police officers are liable for failing to intervene ... because (1) the officers had a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officers' position would have known that the plaintiff's constitutional rights were being violated, and (3) the officers did not take reasonable steps to intervene" is a conclusory allegation that does nothing more than provide a formulaic recitation of the elements of a cause of action, and is therefore not entitled to the presumption of truth. (PAC ¶ 39.) *See Iqbal,* 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.... In keeping with [this] principle[ ] a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."); *Twombly,* 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do."). To state a claim against each individually named defendant, Plaintiff must include allegations as to that defendant. *See Ochre L.L.C. v. Rockwell Architecture Planning & Design, P.C.,* No. 12–CV–2837, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) ("Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants."), *aff'd,* 530 F. App'x 19 (2d Cir.2013); *Appalachian Enters., Inc. v. ePayment Solutions, Ltd.,* No. 01–CV–11502, 2004 WL 2813121, at *7 (S.D.N.Y. Dec.8, 2004) ("A plaintiff fails to satisfy Rule 8, where the complaint lumps all the defendants together and fails to distinguish their conduct because such allegations fail to give adequate notice to the defendants as to what they did wrong." (alterations and internal quotation marks omitted)).

**\*26** In a claim for excessive force or for failure to intervene with respect to excessive force, courts in the Second Circuit have allowed plaintiffs to use a flexible approach, recognizing the difficulty that plaintiffs may have in pleading who did what. For example, "[a] plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003), *aff'd sub nom. Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005). However, this does not eliminate Plaintiff's burden to allege facts supporting a plausible inference of personal involvement by Defendant Ransom. For example, it is sufficient to allege "who was present during the assaults, and that these defendants *either* directly participated in the excessive force *or* failed to

intervene." *Snoussi v. Bivona,* No. 05–CV–3133, 2010 WL 3924255, at *3 (E.D.N.Y. Feb. 17, 2010) (emphasis added), *adopted by* 2010 WL 3924683 (E.D.N.Y. Sept.29, 2010). But, a plaintiff fails to state a claim for which relief can be granted if he does not make any factual allegations that any officer "was present" or "had an opportunity to intercede." *K.D. ex rel. Duncan v. White Plains Sch. Dist.,* 921 F.Supp.2d 197, 207 (S.D.N.Y.2013) (discussing failure to intervene in the context of an alleged due process violation). In assessing the sufficiency of Plaintiff's claims, the Court is also mindful that the activities he describes—being handcuffed, thrown on the ground, beaten, and attacked by a dog—"are likely to have prevented [P]laintiff from identifying which of the defendant officers specifically engaged in the bad acts." *Snoussi,* 2010 WL 3924255, at *3 (brackets and internal quotation marks omitted).

Here, though, Plaintiff fails to meet this liberal standard with respect to his allegations against Defendant Ransom. Plaintiff merely pleads that Defendant Ransom joined the police chase. (PAC ¶ 12.) Plaintiff does not sufficiently plead personal involvement, because he does not even plead that Defendant Ransom was present at the scene of the alleged unconstitutional conduct, and therefore also does not sufficiently plead that a reasonable person in Defendant Ransom's position would know that Plaintiff's rights were being violated and that Defendant Ransom had a reasonable opportunity to intervene but failed to do so. Plaintiff argues that Defendant Ransom was at the scene, relying not on allegations in the Complaint or PAC but rather on a document outside the pleadings that the Court is not permitted to consider, and based on an inference he suggests that "[a]t no point does Ransom claim that he left the scene, so he was presumably also present when Plaintiff was thrown to the ground and beaten, and attacked by the police dog a second time while in handcuffs." (Pl.'s Mem. 12.) However, Plaintiff never alleged that Defendant Ransom was at the scene. But, in light of Plaintiff's citation to Defendant Ransom's trial testimony, the Court will give Plaintiff one more opportunity to amend his Complaint to include any additional allegations against Defendant Ransom.

### III. Conclusion

**\*27** For the above reasons, the Town's Motion To Dismiss is granted; the claims against the Town are dismissed with prejudice, and the claims against Defendant Ransom are dismissed without prejudice. The City's Motion To Dismiss

is granted in part and denied in part. In particular, the claims against the City are dismissed without prejudice, but Plaintiff may file his PAC against the City Police Officer Defendants. Plaintiff shall properly serve the City Police Officer Defendants within 21 days of the date of this Opinion, or else face dismissal of the claims against those Defendants. Additionally, Plaintiff is given 21 days to file an amended complaint to supplement his allegations against Defendant Ransom and the City. The Clerk of the Court is respectfully requested to terminate the pending Motions. (*See* Dkt. Nos. 25, 29.)

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1379652

---

### Footnotes

1   As explained below, Plaintiff's PAC will be accepted unless it would be subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Because the PAC contains all of the factual allegations contained in Plaintiff's original Complaint, as well as additional allegations, the Court will merely address the sufficiency of the factual allegations in the PAC. If any portion of the PAC would be subject to dismissal, the corresponding portion of the Complaint necessarily will also be dismissed under Rule 12(b) (6).

2   Plaintiff asserts that he was lawfully driving that evening, but he was "convicted of driving while impaired by alcohol in violation of Vehicle and Traffic Law § 1192(1), criminal possession of a controlled substance in the seventh degree, resisting arrest, unlawful fleeing a police officer in a motor vehicle in the third degree (two counts) and reckless driving in conjunction with this incident." (Mem. of Law in Supp. of the Town of Newburgh and Sergeant William Ransom's Mot. To Dismiss ("Town's Mem.") 2 n. 1 (Dkt. No. 30); *see also* Newburgh's Reply Br. in Supp. of 12(b) (5) and 12(b)(6) Dismissal ("City's Reply") 1–2 (Dkt. No. 47).) Whether Plaintiff was driving lawfully is not relevant to the instant Motions, so the Court declines to assess whether, and to what extent, it should consider these seemingly undeniable facts put forth by Defendants. However, counsel for Plaintiff may someday be called upon to explain the good faith basis for this allegation.

3   In June 2014, the Court so ordered a stipulation between Plaintiff and Defendant Nales to dismissal of the claims against that Defendant. (*See* Dkt. No. 35.)

4   Plaintiff's PAC also is filed as an attachment to Plaintiff's Memorandum of Law in Opposition, (*see* Dkt. No. 46 Ex. A), and as an attachment to an affidavit submitted by the City in connection with its Memorandum of Law, (*see* Dkt. No. 26 Ex. A).

5   The Court notes that Plaintiff only asserts that service was proper pursuant to N.Y. C.P.L.R. § 308(2). (*See* Pl.'s Mem. 9–11 .)

6   Mr. Root's declaration that 83 Broadway is the usual and typical place to serve all Newburgh officers and employees, (Root Decl. ¶ 3), is the type of "conclusory statement[ ]" that is insufficient to carry the burden that service was adequate. *Doe v. Alsaud,* 12 F.Supp.3d 684, 687–88 (S.D.N.Y.2014) (internal quotation marks omitted).

7   Under New York law, when serving a *corporation,* a process server may rely on the representations of employees of the corporation with respect to who may accept service on the corporation's behalf. *See Melkaz Int'l Inc. v. Flavor Innovation Inc.,* 167 F.R.D. 634, 642 n. 6 (E.D.N.Y.1996). Here, however, Mr. Root was serving individuals and, indeed, not even serving them at their place of business.

8    The Clerk of the Court is respectfully requested to change the name of the attorney appearing for Plaintiff from Stacy Nicole Baden to Roberta D. Asher, as indicated on the notice of appearance. (*See* Dkt. No. 4.)

9    Plaintiff's second counsel, David A. Zelman, entered a notice of appearance on Plaintiff's behalf on December 19, 2013. (Dkt. No. 18.)

10    In its Memorandum of Law in Support of its Motion To Dismiss, the Town argued that the Complaint and PAC "are devoid of factual allegations supporting the inference that the alleged policies actually exist." (Town's Mem. 6.) Though Plaintiff responded to the City's arguments regarding his *Monell* claims, he did not respond to the Town's arguments regarding municipal liability. (*See generally* Pl.'s Mem.) The Town argues in reply that "Plaintiff's failure to raise any argument in opposition to the Town's motion constitutes an abandonment of the claim, and as such, the claims against the Town must be dismissed." (Town of Newburgh and Sergeant William Ransom's Reply Br. in Further Supp. of their Mot. To Dismiss ("Town's Reply") 3 (Dkt. No. 50) (citing *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 724 (S.D.N.Y.2005)).) Though the Court dismisses Plaintiff's *Monell* claims against the Town on the merits, it alternatively holds that Plaintiff has abandoned this claim, as Plaintiff offered no response to the Town's arguments in support of its Motion To Dismiss the *Monell* claim. *See Baity v. Kralik,* —— F.Supp.3d ——, 2014 WL 5010513, at *16 (S.D.N.Y. Sept.30, 2014) (holding that the court "could find [the][p]laintiff to have abandoned any claim that *Monell* liability applies" when the plaintiff's memorandum in opposition made no mention of the defendant's arguments on that issue, and collecting cases); *Chamberlain v. City of White Plains,* 986 F.Supp.2d 363, 392 (S.D.N.Y.2013) (holding, in the context of a § 1983 *Monell* claim, that "[a] court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed").

11    The City puts forward several documents not attached to Plaintiff's Complaint or PAC, specifically, a redacted settlement stipulation from one of the cases Plaintiff refers to in the PAC, releases signed by some plaintiffs in the cases referred to by Plaintiff in the PAC, and an excerpt of the Matrix Report. (*See* Aff. of David L. Posner ("Posner Aff.") Ex. B–D (Dkt. No. 26).) The Court considers the Matrix Report because it is incorporated by reference into the PAC, as Plaintiff specifically cites to the Report and its findings. *See Wilson v. Med. Unit Officials at George R. Vierno Ctr. Jail at 09–09 Hazen St.,* No. 10–CV–1438, 2011 WL 6780934, at *2 (E.D.N.Y. Dec. 27, 2011) ("Because they are explicitly cited in [the] plaintiff's complaint, the court shall deem the ultrasound reports incorporated by reference and shall consider them in assessing [the] defendants' motion to dismiss."); *Harrison v. Metro. Life Ins. Co.,* 417 F.Supp.2d 424, 431 (S.D.N.Y.2006) (considering a document outside the complaint where the plaintiff "cites to" the document in her complaint and specifically quoted from one part of it). Furthermore, Plaintiff does not dispute the veracity of the Report provided by the City.

The other documents provided by Defendants, however, are not material to the Court's determination of the City's Motion, so the Court need not assess whether they are properly considered.

12    "[W]here a pro se plaintiff has submitted other papers to the [c]ourt, such as legal memoranda, the [c]ourt may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations." *Sommersett v. City of New York,* No. 09–CV–5916, 2011 WL 2565301, at *3 (June 28, S.D.N.Y.2011) (italics and internal quotation marks omitted). Here, however, Plaintiff was not pro se when he submitted the PAC, so the Court does not have an obligation read the PAC with the special solicitude due to pro se plaintiffs. *See Neely,* 2013 WL 752636, at *12 ("Although the [c]ourt liberally construed [the][p]laintiff's pro se [o]riginal [c]omplaint, since [the][p]laintiff is now represented by counsel, the [c]ourt has no obligation to construe the [p]roposed [a]mended [c]omplaint liberally[.]" (brackets, italics, and internal quotation marks omitted)).

13    The Supreme Court has emphasized that a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick,* 131 S.Ct. at 1359; *see also Tuttle,* 471 U.S. at

822–23 ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell.*" ).

14    Indeed, the fifteen cases referred to in *Farrow* were *filed* against the city in the preceding five years, so the underlying claims likely occurred even outside that timeframe.

15    Unlike in cases such as *Perez v. N.Y.C. Dep't of Corr.,* No. 10–CV–2697, 2012 WL 3704744 (E.D.N.Y. Aug.27, 2012), there is no doubt here that the City knew about the complaints. *Id.* at *3 (reasoning that "[w]hile a court may consider complaints made against a municipality and its response to them to determine whether the municipality acted with deliberate indifference," the plaintiff's claims must be dismissed because the "plaintiff does not allege who, if anyone, at [the department of corrections] and/or the [c]ity knew about the alleged incidents, or how and through whom these entities may have responded to the alleged incidents").

Additionally, the Court concludes that it can consider all of the other lawsuits cited by Plaintiff, not just the ones involving police dogs, as Plaintiff alleges a custom involving a broad array of unconstitutionally excessive force during arrest, resulting not only in him being attacked by a police dog, but also being punched and beaten severely during his arrest. (*See* PAC ¶¶ 14–16.)

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag

Distinguished by [Guzman v. City of New York,](#) S.D.N.Y., November 13, 2024

⚠️ KeyCite Overruling Risk

Overruling Risk [Darnell v. Pineiro,](#) 2nd Cir., February 21, 2017

2016 WL 6902478

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Frank [VASSALLO](#), Plaintiff,

v.

CITY OF NEW YORK, Corizon Health, Inc., Corizon, Inc., New York City Health and Hospitals Corporation, New York City Department of Correction Commissioner Joseph Ponte, Chief of Department Martin Murphy, Deputy Commissioner of Operations Dr. Errol Toulon, Jr., Manhattan Detention Complex Warden Raleem Moses, Bellevue Hospital Prison Ward Deputy Warden in Command Daniel O'Connell, John/jane Does 1-50, Defendants.

15 Civ. 7125 (KPF)

|

Signed 11/22/2016

**Attorneys and Law Firms**

[Philip Michael Hines](#), Held & Hines, LLP, Brooklyn, NY, for Plaintiff.

Omar Hani Tuffaha, New York City Law Department, [David Rosen](#), [Nicole Teresa Attia](#), Heidell, Pittoni, Murphy & Bach, LLP, New York, NY, [Daniel Gerard May](#), Heidell, Pittoni, Murphy & Bach, LLP, White Plains, NY, for Defendants.

OPINION AND ORDER

[KATHERINE POLK FAILLA](#), District Judge:

**\*1** Plaintiff Frank Vassallo, a diabetic former inmate at the Manhattan Detention Center ("MDC") and Bellevue Hospital Center's Prison Ward ("BPW"), brings this action under [42 U.S.C. § 1983](#), alleging deliberate indifference to his medical needs in violation of the Eighth and Fourteenth Amendments. Various defendants employed by the City of New York (the "City Defendants") and the New York City Health and Hospitals Corporation ("HHC") have filed two motions to dismiss Plaintiff's Amended Complaint (the "FAC") under [Federal Rule of Civil Procedure 12(b)(6)](#). For the reasons that follow, the City Defendants' motion is granted in part and denied in part, and HHC's motion is granted.

BACKGROUND [1]

**A. Factual Background**

**1. Plaintiff's Incarceration at MDC**

The FAC alleges the following facts for the period from December 19, 2014, to December 21, 2014, during which Plaintiff was incarcerated at MDC (the "MDC Period"): On December 19, 2014, Plaintiff was taken into Department of Correction ("DOC") custody for failure to pay child support by Order of Commitment of the Richmond County Family Court. (FAC ¶ 64). The Order directed DOC "to [e]nsure that [Plaintiff] receive all appropriate medical attention and be given all prescribed medications." (*Id.* at ¶ 65). At the time Plaintiff was taken into custody, he was "a well-cared for diabetic, receiving regular insulin via his insulin pump, receiving boluses as required, and not suffering from any foot ulcerations, cellulitis, or infection." (*Id.* at ¶ 67). DOC designated Plaintiff for housing at MDC. (*Id.* at ¶ 66).

In the early morning hours of December 20, 2014, Plaintiff was interviewed by medical intake personnel at MDC about his social, mental health, and medical histories. (FAC ¶ 68). As part of his medical history interview, Plaintiff informed personnel that: (i) he has had Type I diabetes since 1995; (ii) he has been prescribed and has used an insulin pump since 2005, which he was wearing at that time, and which automatically monitors his blood sugar and provides insulin throughout the day; (iii) he had run out of his insulin after being taken into custody but prior to the intake; (iv) he requires a special diabetic diet; (v) he was experiencing swelling in his lower extremities and burning pain at a level of 9 out of 10; and (vi) he was starting to feel sluggish and experiencing other effects of high blood sugar (collectively referred to herein as the "Health Disclosure"). (*Id.*).

**\*2** At this time, Plaintiff requested an insulin refill for his pump, but was informed that DOC policy would not permit him to continue using the pump while in custody. (FAC ¶ 69). He was also told that MDC clinic medical staff would give him insulin shots instead. (*Id.*). Plaintiff was not given any insulin or food at the time of his intake. (*Id.*). He submitted

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 89 of 102

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

to a urine drug screen and was then returned to the intake cell to await his housing assignment. (*Id.*). Several hours later, Plaintiff was taken from the intake cell to the MDC clinic, where he repeated the Health Disclosure that he had provided at intake; he also requested insulin. (*Id.* at ¶ 70). A finger stick test was taken and revealed that Plaintiff's blood sugar was 189 mg/dl. [2] (*Id.*). Plaintiff was still not given any insulin or food at that time. (*Id.*).

Plaintiff was next questioned by an individual whom he believed to be a physician, and repeated his Health Disclosure to this individual. (FAC ¶ 71). Plaintiff also showed the individual a letter from his treating physician, which confirmed Plaintiff's diabetic condition and his need for an insulin pump. (*Id.*). Plaintiff again requested insulin, but was provided no insulin either through a pump refill or a shot. (*Id.*). He was also not given any food at this time. (*Id.*).

At approximately 12:36 p.m. on December 20, 2014, nearly 24 hours after Plaintiff was received into custody, MDC medical personnel performed a physical examination, including a blood test, on Plaintiff. (FAC ¶ 72). MDC medical personnel—including Charles Appiah, RPA, Curt Walker, PA, and Jeanne Israel, RN—tested Plaintiff's hemoglobin A1C, which was found to be 12.6%. (*Id.*). The FAC alleges that such a level is "nearly double the goal for fasting diabetics," and indicates that Plaintiff was "at a significantly heightened risk for developing diabetes-related complications such as kidney failure, blindness and neuropathy." (*Id.*). Plaintiff's blood sugar at that time was 150 mg/dl. (*Id.*). Plaintiff was given four medications (omeprazole, lisinopril, hydrochlorothiazide, and simvastatin) to treat his cholesterol, high blood pressure, and gastric reflux conditions; however, Plaintiff was provided no insulin or medication to manage his diabetes. (*Id.*).

Mr. Appiah contacted Dr. Tahmina Sikder and requested Plaintiff's transfer to the medical dorm at DOC's North Infirmary Command ("NIC"), which the FAC alleges "houses and is better equipped to treat detainees with similar medical conditions, for insulin pump management." (FAC ¶ 73). Although Plaintiff was initially accepted into the NIC medical dorm, his admission was later rescinded because DOC policy allegedly did not permit Plaintiff to be housed at NIC due to his status as a civilly confined prisoner. (*Id.*). Because Plaintiff's medical needs could not be met at MDC, the FAC alleges, Plaintiff was slated for transfer to BPW. (*Id.* at ¶ 74).

**\*3** On December 21, 2014, DOC officers were tasked with transporting Plaintiff from MDC to BPW and commenced the transport; however, upon reaching BPW, the officers were informed by medical staff that "more was required of them than their anticipated '3 hour hospital run.' " (FAC ¶ 76). The FAC alleges that because it was near the end of the officers' shift, rather than wait and admit Plaintiff into BPW, the officers returned Plaintiff to MDC in order for officers from the following shift to transport Plaintiff back to BPW. (*Id.*). Plaintiff was not examined or treated by any medical personnel at BPW before officers returned him to MDC for the next shift's transport. (*Id.*).

Several hours later, Plaintiff was returned to BPW, where he was admitted through the emergency department and transferred to the prison ward. (FAC ¶ 77). At the emergency room, Plaintiff was found to be "hypoglycemic with his blood sugar below 40 mg/dl." (*Id.*) The FAC notes that, prior to that day, Plaintiff had never been hospitalized for his diabetes. (*Id.* at ¶ 78).

In short, Plaintiff received no insulin, food, or diabetes medication from the time of his admission to MDC on December 19, 2014, through the time of his transfer to BPW on the evening of December 21, 2014. (FAC ¶¶ 72, 75, 106-07).

### 2. Plaintiff's Incarceration at BPW

The FAC alleges the following facts for the period from December 21, 2014, to January 14, 2015, during which Plaintiff was in custody at BPW (the "BPW Period"):

### a. Plaintiff's Admission to BPW and Initial Care

Upon Plaintiff's December 21, 2014 admission to BPW, staff conducted a medical and social history intake, during which Plaintiff conveyed the name and contact number for his treating physician, as well as the facts that: (i) he has had Type I diabetes since 1995; (ii) he has been prescribed and has used an insulin pump since 2005, but ran out and the MDC medical staff had refused to refill it; (iii) he had not received any insulin while at MDC; (iv) he had not had a meal since December 19, 2014; and (v) during the intake he was feeling sweaty and experiencing swelling in his lower extremities with burning pain. (FAC ¶ 79). These symptoms are alleged to be well-known complications from elevated blood sugar levels. (*Id.*). Plaintiff was told that DOC policy forbids BPW

from refilling his insulin pump and that he would be given insulin shots instead. (*Id.* at ¶ 80). Plaintiff was not given any insulin or food at that time. (*Id.*).

About four hours after his admission to BPW, at approximately 10:13 p.m. on December 21, 2014, Plaintiff was provided juice and his first meal since his December 19, 2014 admission into MDC; this "made him feel better for the moment." (FAC ¶ 82). About an hour later, Plaintiff reported to his nurse that he was experiencing bilateral foot and leg pain at an 8 out of 10 intensity; upon examination, Plaintiff was confirmed to have bilateral leg swelling, which was worse in his left leg. (*Id.* at ¶ 83). Plaintiff again reported severe throbbing pain about 40 minutes later. (*Id.*).

At 10:40 p.m. on December 22, 2014, Plaintiff's blood sugar was tested and found to be 311 mg/dl. (FAC ¶ 87). In response, BPW medical personnel gave Plaintiff long-acting insulin, but failed to give him any short-acting insulin to bring his sugar down quickly; consequently, by 11:19 p.m. on the same evening, Plaintiff's blood sugar rose to 588 mg/dl, but personnel took no action. (*Id.*). Nearly nine hours later, at 7:45 a.m. on December 23, 2014, BPW medical personnel re-checked Plaintiff's blood sugar, which was found still to be over 450 mg/dl. (*Id.* at ¶ 88). At that point, personnel provided Plaintiff with short-term insulin instead of a sliding scale. (*Id.*). However, as of 9:41 a.m., Plaintiff's blood sugar was still over 450 mg/dl and, by 10:04 a.m., it reached 626 mg/dl. (*Id.*).

**\*4** On December 29, 2014, Plaintiff was examined and found to have an "open laceration under [his] right foot" and dry crust under his left foot, indicative of an underlying ulcer. (FAC ¶ 91). Plaintiff had not been receiving treatment for this ailment despite its progressive worsening. (*Id.*). Following this exam, Plaintiff was ordered to be provided with special foot appliances for his right foot to offload right foot erosion (and to be worn whenever walking); BPW medical personnel were also directed to advise Plaintiff to remain off his feet; and personnel were to dress Plaintiff's right foot to keep it dry in the shower and to apply lotion topically to his feet. (FAC ¶ 92). However, Plaintiff was not provided with these foot appliances or dressings, nor was he advised to stay off his feet. (*Id.*). An x-ray of Plaintiff's right foot was performed, which ruled out osteomyelitis, i.e., a bone infection; however, follow-up studies were not ordered or performed during Plaintiff's admission. (*Id.*).

### b. Plaintiff's Consultations with Specialists

On January 3, 2015, endocrinologist Nidhi Agrawal, M.D., consulted with Plaintiff regarding the ulcers and swelling of his feet. (FAC ¶ 93). Dr. Agrawal reviewed Plaintiff's medication history, blood sugar levels since admission, and lab results, but did not physically examine Plaintiff. (*Id.*). Dr. Agrawal advised medical staff to "[c]onsider vascular surgery consult for diabetic foot ulcers"; however, no such consultation was requested. (*Id.*).

Two days later, Dr. Agrawal returned due to increased swelling of Plaintiff's legs and for evaluation of a plantar ulcer on Plaintiff's right foot, along with two smaller ulcers on the heel and ball of the foot. (FAC ¶ 94). Erythematous areas were found over both legs with pitting edema, which the FAC alleges are indicative of infection. (*Id.*). Again, Dr. Agrawal advised medical staff to "[c]onsider vascular surgery consult for diabetic foot ulcers"; however, no such consultation was requested. (*Id.*). Despite several endocrinal consultations, Plaintiff's hyperglycemia was never controlled and "would range from the 40s to 600s." (*Id.* at ¶ 95).

On January 9, 2015, Plaintiff was examined by podiatrist Eric Nelson, M.D., who found plantar ulcerations and fissures on Plaintiff's feet. (FAC ¶¶ 96-97). Plaintiff reported that he felt no sensation in his feet and was worried about infection. (*Id.* at ¶ 97). Dr. Nelson determined that the ulcerations on both feet were not infected and that the right foot "ulceration is secondary to uncontrolled diabetes w/ peripheral neuropathy." (*Id.* at ¶ 97). Dr. Nelson directed that Plaintiff's right foot be kept elevated and that his dressings be changed daily with an antiseptic, but Plaintiff's right foot was not kept elevated by BPW medical personnel, nor were his dressings changed daily. (*Id.*).

On January 14, 2015, Plaintiff was examined by dermatologist Shields Callahan, M.D., who found Plaintiff with a two-to-three-centimeter ulcer at the base of his right second toe, with granulation tissue at the base and without an active infection. (FAC ¶ 98). Plaintiff's left foot had linear deep fissures on plantar surfaces, also without an active infection. (*Id.*).

Later the same day, podiatrist Mariola Morell, M.D., examined Plaintiff and made further recommendations regarding foot care for Plaintiff; however, Plaintiff was discharged from BPW later that evening. (FAC ¶ 99).

Case 9:23-cv-00362-BKS-ML   Document 58   Filed 05/06/26   Page 91 of 102

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

**3. Plaintiff's Discharge from BPW and Subsequent Medical Care**

On January 14, 2015, Plaintiff was discharged from BPW and released from DOC custody, after having petitioned the Family Court for compassionate release due to inadequate medical care and complications arising from diabetes. (FAC ¶ 100).

The next day, Plaintiff was examined by his own doctor, who diagnosed Plaintiff with an infection, started him on a course of antibiotics, and scheduled him for an MRI to determine whether the infection had reached the bone. (FAC ¶ 103). While the infection did not reach the bone and Plaintiff's foot did not require amputation, "the infection was so prevalent" that, approximately five weeks later, on February 24, 2015, "Plaintiff underwent surgery to excise the infection and skin graft the wound." (*Id.*).

**\*5** On February 24, 2015, prior to the surgery, a tissue sample was taken of the infected area. (FAC ¶ 104). Plaintiff was later advised that he had "contracted a hospital-borne infection—methicillin-resistant staphylococcus aureus (MRSA)—at BPW." (*Id.*). Tissue samples were never taken during Plaintiff's detention at BPW and he was never treated there for MRSA. (*Id.*).

**B. Procedural Background**

On March 10, 2015, Plaintiff filed a Notice of Claim with the City of New York, and on March 11, 2015, Plaintiff filed a Notice of Claim with HHC. (FAC ¶¶ 112-13). HHC held its statutory hearing on May 14, 2015, and the City its statutory hearing on July 6, 2015. (*Id.* at ¶¶ 115-16).

Plaintiff filed the Complaint in this action on September 10, 2015. (Dkt. #1). HHC filed a pre-motion letter on October 29, 2015 (Dkt. #35), to which Plaintiff responded on November 3, 2015 (Dkt. #36). The Court held a joint Initial Pretrial Conference and Pre-Motion Conference on November 17, 2015 (*see* Dkt. #40), at which the City Defendants appeared and also sought leave to move to dismiss (*see* Tr. of Nov. 17, 2015 Pre-Motion Conf., Dkt. #40, at 17:7-23). The Court issued an Order on the same day that, *inter alia*, directed Defendants to produce Plaintiff's medical records, and set a scheduling for amending the Complaint and for motion practice. (*See* Dkt. #39).

Plaintiff filed the FAC on January 29, 2016 (Dkt. #42), naming: (i) the City of New York (the "City"); Corizon Health, Inc. and Corizon, Inc. (together, "Corizon"); Joseph Ponte; Martin Murphy; Errol Toulon; Raleem Moses; Daniel O'Connell; John and Jane Doe healthcare workers and medical staff at MDC, and John and Jane Doe DOC officials (collectively, with the City and Corizon, the "City Defendants"); and (ii) the New York City Health and Hospitals Corporation, and certain John and Jane Doe healthcare workers and medical staff at BPW (collectively, "HHC").

On March 8, 2016, HHC filed a motion to dismiss and memorandum in support thereof, and the City Defendants did the same on the following day. (Dkt. #46-50). On April 6, 2016, Plaintiff filed a memorandum jointly opposing Defendants' motions to dismiss. (Dkt. #55-56). Defendants filed their reply memoranda on April 19, 2016. (Dkt. #57-58).

**DISCUSSION**

**A. Applicable Law**

**1. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### 2. Materials That May Be Considered in Resolving a Motion Under Rule 12(b)(6)

**\*6** "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)); *see generally Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (discussing documents that may properly be considered in resolving a motion to dismiss).

HHC argues for the first time in its Reply Brief that "Plaintiff has made his medical records an integral part of his Complaint," and urges the Court to consider those records, an electronic copy of which HHC has submitted, in connection with resolving the present motions or, alternatively, in converting the present motions practice into one for summary judgment. (*See* HHC Reply 2-3). The Court declines to consider Plaintiff's medical records in resolving the instant motions. For starters, HHC's medical records argument is raised for the first time in reply, despite the fact that it could and should have been made in its opening brief. Although the Court has discretion to consider arguments raised for the first time in reply, it is also "free to disregard" them. *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009); *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court.").

Moreover, the medical records here are neither "attached to the complaint as exhibits," nor "incorporated by reference in the complaint." *DiFolco*, 622 F.3d at 111. Although the Court "*may* nevertheless consider [the medical records] where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint," *Chambers*, 282 F.3d at 153 (emphasis added) (internal quotation marks omitted), upon reviewing the FAC, the Court finds this not

to be the case and, in any event, declines to consider the records at this stage. *See Goel*, 820 F.3d at 559 ("Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough." (internal quotation marks and alterations omitted)).

### 3. Section 1983 Claims Generally

Section 1983 establishes liability for deprivation, under color of state law, "of any rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). As such, a § 1983 claim "has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

As a prerequisite to an award of damages under § 1983, a plaintiff must show the personal involvement of defendants in the alleged constitutional deprivations. *See Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). To show personal involvement, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (citing *Twombly*, 550 U.S. at 555).

### 4. Section 1983 Claims for Deliberate Indifference

**\*7** To plead a violation of the Eighth Amendment for deliberate indifference to a serious medical need, a plaintiff must allege facts that satisfy (i) an objective requirement that the alleged deprivation results in a serious medical condition and (ii) a subjective requirement that the defendant, in depriving the plaintiff of medical treatment, acted with deliberate indifference. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009); *id.* (holding that deliberate indifference to medical need claims "of a person in custody should be analyzed under the same standard irrespective of whether they are brought" under the Eighth Amendment (for convicted detainees) or Fourteenth Amendment (for pretrial detainees)). [3]

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 93 of 102

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

With respect to the subjective element, a plaintiff must allege that the defendant acted with "a sufficiently culpable state of mind," equivalent to criminal recklessness. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal citation omitted). Such a state of mind "entails something more than mere negligence[, but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)) (internal quotation marks omitted).

Mere allegations of negligence will generally be insufficient to state a claim of deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Rather, a plaintiff must allege that "the charged official ... act[ed] or fail[ed] to act while *actually aware* of a substantial risk that serious inmate harm will result." *Bell v. Jendell*, 980 F. Supp. 2d 555, 561 (S.D.N.Y. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (internal quotation marks omitted) (emphasis in *Bell*)); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Accordingly, "not every lapse in medical care is a constitutional wrong." *Salahuddin*, 467 F.3d at 279 (internal citation omitted). A constitutional wrong requires deliberate indifference, and it is well-settled that the ultimate decision of whether to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference. *See Ross v. Correct Care Sols. LLC*, No. 11 Civ. 8542 (DLC), 2013 WL 5018838, at *4 (S.D.N.Y. Sept. 13, 2013).

## B. Analysis

### 1. Plaintiff Adequately Pleads a Claim of Deliberate Indifference as to the MDC Period, But Not as to the BPW Period

#### a. The Objective Element Is Satisfied as to Both the MDC and the BPW Periods

**\*8** The City Defendants argue that Plaintiff's claim, properly construed, is not for the total deprivation of medical care, but rather for delayed or inadequate medical care. (*See* City Br. 9). Therefore, the City Defendants maintain, the seriousness inquiry under the objective element should be focused only on the unreasonableness of the delay or inadequacy rather than on the severity of Plaintiff's underlying condition. (*Id.* at 9-10). HHC argues that, as to the BPW period, Plaintiff was neither deprived of medical care nor provided delayed or inadequate care and, accordingly, Plaintiff's claims fail to satisfy the objective element. (*See* HHC Br. 9-12).

The Second Circuit advises district courts that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin*, 467 F.3d at 279-80. "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)). Where, however, the inadequacy is in the medical treatment given, "the seriousness inquiry is narrower." *Id.* at 280. For example, if the offending conduct is an unreasonable delay or interruption in treatment, "the seriousness inquiry 'focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Smith*, 316 F.3d at 185) (alterations omitted). In such scenarios, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith*, 316 F.3d at 186.

The City Defendants are incorrect that Plaintiff fails to raise a claim for the total deprivation of medical care as to the MDC Period. The FAC makes clear that despite Plaintiff's repeated declarations to MDC personnel that he suffers from diabetes

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 94 of 102

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

and was experiencing its painful symptoms, he was deprived of food, insulin, and diabetes medication during the entirety of the MDC Period. (*See* FAC ¶¶ 68, 70-72, 75, 106-07). Provision of medicine for Plaintiff's unrelated medical needs, such as cholesterol, blood pressure, and gastric reflux (*see id.* at ¶ 72), does nothing to negate Plaintiff's allegations about a complete lack of care for his diabetes, the medical condition on which his claims are based. *See Smith*, 316 F.3d at 185-86 ("There is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition."). As to the BPW Period, however, the FAC may be construed as raising claims based on delayed or inadequate care. (*See, e.g.,* FAC ¶ 84 (alleging that at BPW, Plaintiff's "blood sugar was not tested with regular frequency nor was insulin regularly provided."); *id.* at ¶ 87 ("Plaintiff should have been receiving long-acting insulin rather than by sliding scale, as BPW personnel administered."); *id.* at ¶ 90 (alleging delayed podiatry consultation and surgical evaluation of Plaintiff's foot)).

**\*9** The Court finds that Plaintiff's allegations concerning both the MDC Period and the BPW Period state claims that satisfy the objective element of the deliberate indifference analysis. Plaintiff's diabetes is a sufficiently serious medical condition: a reasonable doctor or patient would find it "important and worthy of comment"; the condition "significantly affects an individual's daily activities"; and it can cause "chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)) (internal quotation marks omitted); *see also Beatty v. Davidson*, 713 F. Supp. 2d 167, 174 (W.D.N.Y. 2010) ("This Court need not linger on this point: diabetes is a sufficiently serious medical condition to meet the objective prong.") (collecting cases); *Colon v. County of Nassau*, No. 12 Civ. 4466 (JS), 2014 WL 4904692, at \*6 (E.D.N.Y. Sept. 26, 2014) (recognizing that "[c]ourts in this Circuit have held that diabetes is a sufficiently serious medical condition to meet the objective prong of a deliberate indifference claim" (internal quotation marks omitted)).

Even under a narrower seriousness inquiry that focuses on "the particular risk of harm" faced by Plaintiff due to delayed or inadequate treatment during the BPW Period, *see Smith*, 316 F.3d at 186, the objective element is met. The FAC alleges infrequent blood sugar monitoring and insulin provision (*see, e.g.,* FAC ¶¶ 84, 88), inadequate insulin treatments (*see, e.g., id.* at ¶ 88), and delayed or inadequate treatment by specialists

(*see, e.g., id.* at ¶¶ 90, 93-94, 96), allegedly resulting in consistently and abnormally elevated blood sugar levels (*see id.* at ¶¶ 86-88), and other diabetes-related complications (*see id.* at ¶¶ 92-93). (*See also* Pl. Opp. 17 ("Plaintiff is not alleging that there were short-term delays and inadequacies of treatment surrounded by otherwise acceptable care, but rather that there were short-term provisions of inadequate care surrounded by otherwise non-existent and/or cursory care.")). These allegations of harm are sufficiently serious, not "minor and inconsequential." *Smith* at 186; *see id* ("For example, the failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment."); *see also Roberts v. C-73 Med. Dir.*, No. 14 Civ. 5198 (GHW), 2015 WL 4253796, at \*5 (S.D.N.Y. July 13, 2015) (finding that allegations of delayed diabetes treatment and resulting pain satisfied objective element of deliberate indifference analysis); *Ferguson v. Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at \*4 (S.D.N.Y. July 12, 2012) (recognizing that "[w]here temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness").

In sum, Plaintiff has plausibly pled that his underlying medical condition and the risk of (and actual) harm incurred due to delayed or inadequate care were sufficiently serious to satisfy the Eighth Amendment's objective element for both the MDC and the BPW Periods.

### b. The Subjective Element Is Satisfied as to the MDC Period But Not as to the BPW Period

### i. The MDC Period

Satisfaction of the objective element is, of course, only half of the inquiry. The City Defendants further argue that the FAC's allegations fail to satisfy the subjective element of the Eighth Amendment analysis. (*See* City Br. 10). Specifically, they contend that Plaintiff pleads no facts from which it can be inferred that "any of the MDC staff he encountered knew of and disregarded an excessive risk to his health or safety." (*Id.* at 11). In support of this argument, the City Defendants point out that, "[i]n the short time he was at MDC, Plaintiff was seen and evaluated by multiple medical staff members, had his blood sugar level tested, was prescribed several medications,

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 95 of 102

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

and was promptly directed to be transferred to [BPW] for the very purpose of ensuring ... that Plaintiff receive 'continual medical care.' " (*Id.* at 11 (quoting FAC ¶ 74)). Furthermore, Plaintiff's allegations about the aborted initial transfer to BPW "raise no inference that the officers delayed with actual knowledge that the delay would result in serious harm" (*id.*), while his allegations about being deprived of food are vague and not sufficiently injurious (*id.* at 12).

**\*10** These arguments are unpersuasive. Plaintiff has pled sufficient facts to claim plausibly that at least certain of the City Defendants acted with culpable recklessness; specifically, that MDC personnel knew of and disregarded an excessive risk to Plaintiff's health. *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (the official must " 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " (quoting *Farmer*, 511 U.S. at 837)).

In *Washington v. Westchester County Department of Correction*, this Court found allegations supporting an analogous deliberate indifference claim to be insufficient because that complaint lacked details regarding "(i) whether [the plaintiff] was in pain or exhibited symptoms [when he was first detained]; (ii) whether Defendants were aware that Plaintiff ... had symptoms of [his medical condition] at the time of his incarceration; and (iii) whether Defendants ignored such symptoms or deliberately withheld medication." No. 13 Civ. 5322 (KPF), 2015 WL 408941, at \*8 (S.D.N.Y. Jan. 30, 2015) (internal quotation marks omitted). Here, by contrast, Plaintiff informed MDC personnel both at his initial intake, and repeatedly thereafter, that he suffers from diabetes; that he was experiencing swelling in his legs and severe burning pain; and that he requires insulin. (*See, e.g.,* FAC ¶¶ 68-71; *see also id.* at ¶ 71 (alleging that Plaintiff presented letter from his treating physician confirming his diabetic condition and need for insulin)). Plaintiff's physical examination approximately 24 hours into his MDC custody confirmed, according to the FAC, that his diabetes was not being properly treated and that he was "at a significantly heightened risk for developing complications such as kidney failure, blindness and neuropathy." (*Id.* at ¶ 72). This led to efforts to transfer Plaintiff to a facility equipped to treat him, but an initial attempt to transfer him to NIC failed due to an alleged DOC policy and the first attempt to transfer him to BPW failed due to DOC officers' alleged malfeasance. (*Id.* at ¶¶ 73-74, 76).

Despite all of this, during the entirety of Plaintiff's MDC detention—an approximately two-day period concluding with Plaintiff's transfer to BPW—Plaintiff was provided no food, insulin, or diabetes medication. (*See* FAC ¶¶ 69-72, 75, 106-07). *See also Washington*, 2015 WL 408941, at \*8 ("[C]ertain medical conditions may be so life-threatening that advising prison personnel of a diagnosis of that condition and providing corroborative prescriptions may, particularly at the pleading stage, be sufficient to state a claim of culpable recklessness if prison officials later fail to act on that knowledge.").

The City Defendants' arguments listed above do not alter this conclusion. First, the mere fact that Plaintiff was "seen and evaluated by multiple medical staff members" and "had his blood sugar level tested" (City Br. 11), but nevertheless received no food, insulin, or diabetes medication over a two-day period, lends no support to (and, indeed, may affirmatively undermine) the City Defendants' position that MDC personnel were not deliberately indifferent to Plaintiff's condition. Next, the City Defendants' argument that Plaintiff "was prescribed several medications" while at MDC (*id.* at 11), is a non-starter: Plaintiff was prescribed medication for cholesterol, blood pressure, and gastric reflux (*see* FAC ¶ 72); none of these medications was intended to treat Plaintiff's diabetes (*see id.*), the medical condition upon which Plaintiff's deliberate indifference claim is based. Finally, the City Defendants' reliance on *Inesti v. Hogan* for the proposition that the "deprivation of one to two isolated meals does not amount to a constitutional violation" is misplaced in this context. (City Br. 12 (citing *Inesti v. Hogan*, No. 11 Civ. 2596 (PAC) (AJP), 2013 WL 791540, at \*24-25 (S.D.N.Y. Mar. 5, 2013), *report and recommendation adopted*, No. 11 Civ. 2596 (PAC), 2013 WL 5677046, at \*1 (S.D.N.Y. Sept. 30, 2013))). Plaintiff's lack of food over an approximately two-day period (*see* FAC ¶ 75), amounts to significantly more than "one or two isolated meals." And, more importantly, the *Inesti* inmate was not a diabetic, nor did he claim to suffer from a condition so directly and delicately tied to food intake and blood sugar regulation. *See Inesti*, 2013 WL 791540, at \*1-4, \*22-25; *Inesti*, 2013 WL 5677046, at \*1 (describing the plaintiff's mental health disorder). The City Defendants' comparison of denying food to a diabetic versus a non-diabetic is self-evidently flawed.

**\*11** In sum, the FAC details how MDC personnel were aware of Plaintiff's serious and deteriorating condition, but failed, over approximately two days, to provide any care

Case 9:23-cv-00362-BKS-ML Document 58 Filed 05/06/26 Page 96 of 102

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

by means of food, insulin, or diabetes medication. (FAC ¶¶ 69-72, 75, 106-07). Taken as a whole, these allegations are sufficient to state a plausible claim that certain of the City Defendants consciously disregarded a substantial risk of serious harm to Plaintiff. *See Hill,* 657 F.3d at 122; *Chance,* 143 F.3d at 703.

### ii. The BPW Period

Plaintiff claims that BPW personnel also failed to manage properly his diabetes in multiple respects, including by infrequently monitoring his blood sugar, providing him with the incorrect insulin regimen and untimely specialist care, and neglecting to maintain sanitary conditions, all of which led to numerous diabetes-related complications. (*See, e.g.,* FAC ¶¶ 83-84, 87, 89, 102). Plaintiff argues that such inadequate care rises to a constitutional violation because, given the condition in which he arrived at BPW and examinations thereafter, HHC personnel knew that a serious risk of harm to Plaintiff existed, but consciously disregarded that risk by providing only "perfunctory treatment and cursory examinations." (Pl. Opp. 19).

The City Defendants argue that Plaintiff fails to state a claim against them as to the BPW Period, because BPW is owned and operated by co-Defendant HHC, a municipal corporation distinct from the City and Corizon. (*See* City Br. 12). In the alternative, the City Defendants argue that Plaintiff's claim fails on the merits because he received "frequent and consistent medical care," and any criticism to the contrary amounts merely to "disagreements with the care provided" and "at worst, negligence amounting to medical malpractice," but nothing approaching Eighth Amendment deliberate indifference. (City Br. 13-14). HHC echoes the latter argument. After cataloguing the treatment Plaintiff received at BPW (*see* HHC Br. 9-12, 15-16), HHC argues that Plaintiff's allegations "merely describe a situation in which [Plaintiff] disagrees with the course of treatment provided," which, "[a]t most ... state[s] a claim for medical malpractice," but which "fall[s] well short of alleging that [HHC] acted with the requisite culpable state of mind" (HHC Br. 14, 16-17).

While Plaintiff's allegations as to the BPW Period may support a claim for negligence or medical malpractice, something Defendants acknowledge, the allegations do not support an inference of culpable recklessness in satisfaction of the subjective element of a deliberate indifference analysis. *See Santana v. Watson,* No. 13 Civ. 1549 (SAS), 2014

WL 1803308, at *5 (S.D.N.Y. May 6, 2014) ("[D]eliberate indifference is more substantial than mere disagreement over a course of treatment, negligence[,] or even medical malpractice."); *cf. Brown v. McElroy,* 160 F. Supp. 2d 699, 706 (S.D.N.Y. 2001) (holding that "the fact that a plaintiff feels that more should have been done for his condition is not a sufficient basis for a deliberate indifference claim").

Unlike the allegations concerning the MDC Period, as to which Plaintiff alleges a total deprivation of medical care for his diabetes, the FAC describes the extensive medical care that Plaintiff received at BPW, including blood sugar level monitoring (FAC ¶ 87); insulin treatment (*id.* at ¶¶ 87-88); examinations of his foot condition (*id.* at ¶¶ 91-92); and treatment by multiple specialists, including two podiatrists, an endocrinologist, and a dermatologist (*id.* at ¶¶ 93-98). At bottom, the FAC alleges that this care was inadequate because it was characterized by delay, irregularity, misdiagnoses, and suboptimal treatment options, but these allegations do not rise to the level of a constitutional violation. *See Demata v. N.Y. State Corr. Dep't of Health Servs.,* 198 F.3d 233 (Table), 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) ("Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." (internal citations omitted)); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) ("A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference."); *Williams v. Williams,* No. 13 Civ. 3154 (RA), 2015 WL 568842, at *7 (S.D.N.Y. Feb. 11, 2015) ("[A]llegations of a negligent misdiagnosis do not satisfy the subjective requirement of the deliberate indifference analysis because they do not suggest that the defendant acted with a conscious disregard to inmate health or safety.").

**\*12** For example, in *Roberts v. C-73 Medical Director,* the diabetic inmate's claim for deliberate indifference was principally based on a treating physician's failure to stabilize his blood sugar levels with appropriate care and her denial of specialist care until his condition worsened and, even then, only on an infrequent basis. *See* No. 14 Civ. 5198 (GHW), 2015 WL 4253796, at *5-6 (S.D.N.Y. July 13, 2015). The Court held that while the inmate's poor physical condition at intake supported "an inference that a serious risk of harm

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 97 of 102

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

existed," the allegations did not show that the physician "drew that inference and then consciously disregarded it." *Id.* "In fact, plaintiff acknowledges that when his condition worsened, [the physician] referred him to a specialist, which does not support a contention that she acted with deliberate indifference." *Id.*; *see also Roberts v. City of N.Y.*, No. 14 Civ. 5198 (GHW), 2016 WL 4146135, at *5 (S.D.N.Y. Aug. 2, 2016) (reaffirming reasoning and holding as to treating physician upon amended complaint).

By contrast, the court in *Colon v. County of Nassau*, found plausible claims of deliberate indifference where two diabetic inmates alleged that a physician denied them necessary, specified medical care because of budgetary constraints. *See* No. 12 Civ. 4466 (JS), 2014 WL 4904692, at *6 (E.D.N.Y. Sept. 26, 2014). "If this is true and if the treatments at issue were medically necessary, this allegation could support a conclusion that [the named physician] was deliberately indifferent to [plaintiffs'] medical needs." *Id.* (citing *Liner v. Fischer*, No. 11 Civ. 6711 (PAC), 2013 WL 4405539, at *21 (S.D.N.Y. Aug. 7, 2013) (denying motion to dismiss deliberate indifference claim because "if, as plaintiff alleges, he was denied necessary medication for almost two years due to 'budget cuts,' this delay could potentially be a factor in support of a finding of deliberate indifference") (alterations omitted)).

Here, although Plaintiff's treatment during the BPW Period, based on the facts alleged, should have been more consistent, timely, and thorough, there is no indication that any of the treatment deficiencies were a result of "a conscious disregard of a substantial risk of serious harm" to Plaintiff. *See Estelle*, 429 U.S. at 105-06 (recognizing that "an inadvertent failure to provide adequate medical care," such as "a complaint that a physician has been negligent in diagnosing or treating a medical condition[,] does not state a valid claim of medical mistreatment under the Eighth Amendment").

### 2. Plaintiff Has Failed to Plead Municipal Liability

#### a. Applicable Law

Municipal entities may be sued directly for constitutional violations pursuant to § 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), but cannot be held liable for the acts of their employees under the doctrine of *respondeat superior*, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). In other words, "*Monell* does not provide a separate

cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original) (citing *Monell*, 436 U.S. at 694).

A plaintiff may establish municipal liability under *Monell* in several ways, including by presenting evidence of "[i] an express policy or custom, [ii] an authorization of a policymaker of the unconstitutional practice, [iii] failure of the municipality to train its employees, which exhibits a 'deliberate indifference' to the rights of its citizens, or [iv] a practice of the municipal employees that is 'so permanent and well settled as to imply the constructive acquiescence of senior policymaking officials.' " *Biswas v. City of N.Y.*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 71-72 (2d Cir. 1999)).

#### b. Plaintiff Allegations of Municipal Liability Are Inadequate

**\*13** Plaintiff raises *Monell* claims against the City, Corizon, and HHC. (*See* FAC ¶¶ 119-23). HHC is a municipal corporation subject to municipal liability. *See Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) (addressing HHC); *Sussman v. N.Y. City Health & Hosps. Corp.*, No. 94 Civ. 8461 (DBS), 1997 WL 334964, at *7 n.3 (S.D.N.Y. June 16, 1997) (same). Corizon, although a private entity, is here treated as a municipal actor for purposes of *Monell*. *See Bess v. City of N.Y.*, No. 11 Civ. 7604 (TPG), 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("Corizon enjoys the benefit of the *Monell* requirements for the same reason it may be named as a defendant in a § 1983 suit. In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality." (collecting cases)); *Law v. Corizon Med. Servs.*, No. 13 Civ. 5286 (KBF), 2014 WL 2111675, at *5 (S.D.N.Y. May 12, 2014) (same).

Plaintiff's claim against HHC presupposes the existence of an independent constitutional violation arising during the BPW Period; because this Court has found that none has been identified, Plaintiff's *Monell* claim is dismissed as to HHC. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (recognizing that municipal liability requires

Case 9:23-cv-00362-BKS-ML   Document 58   Filed 05/06/26   Page 98 of 102

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

that an individual municipal agent committed an underlying constitutional deprivation); *Ferguson v. Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at \*6 (S.D.N.Y. July 12, 2012) ("Because the Court has concluded that [the plaintiff's] constitutional rights have not been violated, his claim of municipal liability pursuant to *Monell* is, *a fortiori*, also meritless.").

As to the MDC Period, and the municipal City Defendants, Plaintiff seeks to establish *Monell* liability principally on the basis of (i) the City Defendants' alleged official policies, including of prohibiting diabetic prisoners' insulin pumps to be used or refilled while in custody and of prohibiting civilly committed individuals to be admitted to the NIC infirmary (*see* Pl. Opp. 23; FAC ¶¶ 125-26); (ii) the City Defendants' widespread practice and customs, including of "failing to employ obvious measures to reduce the risk of abuses alleged," failing to supervise adequately and train properly medical staff and corrections officers, and failing to ensure prompt and adequate medical services to inmates in compliance with the City's Minimal Standards for Health Care (*see* Pl. Opp. 24-25; *see generally* FAC ¶¶ 131-48); and (iii) the City Defendants' failure to train and supervise personnel, including "to ensure that they perform" duties related to inmate medical care "in strict accordance with [inmates'] civil rights and doctors' medical orders" and on how to handle difficult circumstances that are often presented (*see* Pl. Opp. 26-27; *see generally* FAC ¶¶ 119-48).

None of these allegations as pled is sufficient to state a claim for *Monell* liability against the municipal City Defendants. Plaintiff's allegations concerning the two official policies principally targeted—barring use of an insulin pump and precluding civilly confined inmates from receiving treatment at NIC—suffer from at least two defects. First, the FAC fails to plead facts showing that these policies caused the constitutional violation. *See Monell*, 436 U.S. at 693-94 (holding that municipal liability claim must allege that officially adopted policy or custom caused the constitutional violation); *see also Bd. of County Comm'r of Bryan County v. Brown*, 520 U.S. 397, 404 (1997) (holding that plaintiff must demonstrate a "direct causal link between the municipal action and the deprivation of federal rights"). Here, given the alternate medical treatments available, such as insulin shots or care at a different facility, the FAC fails to allege sufficient facts to plead a "direct causal link" between the alleged insulin pump or civil custody policies and the constitutional violation here recognized, i.e., the total deprivation of medical care for Plaintiff's diabetes during the MDC Period.

**\*14** Second, the "official policy" allegations lack sufficient factual detail. The FAC offers little beyond, "[Plaintiff] was told that he would not be allowed to continue using his insulin pump while in custody due to DOC policy" (FAC ¶ 69; *see id.* at ¶¶ 3, 125), and "DOC policy did not permit Plaintiff to be housed at [NIC]" because "Plaintiff was civilly confined" (*id.* at ¶ 73). "To state there is a policy does not make it so. And while a plaintiff need not assert the allegations in the initial complaint with a level of specificity only made possible through discovery," *Betts v. Shearman*, No. 12 Civ. 3195 (JPO), 2013 WL 311124, at \*16 (S.D.N.Y. Jan. 24, 2013), additional facts for Plaintiff's "official policy" *Monell* allegations are required. *Cf. Colon*, 2014 WL 4904692, at \*10 (finding municipal liability adequately pled where complaint alleged that contract between municipality and medical provided subjected provider to a fixed budget that caused it to cut costs and that provider's policy "limit[ed] medication dispensing and prescribing to the facility formulary within the budget for the contract ... notwithstanding medical need").

Relatedly, Plaintiff's allegations concerning the City's (i) training and supervision failures, and (ii) widespread custom and practice of failing to ensure prompt and adequate medical services, a reduced risk of abuse, and the like, are inadequately pled. "[C]onclusory allegations that a municipality failed to train and supervise its employees [are] insufficient to state a *Monell* claim." *Davis v. City of N.Y.*, No. 07 Civ. 1395 (RPP), 2008 WL 2511734, at \*5-6 (S.D.N.Y. June 19, 2008); *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). Under the pleading requirements imposed by *Twombly* and *Iqbal*, Plaintiff must give a factual description of the injurious policy or custom, "not just bald allegations that such a thing existed." *Bess*, 2013 WL 1164919, at \*2.

Here, Plaintiff's allegations consist essentially of a recitation of the inadequate medical treatment received and generic claims that such inadequacies were a product of harmful customs and practices or failures to train or supervise. (*See generally* FAC ¶¶ 124-48; Pl. Opp. 23-27). Such boilerplate allegations are insufficient to state a *Monell* claim. *See Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 535-37 (S.D.N.Y. 2012) (holding that "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details"); *Plair v. City of N.Y.*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (rejecting as inadequately

pled the plaintiff's "conclusory" allegations that the City "permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality ... which constituted a municipal policy, practice or custom and led to plaintiff's assault" (alterations omitted)); *cf. Anderson v. City of N.Y., 657 F. Supp. 1571, 1574 (S.D.N.Y. 1987)* ("Plaintiff cannot infer a policy from the alleged violation of his own civil rights.").

Plaintiff's claim for failure to train (*see* Pl. Opp. 26-27), suffers from the additional pleading defect of nowhere identifying "[a] pattern of similar constitutional violations by untrained employees," which is "ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick,* 563 U.S. at 62 (internal quotation marks omitted). Plaintiff identifies two examples of diabetic inmates dying due to DOC negligence in recent years (*see* Pl. Opp. 27), but nowhere details which deficient training program or manners of supervision caused the violations suffered by both Plaintiff and these other inmates. Consequently, Plaintiff fails to plead adequately that the municipal City Defendants were aware that their training would fail to prevent the violations here suffered by Plaintiff. *See Connick,* 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."). For all of these reasons, Plaintiff's *Monell* claims against the City, Corizon, and HHC are dismissed.

### 3. The Court Dismisses Certain of the Claims Against Certain of the Individual Defendants

**\*15** The FAC names John and Jane Does 1-25, "site directors, physicians, nurses, physician assistants, clinicians, therapists, and other medical staff ... employed by the City, Corizon and/or HHC who were assigned to MDC and BPW on the subject dates and were responsible for the provision of appropriate medical care to patients at MDC and BPW, including Plaintiff, on said dates" (FAC ¶ 55); as well as John and Jane Does 26-50, "DOC officers, including but not limited to assistant deputy wardens, captains, and correction officers, between December 19, 2014[,] and January 14, 2015, who participated in and/or had knowledge of and failed to protect Plaintiff from and/or intervene in the denial of timely and adequate medical care on those dates" (*id.* at ¶ 58). As established above, the FAC plausibly pleads a deliberate indifference claim as to the MDC Period, but not as to the BPW Period. Accordingly, Plaintiff's § 1983 claims are upheld as to the John and Jane Doe individual defendants

responsible for Plaintiff's care at MDC and dismissed as to those responsible for Plaintiff's care at BPW.

The FAC also names five "senior officials" in their individual and official capacities: (i) DOC Commissioner Ponte; (ii) DOC Chief of Department, Martin Murphy; (iii) DOC Deputy Commissioner of Operations Dr. Errol Toulon, Jr.; (iv) MDC Warden Raleem Moses; and (v) BPW Deputy Warden Daniel O'Connell. (*See* FAC ¶¶ 44, 50-53). Plaintiff's allegations regarding these senior officials boil down to the claim that "[t]hese supervisory officials knew or should have known that the pattern of abuse set forth in the [FAC] existed in their jails and hospital prison wards. Their failure to take measures to curb this pattern of brutality constitutes acquiescence in the known unlawful behavior of their subordinates." (Pl. Opp. 22).

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases); *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir. 1973) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required."), *abrogated on other grounds by Graham v. Connor,* 490 U.S. 386, 393 (1989). A court may consider supervisory personnel "personally involved" if a plaintiff plausibly alleges facts showing that those defendants: (i) participated directly in the alleged constitutional violation; (ii) failed to remedy the wrong after being informed of it; (iii) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (iv) were grossly negligent in supervising subordinates who committed the wrongful acts; or (v) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating there were ongoing unconstitutional acts. *See Grullon,* 720 F.3d at 139 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)).

Plaintiff's deliberate indifference claims have been dismissed as to the BPW Period; accordingly, there can be no supervisory liability for those claims. *Cf. Farid,* 593 F.3d at 249 (recognizing that a defendant's personal involvement in a constitutional deprivation is a prerequisite to a damages award under § 1983); *see Houston v. Schriro,* No. 11 Civ. 7374 (LAP), 2014 WL 6694468, at *14 (S.D.N.Y. Nov. 26, 2014)

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 100 of 102

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

(holding that there can be no supervisory liability for § 1983 claims that have been dismissed).

Turning to the MDC Period, the FAC fails to allege sufficient facts to plausibly demonstrate the personal involvement of the named supervisory officials. The FAC merely recites the duties that inhere in each of the supervisor's positions and attempts to bootstrap these responsibilities into generic claims of personal involvement. *See Colon*, 58 F.3d at 874 (dismissing claim against DOCS Commissioner because "[t]he bare fact that [he] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim"); *Walker v. Schriro*, No. 11 Civ. 9299 (JPO), 2013 WL 1234930, at *15 (S.D.N.Y. Mar. 26, 2013) ("A defendant's status as warden or commissioner of a prison, standing alone, is ... insufficient to establish personal involvement under section 1983."); *id.* ("[P]roof of 'linkage in the prison chain of command' is insufficient." (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985))); *see generally Ramrattan v. Fischer*, No. 13 Civ. 6890 (KPF), 2015 WL 3604242, at *9-10 (S.D.N.Y. June 9, 2015).

**\*16** As discussed, the FAC fails to plead adequately any official policy, custom or practice, or deficient training or supervision, that led to the constitutional violation here recognized. Likewise, the FAC fails to allege sufficient facts concerning which of these officials were responsible for creating which particular policies or customs, how they were grossly negligent in supervision, or in what specific manner they failed to act to prevent Plaintiff's injury. Generic allegations that these officials "exercised policymaking, supervisory, and disciplinary authority on behalf of DOC," are insufficient to support a finding of supervisory liability. *See Collins v. Goord*, 438 F. Supp. 2d 399, 420 (S.D.N.Y. 2006) (rejecting claims of supervisory liability against DOC Commissioner and prison superintendent because "entirely conclusory allegations" claimed that officials "were aware of and acquiesced to the unlawful practices"). Accordingly, Plaintiff's claims against the named "senior official" defendants are dismissed.

### 4. The Court Dismisses Certain of Plaintiff's State Law Claims

Plaintiff raises nine pendent state law claims in connection with his medical care during the MDC and BPW Periods. (*See generally* FAC ¶¶ 164-232). The City Defendants and HHC make no merits argument in favor of dismissing these claims. (*See* City Br. 20-21; HHC Br. 17). Rather, they presuppose the absence of a viable federal claim and argue exclusively

that the Court should decline to exercise its supplemental jurisdiction. (*Id.*).

Having upheld Plaintiff's federal claim as to the MDC Period, the Court presently declines to dismiss the state law claims arising from the MDC Period. By contrast, having dismissed Plaintiff's federal claim as to the BPW Period, the Court exercises its discretion under 28 U.S.C. § 1367 to decline jurisdiction over Plaintiff's state-law claims for care received during the BPW Period. *See Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013).

### 5. Plaintiff Is Granted Leave to Amend in Part

Plaintiff requests leave to amend the FAC if the Court finds it deficient. (*See* Pl. Opp. 29). This request is granted in part and denied in part.

The Court has found that the FAC's allegations concerning the BPW Period fail to demonstrate "a conscious disregard of a substantial risk of serious harm," *Hill*, 657 F.3d at 123 (quoting *Chance*, 143 F.3d at 703), and thereby fail, as a matter of law, to state a valid claim for deliberate indifference under the Eighth and Fourteenth Amendments. In light of the Court's reasoning, set forth *supra*, the Court finds that any effort to replead would be futile and, thus, denies Plaintiff leave to amend the FAC with regard to the BPW Period. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that leave to amend should be "freely given," but not if amendment would be futile); *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003) ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile."). Accordingly, all of Plaintiff's federal claims as to the BPW Period are dismissed with prejudice. *See Ferguson*, 2012 WL 2865474, at *6 (finding municipal liability claim *a fortiori* meritless where no constitutional violation found); *Houston*, 2014 WL 6694468, at *14 (applying same reasoning for supervisory liability claim). Plaintiff's state law claims based on the BPW Period are dismissed without prejudice to their potential refiling in state court.

With regard to the MDC Period, the Court has found that the FAC plausibly pleads a claim for deliberate indifference in violation of the Eighth and Fourteenth Amendments, but not for *Monell* or supervisory liability based on that violation. As currently pled, both of these theories of liability are supported by insufficient facts and also suffer from serious defects related to causation, e.g., that the deprivation of care here recognized to be a constitutional violation was

Case 9:23-cv-00362-BKS-ML    Document 58    Filed 05/06/26    Page 101 of 102

Vassallo v. City of New York, Not Reported in Fed. Supp. (2016)

due to a specific policy, widespread practice or custom, or training or supervision failures, *see Monell,* 436 U.S. at 693-94 (holding that municipal liability claim must allege that officially adopted policy or custom caused the constitutional violation); *see also Bryan County,* 520 U.S. at 403 (holding that plaintiff must demonstrate a "direct causal link between the municipal action and the deprivation of federal rights"). Nonetheless, because Plaintiff did not have the benefit of a pre-motion submission from the City Defendants before amending his original complaint (*see* Tr. of Nov. 17, 2016 Pre-Motion Conf., Dkt. #40, at 17:14-19; *see also* Dkt. #42), the Court grants Plaintiff leave to amend the FAC as to the MDC Period only. In so doing, the Court expects that Plaintiff will take seriously the pleading deficiencies discussed in this Opinion, and will refrain from repleading these claims if those deficiencies cannot credibly be remedied.

 **\*17**  Accordingly, Plaintiff's claims for the MDC Period against the municipal City Defendants (City, Corizon) and the named "senior official" Defendants (Ponte, Murphy, Toulon, and Moses) are dismissed without prejudice to replead; Plaintiff's claims against BPW Deputy Warden O'Connell are dismissed with prejudice. Plaintiff's § 1983 claims are upheld as to the John and Jane Doe healthcare workers and DOC

officers assigned to and responsible for Plaintiff's care at MDC. (*See* FAC ¶¶ 55, 58). Finally, as the City Defendants did not move to dismiss Plaintiff's state law claims based on the merits, those claims endure insofar as they arise from the MDC Period.

### CONCLUSION

For the foregoing reasons, the City Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART, and HHC's motion to dismiss is GRANTED. Plaintiff is permitted to file an amended complaint in accordance with this Opinion, if he wishes to, on or before December 22, 2016. The City Defendants can file an answer or other response within 21 days of the filing of the amended complaint. Thereafter, the Court will schedule a pretrial conference in the matter.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6902478

---

### Footnotes

1    This Opinion draws on facts from the Amended Complaint ("FAC", Dkt. #42), which facts are taken as true for purposes of this motion. *See Faber v. Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)). For convenience, the City Defendants' moving brief is referred to as "City Br." (Dkt. #50); HHC's moving brief as "HHC Br." (Dkt. #48); Plaintiff's brief in joint opposition as "Pl. Opp." (Dkt. #56); the City Defendants' reply as "City Reply" (Dkt. #58); and HHC's reply as "HHC Reply" (Dkt. #57).

2    In an effort to be comprehensive, Plaintiff includes considerable detail in the FAC regarding his blood chemistry during the period of his confinement, including, for example, his hemoglobin A1C levels and milligrams of glucose per deciliter of blood (mg/dl). (*See, e.g.,* FAC ¶¶ 70, 72, 87-88). Plaintiff also alleges the appropriate blood sugar levels for a "well-managed" diabetic. (*See id.* at ¶ 85 (alleging that diabetic's blood sugar before meals should be between 70 and 130 mg/dl; two hours after meals, should be less than 180 mg/dl; and at bedtime, should be between 90 to 130 mg/dl)). This level of medical detail is usually presented and considered at the summary judgment stage, not on the pleadings. This Court's review of other courts' treatment of such medical details at the pleadings stage has not revealed perfect consistency in that treatment. The Court has considered Plaintiff's blood chemistry details, but does not believe that, in light of the FAC's overall allegations, the inclusion or exclusion of such details would impact the deliberate indifference analysis in this Opinion.

3    The Second Circuit has not indicated post-*Caiozzo* whether a different standard applies in the civil detention setting presented here. *Cf. Calhoun v. Umeasor*, No. 12 Civ. 7238 (AJN), 2014 WL 1229592, at *3 (S.D.N.Y. Mar. 21, 2014) (finding that *Caiozzo* obviated the need, when conducting a deliberate indifference to medical needs analysis, to resolve the factual issue of whether the plaintiff was criminally or civilly confined); *accord James v. Kaskiw*, No. 13 Civ. 526 (DNH), 2014 WL 3845086, at *3 (N.D.N.Y. Aug. 5, 2014). Nor does Plaintiff argue for a different standard based on his civil detention. (*See* FAC ¶¶ 9, 127, 152; Pl. Opp. 12-20). In light of *Caiozzo*'s holding, and for ease of reference, this Opinion refers only to the Eighth Amendment deliberate indifference framework, while recognizing that Plaintiff raises his deliberate indifference claim under both the Eighth and Fourteenth Amendments. (*See id.*).

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---